**ERIC BJORGUM (State Bar No. 198392)**
Eric.bjorgum@kb-ip.com
KARISH & BJORGUM PC
119 E. Union Street, Suite B
Pasadena, CA 91103
Telephone:   (213) 785-8070
Facsimile:   (213) 955-5010

Attorneys for Plaintiffs
Agustin Ramirez, Anthony Ramirez
and Agustin Ramirez, Jr.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| AGUSTIN RAMIREZ**,** ANTHONY RAMIREZ and AGUSTIN RAMIREZ, JR.<br><br>Plaintiffs,<br><br>vs.<br><br>MARTIN NAVARRO and DOES 1-10, inclusive,<br>Defendant | Case No. 5:20-cv-02408-SP<br><br>**DECLARATION OF ERIC BJORGUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF MARTIN NAVARRO**<br><br>Date:  December 6, 2022<br>Time: 11:00 a.m.<br>Judge: Sheri Pym<br>Courtroom: 3<br>Place: George E. Brown Jr. Federal Building<br>         3470 12th Street<br>         Riverside, California 92501<br><br>Trial Date:  February 27, 2023<br>Pre-Trial Conference:  February 14, 2023 |

1

## DECLARATION OF ERIC BJORGUM

I, ERIC BJORGUM, declare as follows:

1.      I am an attorney licensed to practice in the State of California.  I am a partner in the law firm of Karish & Bjorgum, PC, attorneys of record for Plaintiffs, Agustin Ramirez, Anthony Ramirez and Agustin Ramirez, Jr. ("Plaintiffs") in this action.  All facts contained herein are within my personal knowledge and, if called as a witness, I could and would competently testify thereto.  This Declaration is made in support of Plaintiffs' Motion for Summary Judgment.

2.      Attached hereto as Exhibit A is a true and correct copy of the trademark application for LOS CAMINANTES INC., U.S. Trademark App. Ser. No. 85829084, filed by Martin Navarro's corporation on January 22, 2013.

3.      Attached hereto as Exhibit B is a true and correct copy of relevant portions of the Office Action received in response to the application for LOS CAMINANTES INC.  It finds confusion with Plaintiffs' LOS CAMINANTES application.

5.      Attached hereto as Exhibit C is a true and correct copy of Martin Navarro's LOS CAMINANTES HN trademark application.

6.      Attached hereto as Exhibit D is a true and correct copy of the office action for the LOS CAMINANTES HN trademark application, finding confusion with Plaintiffs' registration.

7.      . Attached hereto as Exhibit E is a true and correct copy of LOS CAMINANTES H.N application.

8.      Attached hereto as Exhibit F is a true and correct copy of LOS CAMINANTES H.N office action finding confusion with Plaintiff's trademark.

9.      Attached hereto as Exhibit G are true and correct copies of the advertisements for LOS CAMINANTES-related shows by bands other than Plaintiff on May 13, 2022.

2

10. Attached hereto as Exhibit I is true and correct copy of Defendant Marrin Navarro's response to Plaintiffs' Interrogatories.

11. Attached hereto as Exhibit J are true and correct copies of the relevant portions of the deposition of Martin Navarro.

12. Attached hereto as Exhibit K is a true and correct copy of the Counterclaim of the Estate of Humbert Navarro in the 2011 trademark infringement suit filed by Plaintiffs against Martin Navarro.

13. Attached hereto as Exhibit L is a true and correct copy of the expert report submitted in this case. Navarro did not submit a rebuttal report.

14. During this litigation, Defendant Navarro never produced documents showing the number of shows he played each year.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on November 15, 2022 in Pasadena, California.

*/s/ Eric Bjorgum*
ERIC BJORGUM

P

# Exhibit A

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

## TEAS Plus Application

**Serial Number: 85829084**
**Filing Date: 01/22/2013**

*NOTE: Data fields with the \* are mandatory under TEAS Plus. The wording "(if applicable)" appears where the field is only mandatory under the facts of the particular application.*

---

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **TEAS Plus** | **YES** |
| **MARK INFORMATION** | |
| **\*MARK** | Los Caminantes Inc. |
| **\*STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | Los Caminantes Inc. |
| **\*MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| **\*OWNER OF MARK** | Los Caminantes Inc. |
| **\*STREET** | 123 N. Laurel Ave. |
| **\*CITY** | Ontario |
| **\*STATE** (Required for U.S. applicants) | California |
| **\*COUNTRY** | United States |
| **\*ZIP/POSTAL CODE** (Required for U.S. applicants only) | 91762 |
| **LEGAL ENTITY INFORMATION** | |
| **\*TYPE** | CORPORATION |
| **\* STATE/COUNTRY OF INCORPORATION** | California |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| **\*INTERNATIONAL CLASS** | 009 |
| **\*IDENTIFICATION** | Compact discs featuring music; Digital materials, namely, concerts and performances featuring performances provided through cable television, satellite cable, webcast, and video on demand; Digital music downloadable from the Internet; Downloadable musical sound recordings; Musical recordings; Musical sound recordings; Musical video recordings; Pre-recorded DVDs featuring musical |

| | |
|---|---|
| | **performances**; Prerecorded audio tapes featuring music; Prerecorded video cassettes featuring music; Prerecorded video tapes featuring music; Series of musical sound recordings; Visual recordings and audiovisual recordings featuring music and animation |
| *FILING BASIS | SECTION 1(b) |
| *INTERNATIONAL CLASS | 041 |
| *IDENTIFICATION | Entertainment in the nature of on-going television programs in the field of **music and concert performances provided through cable television, satellite cable, webcast, and video on demand**; Entertainment in the nature of visual and audio performances by **LIVE PERFORMANCES, ROAD SHOWS, LIVE STAGE EVENTS, LIVE MUSIC CONCERTS**; Entertainment services in the nature of live musical performances; Entertainment services in the nature of presenting live musical performances; Entertainment services in the nature of recording, production and post-production services in the field of music; Entertainment, namely, live music concerts; Entertainment, namely, live performances by musical bands; Music composition services; Music production services; Production of DVDs, videotapes and television programs featuring **musical performances**; Production of sound and music video recordings |
| *FILING BASIS | SECTION 1(b) |
| **ADDITIONAL STATEMENTS INFORMATION** | |
| *TRANSLATION (if applicable) | |
| *TRANSLITERATION (if applicable) | |
| *CLAIMED PRIOR REGISTRATION (if applicable) | |
| *CONSENT (NAME/LIKENESS) (if applicable) | |
| *CONCURRENT USE CLAIM (if applicable) | |
| **ATTORNEY INFORMATION** | |
| NAME | Allan Howard Grant |
| FIRM NAME | GRANT'S LAW FIRM |
| STREET | 17351 Greentree Drive |
| CITY | Riverside |
| STATE | California |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 92503 |
| PHONE | 9515445248 |
| EMAIL ADDRESS | allan_grant@sbcglobal.net |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **CORRESPONDENCE INFORMATION** | |
| *NAME | Allan Howard Grant |

| FIRM NAME | GRANT'S LAW FIRM |
|---|---|
| *STREET | 17351 Greentree Drive |
| *CITY | Riverside |
| *STATE<br>(Required for U.S. applicants) | California |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE | 92503 |
| PHONE | 9515445248 |
| *EMAIL ADDRESS | allan_grant@sbcglobal.net;allan@grants-law.com |
| *AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| NUMBER OF CLASSES | 2 |
| FEE PER CLASS | 275 |
| *TOTAL FEE PAID | 550 |
| **SIGNATURE INFORMATION** | |
| * SIGNATURE | / Allan Howard Grant / |
| * SIGNATORY'S NAME | Allan Howard Grant |
| * SIGNATORY'S POSITION | Attorney of Record, CA Bar No.: 213658 |
| SIGNATORY'S PHONE NUMBER | 951-544-5248 |
| * DATE SIGNED | 01/22/2013 |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

## TEAS Plus Application

**Serial Number: 85829084**
**Filing Date: 01/22/2013**

## To the Commissioner for Trademarks:

**MARK:** Los Caminantes Inc. (Standard Characters, see mark)
The literal element of the mark consists of Los Caminantes Inc..
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Los Caminantes Inc., a corporation of California, having an address of
   123 N. Laurel Ave.
   Ontario, California 91762
   United States

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

**For specific filing basis information for each item, you must view the display within the Input Table.**
   International Class 009:  Compact discs featuring music; Digital materials, namely, concerts and performances featuring performances provided through cable television, satellite cable, webcast, and video on demand; Digital music downloadable from the Internet; Downloadable musical sound recordings; Musical recordings; Musical sound recordings; Musical video recordings; Pre-recorded DVDs featuring musical performances; Prerecorded audio tapes featuring music; Prerecorded video cassettes featuring music; Prerecorded video tapes featuring music; Series of musical sound recordings; Visual recordings and audiovisual recordings featuring music and animation
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).

**For specific filing basis information for each item, you must view the display within the Input Table.**
   International Class 041:  Entertainment in the nature of on-going television programs in the field of music and concert performances provided through cable television, satellite cable, webcast, and video on demand; Entertainment in the nature of visual and audio performances by LIVE PERFORMANCES, ROAD SHOWS, LIVE STAGE EVENTS, LIVE MUSIC CONCERTS; Entertainment services in the nature of live musical performances; Entertainment services in the nature of presenting live musical performances; Entertainment services in the nature of recording, production and post-production services in the field of music; Entertainment, namely, live music concerts; Entertainment, namely, live performances by musical bands; Music composition services; Music production services; Production of DVDs, videotapes and television programs featuring musical performances; Production of sound and music video recordings
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).

The applicant's current Attorney Information:
   Allan Howard Grant of GRANT'S LAW FIRM
   17351 Greentree Drive
   Riverside, California 92503
   United States

The applicant's current Correspondence Information:
   Allan Howard Grant
   GRANT'S LAW FIRM
   17351 Greentree Drive
   Riverside, California 92503
   9515445248(phone)

allan_grant@sbcglobal.net;allan@grants-law.com (authorized)

A fee payment in the amount of $550 has been submitted with the application, representing payment for 2 class(es).

**Declaration**

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.


Signature: / Allan Howard Grant /   Date Signed: 01/22/2013
Signatory's Name: Allan Howard Grant
Signatory's Position: Attorney of Record, CA Bar No.: 213658


RAM Sale Number: 2035
RAM Accounting Date: 01/23/2013

Serial Number: 85829084
Internet Transmission Date: Tue Jan 22 15:14:43 EST 2013
TEAS Stamp: USPTO/FTK-XX.X.XXX.XX-201301221514431457
41-85829084-490199c08ec8a8ae831dc6a32c80
52afb6-CC-2035-20130122144540821292

# Los Caminantes Inc.

# Exhibit B

| | |
|---|---|
| **To:** | Los Caminantes Inc. (allan_grant@sbcglobal.net) |
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 85829084 - LOS CAMINANTES INC. - N/A |
| **Sent:** | 5/6/2013 9:54:42 PM |
| **Sent As:** | ECOM104@USPTO.GOV |
| **Attachments:** | Attachment - 1 |
| | Attachment - 2 |
| | Attachment - 3 |
| | Attachment - 4 |
| | Attachment - 5 |

**UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)**
**OFFICE ACTION (OFFICIAL LETTER) ABOUT APPLICANT'S TRADEMARK APPLICATION**

**U.S. APPLICATION SERIAL NO.** 85829084

**MARK:** LOS CAMINANTES INC.

**CORRESPONDENT ADDRESS:**
  ALLAN HOWARD GRANT
  GRANT'S LAW FIRM
  17351 GREENTREE DR
  RIVERSIDE, CA 92503-6762

**APPLICANT:** Los Caminantes Inc.

**CORRESPONDENT'S REFERENCE/DOCKET NO :**
  N/A
**CORRESPONDENT E-MAIL ADDRESS:**
  allan_grant@sbcglobal.net

**\*85829084\***

CLICK HERE TO RESPOND TO THIS LETTER:
http://www.uspto.gov/trademarks/teas/response_forms.jsp

# OFFICE ACTION

## STRICT DEADLINE TO RESPOND TO THIS LETTER

TO AVOID ABANDONMENT OF APPLICANT'S TRADEMARK APPLICATION, THE USPTO MUST RECEIVE APPLICANT'S COMPLETE RESPONSE TO THIS LETTER **WITHIN 6 MONTHS** OF THE ISSUE/MAILING DATE BELOW.

**ISSUE/MAILING DATE: 5/6/2013**

 The referenced application has been reviewed by the assigned trademark examining attorney.  Applicant must respond timely and completely to the issue(s) below.  15 U.S.C. §1062(b); 37 C.F.R. §§2.62(a), 2.65(a); TMEP §§711, 718.03.

**Search Results**

 The trademark examining attorney has searched the Office's  database of registered and pending marks and has found no conflicting marks that would bar registration under Trademark Act Section 2(d).  TMEP §704.02; *see* 15 U.S.C. §1052(d).

SUMMARY OF ISSUES that applicant must address:

- PRIOR PENDING APPLICATION
- IDENTIFICATION OF GOODS AND SERVICES
- TRANSLATION
- DISCLAIMER

PRIOR PENDING APPLICATION

The filing date of pending U.S. Application Serial No. 85767031 precedes applicant's filing date. See attached referenced application. If the mark in the referenced application registers, applicant's mark may be refused registration under Trademark Act Section 2(d) because of a likelihood of confusion between the two marks. *See* 15 U.S.C. §1052(d); 37 C.F.R. §2.83; TMEP §§1208 *et seq.* Therefore, upon receipt of applicant's response to this Office action, action on this application may be suspended pending final disposition of the earlier-filed referenced application.

In response to this Office action, applicant may present arguments in support of registration by addressing the issue of the potential conflict between applicant's mark and the mark in the referenced application. Applicant's election not to submit arguments at this time in no way limits applicant's right to address this issue later if a refusal under Section 2(d) issues.

IDENTIFICATION OF GOODS AND SERVICES

The wording "Digital materials, namely, concerts and performances featuring performances provided through cable television, satellite cable, webcast, and video on demand" in the identification of goods is indefinite and must be clarified because it is unclear whether the entry is identifying goods or services. Applicant must further specify the form/nature of the goods/services. *See* TMEP §1402.01. Applicant may substitute the following wording, if accurate: "Digital materials, namely, **{indicate form of the goods, e.g., downloadable audio-visual files, etc.}** featuring **{indicate subject matter or field, e.g., concerts} provided by webcast"**.

The wording "Entertainment in the nature of visual and audio performances by live performances, road shows, live stage events, live music concerts" in the identification of services is indefinite and must be clarified because applicant must specify who is giving the performances. *See* TMEP §1402.01. Applicant may substitute the following wording, if accurate: " **Entertainment in the nature of visual and audio live performances by {specify, e.g., actors, musical bands, dancers, etc.}".**

An applicant may amend an identification of goods and services only to clarify or limit the goods and service; adding to or broadening the scope of the goods and services is not permitted. 37 C.F.R. §2.71(a); *see* TMEP §§1402.06 *et seq.*, 1402.07 *et seq.*

For assistance with identifying and classifying goods and/or services in trademark applications, please see the USPTO's online searchable *U.S. Acceptable Identification of Goods and Services Manual* at http://tess2.uspto.gov/netahtml/tidm.html. *See* TMEP §1402.04.

TRANSLATION

Applicant must submit an English translation of all foreign wording in the mark. 37 C.F.R. §2.32(a)(9); *see* TMEP §809. In the present case, the wording " LOS CAMINANTES" requires translation.

The following translation statement is suggested:

**The English translation of "LOS CAMINANTES" in the mark is "THE WALKERS".**

TMEP §809.03.

DISCLAIMER REQUIRED

Applicant must disclaim the descriptive wording "INC." apart from the mark as shown because it merely describes applicant's entity type. INC. is defined as "incorporated". Please see the attached Internat dictionary definition.

Business entity designations such as "Corporation," "Inc.," "Company," and "Ltd." must be disclaimed because they merely indicate applicant's entity type and generally do not function to indicate the source of goods or services. TMEP §1213.03(d); *see, e.g., Goodyear's India Rubber Glove Mfg. Co. v. Goodyear Rubber Co.*, 128 U.S. 598, 602-03 (1888); *In re Patent & Trademark Servs., Inc.*, 49 USPQ2d 1537, 1539-40 (TTAB 1998); *In re The Paint Prods. Co.*, 8 USPQ2d 1863, 1866 (TTAB 1988).

Applicant may submit the following standardized format for a disclaimer:

**No claim is made to the exclusive right to use "INC." apart from the mark as shown.**

TMEP §1213.08(a)(i); *see In re Owatonna Tool Co.*, 231 USPQ 493 (Comm'r Pats. 1983).

ASSISTANCE

If applicant has questions regarding this Office action, please telephone or e-mail the assigned trademark examining attorney. All relevant e-mail communications will be placed in the official application record; however, an e-mail communication will not be accepted as a response to this Office action and will not extend the deadline for filing a proper response. *See* 37 C.F.R. §2.191; TMEP §§304.01-.02, 709.04-.05. Further, although the trademark examining attorney may provide additional explanation pertaining to the refusal(s) and/or requirement(s) in this Office action, the trademark examining attorney may not provide legal advice or statements about applicant's rights. *See* TMEP §§705.02, 709.06.

**TEAS PLUS APPLICANTS MUST SUBMIT DOCUMENTS ELECTRONICALLY OR SUBMIT FEE:** Applicants who filed their application online using the reduced-fee TEAS Plus application must continue to submit certain documents online using TEAS, including responses to Office actions. *See* 37 C.F.R. §2.23(a)(1). For a complete list of these documents, see TMEP §819.02(b). In addition, such applicants must accept correspondence from the Office via e-mail throughout the examination process and must maintain a valid e-mail address. 37 C.F.R. §2.23(a)(2); TMEP §§819, 819.02(a). TEAS Plus applicants who do not meet these requirements must submit an additional fee of $50 per international class of goods and/or services. 37 C.F.R. §2.6(a)(1)(iv); TMEP §819.04. In appropriate situations and where all issues can be resolved by amendment, responding by telephone to authorize an examiner's amendment will not incur this additional fee.

> /Carol Spils/
> Trademark Attorney
> Law Office 104
> (571)272-9226
> carol.spils@uspto.gov

**TO RESPOND TO THIS LETTER:** Go to http://www.uspto.gov/trademarks/teas/response_forms.jsp. Please wait 48-72 hours from the issue/mailing date before using the Trademark Electronic Application System (TEAS), to allow for necessary system updates of the application. For *technical* assistance with online forms, e-mail TEAS@uspto.gov. For questions about the Office action itself, please contact the assigned trademark examining attorney. **E-mail communications will not be accepted as responses to Office actions; therefore, do not respond to this Office action by e-mail.**

All informal e-mail communications relevant to this application will be placed in the official application record.

**WHO MUST SIGN THE RESPONSE:** It must be personally signed by an individual applicant or someone with legal authority to bind an applicant (i.e., a corporate officer, a general partner, all joint applicants). If an applicant is represented by an attorney, the attorney must sign the response.

**PERIODICALLY CHECK THE STATUS OF THE APPLICATION:** To ensure that applicant does not miss crucial deadlines or official notices, check the status of the application every three to four months using the Trademark Status and Document Retrieval (TSDR) system at http://tsdr.uspto.gov/. Please keep a copy of the TSDR status screen. If the status shows no change for more than six months, contact the Trademark Assistance Center by e-mail at TrademarkAssistanceCenter@uspto.gov or call 1-800-786-9199. For more information on checking status, see http://www.uspto.gov/trademarks/process/status/.

**TO UPDATE CORRESPONDENCE/E-MAIL ADDRESS:** Use the TEAS form at http://www.uspto.gov/trademarks/teas/correspondence.jsp.

**Print: May 6, 2013**                           **85767031**

**DESIGN MARK**

**Serial Number**
85767031

**Status**
SUSPENSION LETTER - MAILED

**Word Mark**
LOS CAMINANTES

**Standard Character Mark**
Yes

**Type of Mark**
SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
Ramirez, Anthony INDIVIDUAL UNITED STATES 10020 Spruce Ave Bloomington
CALIFORNIA 92316

**Owner**
Ramirez, Jr., Agustin INDIVIDUAL UNITED STATES 10020 Spruce Ave
Bloomington CALIFORNIA 92316

**Owner**
Ramirez, Agustin INDIVIDUAL UNITED STATES 10020 Spruce Ave Bloomington
CALIFORNIA 92316

**Goods/Services**
Class Status -- ACTIVE.  IC 041.  US  100 101 107.  G & S:
Entertainment in the nature of live performances by a musical group.
First Use: 1975/02/14.  First Use In Commerce: 1975/02/14.

**Translation Statement**
The English translation of "LOS CAMINANTES" in the mark is   "The
Walkers"

**Filing Date**
2012/10/30

**Examining Attorney**
BLOHM, LINDA E.

**Attorney of Record**

-1-

**Print: May 6, 2013**                    **85767031**

Steven J. Eyre

# LOS CAMINANTES

http://www.yourdictionary.com/inc        05/06/2013 08:14:23 PM





*Webster's New World College Dictionary* Copyright © 2010 by Wiley Publishing, Inc., Cleveland, Ohio.
Used by arrangement with John Wiley & Sons, Inc.

Ads by Google

**Free Online Dictionary** Check Spelling & Find Word Definitions Instantly-Get Free App! **www.FreeDefinitionNow.com**

### See inc in *American Heritage Dictionary 4*

*abbreviation*

**incorporated**

*The American Heritage® Dictionary of the English Language*, **4th edition** Copyright © 2010 by Houghton Mifflin Harcourt Publishing Company. Published by Houghton Mifflin Harcourt Publishing Company. All rights reserved.

### Learn more about inc

**Inc. investment & finance**

### Related Articles

**Business Word Abbreviations**

**Knitting Abbreviations**

**Crochet Abbreviations**

link/cite          print          suggestion box

**Also Mentioned In**

AOL Inc.
blog
charity
Cisco Systems, Inc.
inc
Inc.
McAfee, Inc.
NASD Regulation Inc.
North American Securities Administrators Association Inc.
primary dealers
» more results...

**Browse entries near inc**

| | |
|---|---|
| incurvate | indaba |
| incurve | indamine |
| incur | indebtedness |
| incuse | indebted |
| incus | indecency |

**More from YD**

About YourDictionary    Advertisers    Contact Us    Privacy Policy    Terms of Use    Bookmark Site    Help    Suggestion Box    Tools

© 1996-2013 LoveToKnow, Corp. All Rights Reserved. Audio pronunciation provided by LoveToKnow, Corp.

| | |
|---|---|
| **To:** | Los Caminantes Inc. (allan_grant@sbcglobal.net) |
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 85829084 - LOS CAMINANTES INC. - N/A |
| **Sent:** | 5/6/2013 9:54:43 PM |
| **Sent As:** | ECOM104@USPTO.GOV |
| **Attachments:** | |

## UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)

## IMPORTANT NOTICE REGARDING YOUR
## U.S. TRADEMARK APPLICATION

USPTO OFFICE ACTION (OFFICIAL LETTER) HAS ISSUED
ON **5/6/2013** FOR U.S. APPLICATION SERIAL NO. 85829084

Please follow the instructions below:

**(1)  TO READ THE LETTER:**  Click on this link or go to http://tsdr.uspto.gov, enter the U.S. application serial number, and click on "Documents."

The Office action may not be immediately viewable, to allow for necessary system updates of the application, but will be available within 24 hours of this e-mail notification.

**(2)  TIMELY RESPONSE IS REQUIRED:**  Please carefully review the Office action to determine (1) how to respond, and (2) the applicable response time period.  Your response deadline will be calculated from **5/6/2013** (*or sooner if specified in the Office action*).  For information regarding response time periods, see http://www.uspto.gov/trademarks/process/status/responsetime.jsp.

**Do NOT hit "Reply" to this e-mail notification, or otherwise e-mail your response** because the USPTO does NOT accept e-mails as responses to Office actions.  Instead, the USPTO recommends that you respond online using the Trademark Electronic Application System (TEAS) response form located at http://www.uspto.gov/trademarks/teas/response_forms.jsp.

**(3)  QUESTIONS:**  For questions about the contents of the Office action itself, please contact the assigned trademark examining attorney.  For *technical* assistance in accessing or viewing the Office action in the Trademark Status and Document Retrieval (TSDR) system, please e-mail TSDR@uspto.gov.

## WARNING

**Failure to file the required response by the applicable response deadline will result in the ABANDONMENT of your application.**  For more information regarding abandonment, see http://www.uspto.gov/trademarks/basics/abandon.jsp.

**PRIVATE COMPANY SOLICITATIONS REGARDING YOUR APPLICATION:**  Private companies **not** associated with the USPTO are using information provided in trademark applications to mail or e-mail trademark-related solicitations.  These companies often use names that closely resemble the USPTO and their solicitations may look like an official government document.  Many solicitations require that you pay "fees."

Please carefully review all correspondence you receive regarding this application to make sure that you are responding to an official document from the USPTO rather than a private company solicitation.  All official USPTO correspondence will be mailed only from the "United States Patent and Trademark Office" in Alexandria, VA; or sent by e-mail from the domain "@uspto.gov."  For more information on how to handle private company solicitations, see http://www.uspto.gov/trademarks/solicitation_warnings.jsp.

# Exhibit C

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1478 (Rev 09/2006)
OMB No. 0651-0009 (Exp 02/28/2018)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 87156115**
**Filing Date: 08/30/2016**

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 87156115 |
| **MARK INFORMATION** | |
| *MARK | \\TICRS\EXPORT16\IMAGEOUT 16\871\561\87156115\xml1\ RFA0002.JPG |
| SPECIAL FORM | YES |
| USPTO-GENERATED IMAGE | NO |
| LITERAL ELEMENT | Los Caminantes H.N. |
| COLOR MARK | YES |
| COLOR(S) CLAIMED (If applicable) | The color(s) Black and Gold is/are claimed as a feature of the mark. |
| *DESCRIPTION OF THE MARK (and Color Location, if applicable) | The mark consists of Gold cursive letters with black background. |
| PIXEL COUNT ACCEPTABLE | NO |
| PIXEL COUNT | 1980 x 845 |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | Navarro, Martin |
| *STREET | 16253 Magnolia Way |
| *CITY | Fontana |
| *STATE (Required for U.S. applicants) | California |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants) | 92336 |
| PHONE | 9092145194 |
| EMAIL ADDRESS | XXXX |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **LEGAL ENTITY INFORMATION** | |
| TYPE | individual |
| COUNTRY OF CITIZENSHIP | United States |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| INTERNATIONAL CLASS | 041 |

| | |
|---|---|
| **\*IDENTIFICATION** | Entertainment services in the nature of <span style="color:red">**Entertainment in the nature of on-going television programs in the field of music and concert performances provided through cable television, satellite cable, webcast, and video on demand; Entertainment in the nature of visual and audio performances by LIVE PERFORMANCES, ROAD SHOWS, LIVE STAGE EVENTS, LIVE MUSIC CONCERTS; Entertainment services in the nature of live musical performances; Entertainment services in the nature of presenting live musical performances; Entertainment services in the nature of recording, production and post-production services in the field of music; Entertainment, namely, live music concerts; Entertainment, namely, live performances by musical bands; Music composition services; Music production services; Production of DVDs, videotapes and television programs featuring musical performances; Production of sound and music video recordings**</span> |
| **FILING BASIS** | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 09/27/2011 |
| FIRST USE IN COMMERCE DATE | At least as early as 09/27/2011 |
| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT16\IMAGEOUT 16\871\561\87156115\xml1\ RFA0003.JPG |
| SPECIMEN DESCRIPTION | Gold cursive letters and black background |
| **CORRESPONDENCE INFORMATION** | |
| NAME | Navarro, Martin |
| STREET | 16253 Magnolia Way |
| CITY | Fontana |
| STATE | California |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 92336 |
| PHONE | 9092145194 |
| \*EMAIL ADDRESS | sun7676@yahoo.com |
| \*AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| APPLICATION FILING OPTION | TEAS RF |
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 275 |
| \*TOTAL FEE DUE | 275 |
| \*TOTAL FEE PAID | 275 |
| **SIGNATURE INFORMATION** | |
| SIGNATURE | /MARTIN NAVARRO/ |
| SIGNATORY'S NAME | Martin Navarro |
| SIGNATORY'S POSITION | Owner |

| | |
|---|---|
| **SIGNATORY'S PHONE NUMBER** | 9092145194 |
| **DATE SIGNED** | 08/30/2016 |

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1478 (Rev 09/2006)
OMB No. 0651-0009 (Exp 02/28/2018)

## Trademark/Service Mark Application, Principal Register

**Serial Number: 87156115**
**Filing Date: 08/30/2016**

## To the Commissioner for Trademarks:

**MARK:** Los Caminantes H.N. (stylized and/or with design, see mark)

The literal element of the mark consists of Los Caminantes H.N..
The color(s) Black and Gold is/are claimed as a feature of the mark. The mark consists of Gold cursive letters with black background.
The applicant, Martin Navarro, a citizen of United States, having an address of
   16253 Magnolia Way
   Fontana, California 92336
   United States
   9092145194(phone)
   XXXX

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

**For specific filing basis information for each item, you must view the display within the Input Table.**
   International Class 041:  Entertainment services in the nature of Entertainment in the nature of on-going television programs in the field of music and concert performances provided through cable television, satellite cable, webcast, and video on demand; Entertainment in the nature of visual and audio performances by LIVE PERFORMANCES, ROAD SHOWS, LIVE STAGE EVENTS, LIVE MUSIC CONCERTS; Entertainment services in the nature of live musical performances; Entertainment services in the nature of presenting live musical performances; Entertainment services in the nature of recording, production and post-production services in the field of music; Entertainment, namely, live music concerts; Entertainment, namely, live performances by musical bands; Music composition services; Music production services; Production of DVDs, videotapes and television programs featuring musical performances; Production of sound and music video recordings

In International Class 041, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 09/27/2011, and first used in commerce at least as early as 09/27/2011, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) Gold cursive letters and black background.
Specimen File1

The applicant's current Correspondence Information:
   Navarro, Martin
   16253 Magnolia Way
   Fontana, California 92336
   9092145194(phone)
   sun7676@yahoo.com (authorized)
**E-mail Authorization:** I authorize the USPTO to send e-mail correspondence concerning the application to the applicant or applicant's attorney at the e-mail address provided above. I understand that a valid e-mail address must be maintained and that the applicant or the applicant's attorney must file the relevant subsequent application-related submissions via the Trademark Electronic Application System (TEAS). Failure to do so will result in an additional processing fee of $50 per international class of goods/services.

A fee payment in the amount of $275 has been submitted with the application, representing payment for 1 class(es).

### Declaration

The signatory believes that: if the applicant is filing the application under 15 U.S.C. § 1051(a), the applicant is the owner of the trademark/service mark sought to be registered; the applicant is using the mark in commerce on or in connection with the goods/services in the

application; the specimen(s) shows the mark as used on or in connection with the goods/services in the application; and/or if the applicant filed an application under 15 U.S.C. § 1051(b), § 1126(d), and/or § 1126(e), the applicant is entitled to use the mark in commerce; the applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the goods/services in the application. The signatory believes that to the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive. The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

**Declaration Signature**

Signature: /MARTIN NAVARRO/   Date: 08/30/2016
Signatory's Name: Martin Navarro
Signatory's Position: Owner
RAM Sale Number: 87156115
RAM Accounting Date: 08/31/2016

Serial Number: 87156115
Internet Transmission Date: Tue Aug 30 22:37:11 EDT 2016
TEAS Stamp: USPTO/BAS-XX.XX.XXX.XX-20160830223711573
480-87156115-550509b9720d63db2788348b597
7a96abff9b7aa71e378b2e0d02feff55289-CC-6
084-20160830214905288869





# Exhibit D

| To: | Navarro, Martin (sun7676@yahoo.com) |
|---|---|
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 87156115 - LOS CAMINANTES HN - N/A |
| **Sent:** | 12/8/2016 5:31:57 PM |
| **Sent As:** | ECOM113@USPTO.GOV |
| **Attachments:** | Attachment - 1 |
| | Attachment - 2 |
| | Attachment - 3 |
| | Attachment - 4 |
| | Attachment - 5 |
| | Attachment - 6 |
| | Attachment - 7 |
| | Attachment - 8 |
| | Attachment - 9 |
| | Attachment - 10 |
| | Attachment - 11 |
| | Attachment - 12 |
| | Attachment - 13 |
| | Attachment - 14 |
| | Attachment - 15 |
| | Attachment - 16 |
| | Attachment - 17 |
| | Attachment - 18 |
| | Attachment - 19 |
| | Attachment - 20 |
| | Attachment - 21 |
| | Attachment - 22 |
| | Attachment - 23 |
| | Attachment - 24 |
| | Attachment - 25 |
| | Attachment - 26 |
| | Attachment - 27 |
| | Attachment - 28 |
| | Attachment - 29 |
| | Attachment - 30 |
| | Attachment - 31 |
| | Attachment - 32 |
| | Attachment - 33 |
| | Attachment - 34 |
| | Attachment - 35 |
| | Attachment - 36 |
| | Attachment - 37 |

**UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)**
**OFFICE ACTION (OFFICIAL LETTER) ABOUT APPLICANT'S TRADEMARK APPLICATION**

**U.S. APPLICATION SERIAL NO.** 87156115

**MARK:** LOS CAMINANTES HN

**\*87156115\***

CORRESPONDENT ADDRESS:
   NAVARRO, MARTIN
   16253 MAGNOLIA WAY
   FONTANA, CA 92336

**CLICK HERE TO RESPOND TO THIS LETTER:**
http://www.uspto.gov/trademarks/teas/response_forms.jsp

VIEW YOUR APPLICATION FILE

**APPLICANT:** Navarro, Martin

**CORRESPONDENT'S REFERENCE/DOCKET NO :**
   N/A
**CORRESPONDENT E-MAIL ADDRESS:**
   sun7676@yahoo.com

# OFFICE ACTION

## STRICT DEADLINE TO RESPOND TO THIS LETTER

TO AVOID ABANDONMENT OF APPLICANT'S TRADEMARK APPLICATION, THE USPTO MUST RECEIVE APPLICANT'S COMPLETE RESPONSE TO THIS LETTER **WITHIN 6 MONTHS** OF THE ISSUE/MAILING DATE BELOW.

**ISSUE/MAILING DATE: 12/8/2016**

The referenced application has been reviewed by the assigned trademark examining attorney. Applicant must respond timely and completely to the issues below. 15 U.S.C. §1062(b); 37 C.F.R. §§2.62(a), 2.65(a); TMEP §§711, 718.03.

## SUMMARY OF ISSUES

In response to this Office action, applicant must address the following issues:

   (1)   Section 2(d) Refusal – Likelihood of Confusion;
   (2)   Specimen Refusal – Specimen Consists Of Mark Drawing Only;
   (3)   Amendment Required – Identification Of Services Is Indefinite;
   (4)   Amendment To Description Of Mark Required;
   (5)   English Translation Required;
   (6)   Explanation Of Mark's Significance Required.

## SECTION 2(d) REFUSAL – LIKELIHOOD OF CONFUSION

Registration of the applied-for mark is refused because of a likelihood of confusion with the mark in U.S. Registration No. 4410019. Trademark Act Section 2(d), 15 U.S.C. §1052(d); *see* TMEP §§1207.01 *et seq*. *See the attached registration.*

### Standard of Analysis for Section 2(d) Refusal

Trademark Act Section 2(d) bars registration of an applied-for mark that so resembles a registered mark that it is likely a potential consumer would be confused, mistaken, or deceived as to the source of the services of the applicant and registrant. *See* 15 U.S.C. §1052(d). A determination of likelihood of confusion under Section 2(d) is made on a case-by case basis and the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ 563, 567 (C.C.P.A. 1973) aid in this determination. *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 1349, 98 USPQ2d 1253, 1256 (Fed. Cir. 2011) (citing *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085, 56 USPQ2d 1471, 1474 (Fed. Cir. 2000)). Not all the *du Pont* factors, however, are necessarily relevant or of equal weight, and any one of the factors may control in a given case, depending upon the evidence of record. *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d at 1355, 98 USPQ2d at 1260; *In re Majestic Distilling Co.*, 315 F.3d 1311, 1315, 65 USPQ2d 1201, 1204 (Fed. Cir. 2003); *see In re E. I. du Pont de Nemours & Co.*, 476 F.2d at 1361-62, 177 USPQ at 567.

In this case, the following factors are the most relevant: similarity of the marks, similarity and nature of the services, and similarity of the trade channels of the services. *See In re Viterra Inc.*, 671 F.3d 1358, 1361-62, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012); *In re Dakin's Miniatures Inc.*, 59 USPQ2d 1593, 1595-96 (TTAB 1999); TMEP §§1207.01 *et seq*.

### Facts

Applicant has applied to register the mark **LOS CAMINANTES H N** *in stylized form* for use on "Entertainment services in the nature of Entertainment in the nature of on-going television programs in the field of music and concert performances provided through cable television, satellite cable, webcast, and video on demand; Entertainment in the nature of visual and audio performances by LIVE PERFORMANCES, ROAD SHOWS, LIVE STAGE EVENTS, LIVE MUSIC CONCERTS; Entertainment services in the nature of live musical performances; Entertainment services in the nature of presenting live musical performances; Entertainment services in the nature of recording, production and post-production services in the field of music; Entertainment, namely, live music concerts; Entertainment, namely, live performances by musical bands; Music composition services; Music production services; Production of DVDs, videotapes and television programs featuring musical performances; Production of sound and music video recordings" in International Class 41.

U.S. Registration No. 4410019 for the mark **LOS CAMINANTES** is used in connection with "Entertainment in the nature of live performances by a musical group" in International Class 41.

**Similarity of the Marks**

Marks are compared in their entireties for similarities in appearance, sound, connotation, and commercial impression. *Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 1321, 110 USPQ2d 1157, 1160 (Fed. Cir. 2014) (quoting *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F. 3d 1369, 1371, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005)); TMEP §1207.01(b)-(b)(v). "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014) (citing *In re 1st USA Realty Prof'ls, Inc.* , 84 USPQ2d 1581, 1586 (TTAB 2007)); *In re White Swan Ltd.*, 8 USPQ2d 1534, 1535 (TTAB 1988)); TMEP §1207.01(b).

In this case, applicant's mark, **LOS CAMINANTES H N** *in stylized form*, is confusingly similar to registrant's mark, **LOS CAMINANTES**, because the marks are highly similar in sound, appearance, connotation, and commercial impression. Specifically, the marks share the dominant wording **LOS CAMINANTES**, and this wording may be pronounced and displayed identically, thereby creating similarities in sound and appearance. Moreover, the wording **LOS CAMINANTES**, being Spanish for "the walkers", appears to be arbitrary in the context of the identified services; therefore, this wording conveys a similar meaning and creates a similar commercial impression of being arbitrary wording in both marks. *See* Google Translate, https://translate.google.com/#auto/en/los%20caminantes.

Although marks are compared in their entireties, one feature of a mark may be more significant or dominant in creating a commercial impression. *See In re Viterra Inc.*, 671 F.3d 1358, 1362, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012); *In re Nat'l Data Corp.* , 753 F.2d 1056, 1058, 224 USPQ 749, 751 (Fed. Cir. 1985); TMEP §1207.01(b)(viii), (c)(ii). Greater weight is often given to this dominant feature when determining whether marks are confusingly similar. *See In re Nat'l Data Corp.* , 753 F.2d at 1058, 224 USPQ at 751.

The wording **LOS CAMINANTES** is the dominant feature of the marks. Consumers are generally more inclined to focus on the first word, prefix, or syllable in any trademark or service mark. *See Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1372, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005) ("VEUVE . . . remains a 'prominent feature' as the first word in the mark and the first word to appear on the label"); *In re Integrated Embedded*, ___ USPQ2d ___, ___, Ser. No. 86140341, 2016 TTAB LEXIS 470, at *30-31 (Sept. 27, 2016) ("[T]he dominance of BARR in [a]pplicant's mark BARR GROUP is reinforced by its location as the first word in the mark."); *Presto Prods., Inc. v. Nice-Pak Prods., Inc.*, 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered" when making purchasing decisions). In this case, the wording **LOS CAMINANTES** is the first wording to appear in the applied-for mark and the only wording to appear in the registered mark; therefore, this wording is the dominant feature upon which consumers are likely to focus. The marks are identical with respect to this shared dominant element.

The applied-for mark contains the additional letters **H N**; however, the presence of these additional letters does not obviate the similarities between the marks. Specifically, applicant merely adds these letters to an already registered mark, and adding a term to a registered mark generally does not obviate the similarity between the compared marks, as in the present case, nor does it overcome a likelihood of confusion under Section 2(d). *See Coca-Cola Bottling Co. v. Jos. E. Seagram & Sons, Inc.*, 526 F.2d 556, 557, 188 USPQ 105, 106 (C.C.P.A. 1975) (finding BENGAL and BENGAL LANCER and design confusingly similar); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1269 (TTAB 2009) (finding TITAN and VANTAGE TITAN confusingly similar); *In re El Torito Rests., Inc.*, 9 USPQ2d 2002, 2004 (TTAB 1988) (finding MACHO and MACHO COMBOS confusingly similar); TMEP §1207.01(b)(iii). In the present case, the marks are identical in part. Accordingly, the presence of the additional letters does not obviate the similarities between the marks.

The applied-for mark also contains stylization elements; however, the presence of this stylization does not obviate the similarities between the marks. For a composite mark containing both words and a design, the word portion may be more likely to indicate the origin of the services because it is that portion of the mark that consumers use when referring to or requesting the services. *Bond v. Taylor*, 119 USPQ2d 1049, 1055 (TTAB 2016) (citing *In re Viterra Inc.*, 671 F.3d 1358, 1362, 101 USPQ2d 1905, 1908, 1911 (Fed. Cir. 2012)); TMEP §1207.01(c)(ii). Thus, although such marks must be compared in their entireties, the word portion is often considered the dominant feature and is accorded greater weight in determining whether marks are confusingly similar, even where the word portion has been disclaimed. *In re Viterra Inc.*, 671 F.3d at 1366-67, 101 USPQ2d at 1911 (citing *Giant Food, Inc. v. Nation's Foodservice, Inc.* , 710 F.2d 1565, 1570-71, 218 USPQ2d 390, 395 (Fed. Cir. 1983)).

In the present case, the dominant word portions of the marks are identical in appearance, sound, connotation, and commercial impression; therefore, the addition of stylization does not obviate the similarity of the marks in this case. *See In re Shell Oil Co.*, 992 F.2d 1204, 1206, 26 USPQ2d 1687, 1688 (Fed. Cir. 1993); TMEP §1207.01(c)(ii).

Ultimately, applicant's mark is likely to cause confusion with registrant's mark because the similarities in sound, appearance, and connotation create the same overall commercial impression in the minds of consumers.  Thus the marks are confusingly similar.

### Relatedness of Services

The services of the parties need not be identical or even competitive to find a likelihood of confusion. *See On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 1086, 56 USPQ2d 1471, 1475 (Fed. Cir. 2000); *Recot, Inc. v. Becton*, 214 F.3d 1322, 1329, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000) ("[E]ven if the services in question are different from, and thus not related to, one another in kind, the same services can be related in the mind of the consuming public as to the origin of the services."); TMEP §1207.01(a)(i).

The respective services need only be "related in some manner and/or if the circumstances surrounding their marketing [be] such that they could give rise to the mistaken belief that [the services] emanate from the same source." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012) (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)); TMEP §1207.01(a)(i).

The application identifies "Entertainment services in the nature of Entertainment in the nature of on-going television programs in the field of music and concert performances provided through cable television, satellite cable, webcast, and video on demand; Entertainment in the nature of visual and audio performances by LIVE PERFORMANCES, ROAD SHOWS, LIVE STAGE EVENTS, LIVE MUSIC CONCERTS; Entertainment services in the nature of live musical performances; Entertainment services in the nature of presenting live musical performances; Entertainment services in the nature of recording, production and post-production services in the field of music; Entertainment, namely, live music concerts; Entertainment, namely, live performances by musical bands; Music composition services; Music production services; Production of DVDs, videotapes and television programs featuring musical performances; Production of sound and music video recordings" in International Class 41.

U.S. Registration No. 4410019 for the mark **LOS CAMINANTES** is used in connection with "Entertainment in the nature of live performances by a musical group" in International Class 41.

In the present case, applicant's services are related to registrant's services because the same entity that provides "Entertainment in the nature of live performances by a musical group" also commonly provides "Entertainment services in the nature of Entertainment in the nature of on-going television programs in the field of music and concert performances provided through cable television, satellite cable, webcast, and video on demand; Entertainment in the nature of visual and audio performances by LIVE PERFORMANCES, ROAD SHOWS, LIVE STAGE EVENTS, LIVE MUSIC CONCERTS; Entertainment services in the nature of live musical performances; Entertainment services in the nature of presenting live musical performances; Entertainment services in the nature of recording, production and post-production services in the field of music; Entertainment, namely, live music concerts; Entertainment, namely, live performances by musical bands; Music composition services; Music production services; Production of DVDs, videotapes and television programs featuring musical performances; Production of sound and music video recordings", and these services are all marketed together to consumers under a common mark.  Moreover, these services are sold through the same channels of trade and used by the same class of consumers in the same fields of use.

The attached Internet evidence consists of websites for third-party providers of music and entertainment services, such as those identified in the application and registration.  For example, The Wiggles is a musical group that offers entertainment services in the nature of live musical performances and an ongoing television program featuring music.  Similarly, PPS is a provider of music and entertainment services that offers consumers live musical performances, music recording and production services, concerts, music composition services, and production of DVDs, videotapes, and sound and music video recordings.  This evidence establishes that the same entity commonly provides the relevant services and markets the services under the same mark, that the relevant services are sold or provided through the same trade channels and used by the same classes of consumers in the same fields of use, and that the services are similar or complementary in terms of purpose or function.  Therefore, applicant's and registrant's services are considered related for likelihood of confusion purposes.  *See, e.g., In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1202-04 (TTAB 2009); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1268-69, 1271-72 (TTAB 2009).

The Wiggles, http://www.thewiggles.com/watch; http://www.thewiggles.com/tours/notfound; http://baltimore.broadway.com/shows/wiggles-wiggle-town-north-american-tour/;
Austin City Limits, http://acltv.com/; http://austincitylimits.com/; https://www.aclfestival.com/;
Imagination Movers, http://www.imaginationmovers.com/events; http://www.imaginationmovers.com/season3/;
PPS, http://performanceproductionservices.com/production-rates/; http://performanceproductionservices.com/music-production/;
iMusicRain, http://www.imusicrain.com/events-and-performances.html;
Farley Music Services, http://www.farleymusicandart.com/farley-music-services;

UC San Diego, http://musicweb.ucsd.edu/about/about-pages.php?i=413; http://musicweb.ucsd.edu/about/musicians_referral.php; http://musicweb.ucsd.edu/media/discography.php; http://musicweb.ucsd.edu/concerts/; http://musicweb.ucsd.edu/media/audio_video.php; http://musicweb.ucsd.edu/about/about-pages.php?i=403;

Evidence obtained from the Internet may be used to support a determination under Section 2(d) that services are related. *See, e.g., In re G.B.I. Tile & Stone, Inc.*, 92 USPQ2d 1366, 1371 (TTAB 2009); *In re Paper Doll Promotions, Inc.*, 84 USPQ2d 1660, 1668 (TTAB 2007). The Internet has become integral to daily life in the United States, with Census Bureau data showing approximately three-quarters of American households used the Internet in 2013 to engage in personal communications, to obtain news, information, and entertainment, and to do banking and shopping. *See In re Nieves & Nieves LLC*, 113 USPQ2d 1639, 1642 (TTAB 2015) (taking judicial notice of the following two official government publications: (1) Thom File & Camille Ryan, U.S. Census Bureau, Am. Cmty. Survey Reports ACS-28, *Computer & Internet Use in the United States: 2013* (2014), *available at* http://www.census.gov/content/dam/Census/library/publications/2014/acs/acs-28.pdf, and (2) The Nat'l Telecomms. & Info. Admin. & Econ. & Statistics Admin., *Exploring the Digital Nation: America's Emerging Online Experience* (2013), *available at* http://www.ntia.doc.gov/files/ntia/publications/exploring_the_digital_nation_-_americas_emerging_online_experience.pdf). Thus, the widespread use of the Internet in the United States suggests that Internet evidence may be probative of public perception in trademark examination.

Therefore, because the marks are confusingly similar and the services are closely related, purchasers encountering these services are likely to believe, mistakenly, that they emanate from a common source. Accordingly, there is a likelihood of confusion and registration is refused pursuant to Section 2(d) of the Trademark Act.

Applicant should note the following additional ground for refusal.

**SPECIMEN REFUSAL – SPECIMEN CONSISTS OF MARK DRAWING ONLY**

Registration is refused because the specimen in International Class 41 is merely a photocopy of the drawing or a picture or rendering of the applied-for mark, and thus fails to show the applied-for mark in use in commerce with the services for each international class. Trademark Act Sections 1 and 45, 15 U.S.C. §§1051, 1127; 37 C.F.R. §§2.34(a)(1)(iv), 2.56(a); *In re Chica*, 84 USPQ2d 1845, 1848 (TTAB 2007); TMEP §§904, 904.07(a), 1301.04(g)(i).

An application based on Trademark Act Section 1(a) must include a specimen showing the applied-for mark in use in commerce for each international class of services identified in the application or amendment to allege use. 15 U.S.C. §1051(a)(1); 37 C.F.R. §§2.34(a)(1)(iv), 2.56(a); TMEP §§904, 904.07(a).

Examples of specimens for services include advertising and marketing materials, brochures, photographs of business signage and billboards, and webpages that show the mark used in the actual sale, rendering, or advertising of the services. *See* TMEP §1301.04(a), (h)(iv)(C). Specimens comprising advertising and promotional materials must show a direct association between the mark and the services. TMEP §1301.04(f)(ii).

Applicant may respond to this refusal by satisfying one of the following for each applicable international class:

(1) Submit a different specimen (a verified "substitute" specimen ) that (a) was in actual use in commerce at least as early as the filing date of the application or prior to the filing of an amendment to allege use and (b) shows the mark in actual use in commerce for the services identified in the application or amendment to allege use. A "verified substitute specimen" is a specimen that is accompanied by the following statement made in a signed affidavit or supported by a declaration under 37 C.F.R. §2.20: "The substitute (or new, or originally submitted, if appropriate) specimens were in use in commerce at least as early as the filing date of the application or prior to the filing of the amendment to allege use." The substitute specimen cannot be accepted without this statement.

(2) Amend the filing basis to intent to use under Section 1(b), for which no specimen is required. This option will later necessitate additional fees and filing requirements such as providing a specimen.

For an overview of *both* response options referenced above and instructions on how to satisfy either option online using the Trademark Electronic Application System (TEAS) form, please go to http://www.uspto.gov/trademarks/law/specimen.jsp.

Although applicant's mark has been refused registration, applicant may respond to the refusals by submitting evidence and arguments in support of registration. However, if applicant responds to the refusals, applicant must also respond to the requirements set forth below.

**AMENDMENT REQUIRED – IDENTIFICATION OF SERVICES IS INDEFINITE**

The wording "Entertainment services in the nature of Entertainment in the nature of on-going television programs in the field of music and concert performances provided through cable television, satellite cable, webcast, and video on demand" in the identification of services is

indefinite and must be clarified because the duplicate wording "Entertainment services in the nature of" creates ambiguity regarding the exact nature of the services. *See* 37 C.F.R. §2.32(a)(6); TMEP §1402.01. Applicant must therefore clarify this wording by either further specifying the exact nature or purpose of the services or by deleting the duplicative wording.

The wording "Entertainment in the nature of visual and audio performances by LIVE PERFORMANCES, ROAD SHOWS, LIVE STAGE EVENTS, LIVE MUSIC CONCERTS" in the identification of services is indefinite and must be clarified because the wording following "by" does not identify the nature or type of performer, but rather, identifies an event type. *See* 37 C.F.R. §2.32(a)(6); TMEP §1402.01. Applicant must therefore clarify this wording by further specifying the exact nature or purpose of the services and also specifying by whom the services are performed.

Applicant may substitute the following wording, if accurate:

Class 41 – "Entertainment in the nature of on-going television programs in the field of music and concert performances provided through cable television, satellite cable, webcast, and video on demand; Entertainment in the nature of visual and audio performances, **namely,** live performances, road shows, live stage events, **and** live music concerts, **all performed by** {*applicant to clarify nature of group or individual providing services, e.g. "a musical band"*}; Entertainment services in the nature of live musical performances; Entertainment services in the nature of presenting live musical performances; Entertainment services in the nature of recording, production and post-production services in the field of music; Entertainment, namely, live music concerts; Entertainment, namely, live performances by musical bands; Music composition services; Music production services; Production of DVDs, videotapes and television programs featuring musical performances; Production of sound and music video recordings"

*See* TMEP §§1402.01, 1402.03.

Applicant's services may be clarified or limited, but may not be expanded beyond those originally itemized in the application or as acceptably amended. *See* 37 C.F.R. §2.71(a); TMEP §1402.06. Applicant may clarify or limit the identification by inserting qualifying language or deleting items to result in a more specific identification; however, applicant may not substitute different services or add services not found or encompassed by those in the original application or as acceptably amended. *See* TMEP §1402.06(a)-(b). The scope of the services sets the outer limit for any changes to the identification and is generally determined by the ordinary meaning of the wording in the identification. TMEP §§1402.06(b), 1402.07(a)-(b). Any acceptable changes to the services will further limit scope, and once services are deleted, they are not permitted to be reinserted. TMEP §1402.07(e).

For assistance with identifying and classifying goods and services in trademark applications, please see the USPTO's online searchable *U.S. Acceptable Identification of Goods and Services Manual*. *See* TMEP §1402.04.

**AMENDMENT TO DESCRIPTION OF MARK REQUIRED**

Applicant must provide a complete mark description because the mark description in the application does not include all elements shown in the mark. A complete mark description for a mark depicted in color must identify all the literal and design elements in the mark and specify where the colors appear in those elements. *See* 37 C.F.R. §§2.37, 2.52(b)(1); TMEP §807.07(a)-(a)(ii).

If black, white, and/or gray are not being claimed as a color feature of the mark, applicant must exclude them from the color claim and include in the mark description a statement that the colors black, white, and/or gray represent background, outlining, shading, and/or transparent areas and are not part of the mark. *See* TMEP §807.07(d).

The following mark description is suggested, if accurate:

**The mark consists of the wording "LOS CAMINANTES H N" in gold stylized lettering on a black background.**

**ENGLISH TRANSLATION REQUIRED**

Applicant must submit an English translation of all foreign wording in the mark. 37 C.F.R. §§2.32(a)(9), 2.61(b); *see* TMEP §809. In the present case, the wording "**LOS CAMINANTES**" requires translation.

The following translation statement is suggested:

**The English translation of the word "LOS CAMINANTES" in the mark is "the walkers".**

TMEP §809.03. *See attached translation evidence*.

**EXPLANATION OF MARK'S SIGNIFICANCE REQUIRED**

Applicant must specify whether the letters " **H N**" have any significance in the music and entertainment trade or industry or as applied to the services described in the application, or if such letters represent a "term of art" within applicant's industry. *See* 37 C.F.R. §2.61(b); TMEP §814.

Failure to respond to a request for information is an additional ground for refusing registration. *See In re Cheezwhse.com, Inc.*, 85 USPQ2d 1917, 1919 (TTAB 2008); *In re DTI P'ship LLP* , 67 USPQ2d 1699, 1701 (TTAB 2003); TMEP §814.

**RESPONSE GUIDELINES**

For this application to proceed further, applicant must explicitly address each refusal and/or requirement raised in this Office action. If the action includes a refusal, applicant may provide arguments and/or evidence as to why the refusal should be withdrawn and the mark should register. Applicant may also have other options specified in this Office action for responding to a refusal, and should consider those options carefully. To respond to requirements and certain refusal response options, applicant should set forth in writing the required changes or statements.

In addition, because applicant filed a TEAS Plus application, applicant must respond online using the Trademark Electronic Application System (TEAS) to avoid incurring an additional fee. *See* 37 C.F.R. §2.22(b)(1), (c). For more information and general tips on responding to USPTO Office actions, response options, and how to file a response online, see "Responding to Office Actions" on the USPTO's website.

If applicant does not respond to this Office action within six months of the issue/mailing date, or responds by expressly abandoning the application, the application process will end and the trademark will fail to register. *See* 15 U.S.C. §1062(b); 37 C.F.R. §§2.65(a), 2.68(a); TMEP §§718.01, 718.02. Additionally, the USPTO will not refund the application filing fee, which is a required processing fee. *See* 37 C.F.R. §§2.6(a)(1)(i)-(iv), 2.209(a); TMEP §405.04.

Where the application has been abandoned for failure to respond to an Office action, applicant's only option would be to file a timely petition to revive the application, which, if granted, would allow the application to return to active status. *See* 37 C.F.R. §2.66; TMEP §1714. There is a $100 fee for such petitions. *See* 37 C.F.R. §§2.6(a)(15), 2.66(b)(1).

If applicant has questions regarding this Office action, please telephone or e-mail the assigned trademark examining attorney. All relevant e-mail communications will be placed in the official application record; however, an e-mail communication will not be accepted as a response to this Office action and will not extend the deadline for filing a proper response. *See* 37 C.F.R. §§2.62(c), 2.191; TMEP §§304.01-.02, 709.04-.05. Further, although the trademark examining attorney may provide additional explanation pertaining to the refusals or requirements in this Office action, the trademark examining attorney may not provide legal advice or statements about applicant's rights. *See* TMEP §§705.02, 709.06.

**TEAS PLUS OR TEAS REDUCED FEE (TEAS RF) APPLICANTS – TO MAINTAIN LOWER FEE, ADDITIONAL REQUIREMENTS MUST BE MET, INCLUDING SUBMITTING DOCUMENTS ONLINE:** Applicants who filed their application online using the lower-fee TEAS Plus or TEAS RF application form must (1) file certain documents online using TEAS, including responses to Office actions (see TMEP §§819.02(b), 820.02(b) for a complete list of these documents); (2) maintain a valid e-mail correspondence address; and (3) agree to receive correspondence from the USPTO by e-mail throughout the prosecution of the application. *See* 37 C.F.R. §§2.22(b), 2.23(b); TMEP §§819, 820. TEAS Plus or TEAS RF applicants who do not meet these requirements must submit an additional processing fee of $50 per international class of services. 37 C.F.R. §§2.6(a)(1)(v), 2.22(c), 2.23(c); TMEP §§819.04, 820.04. However, in certain situations, TEAS Plus or TEAS RF applicants may respond to an Office action by authorizing an examiner's amendment by telephone or e-mail without incurring this additional fee.

/Seth Dennis/
Examining Attorney
Law Office 113
(571) 272-9495
seth.dennis@uspto.gov

**TO RESPOND TO THIS LETTER:** Go to http://www.uspto.gov/trademarks/teas/response_forms.jsp. Please wait 48-72 hours from the issue/mailing date before using the Trademark Electronic Application System (TEAS), to allow for necessary system updates of the application. For *technical* assistance with online forms, e-mail TEAS@uspto.gov. For questions about the Office action itself, please contact the assigned trademark examining attorney. **E-mail communications will not be accepted as responses to Office actions; therefore, do not respond to this Office action by e-mail.**

**All informal e-mail communications relevant to this application will be placed in the official application record.**

**WHO MUST SIGN THE RESPONSE:** It must be personally signed by an individual applicant or someone with legal authority to bind an applicant (i.e., a corporate officer, a general partner, all joint applicants). If an applicant is represented by an attorney, the attorney must sign the response.

**PERIODICALLY CHECK THE STATUS OF THE APPLICATION:** To ensure that applicant does not miss crucial deadlines or official notices, check the status of the application every three to four months using the Trademark Status and Document Retrieval (TSDR) system at http://tsdr.uspto.gov/. Please keep a copy of the TSDR status screen. If the status shows no change for more than six months, contact the Trademark Assistance Center by e-mail at TrademarkAssistanceCenter@uspto.gov or call 1-800-786-9199. For more information on checking status, see http://www.uspto.gov/trademarks/process/status/.

**TO UPDATE CORRESPONDENCE/E-MAIL ADDRESS:** Use the TEAS form at http://www.uspto.gov/trademarks/teas/correspondence.jsp.

**Print: Dec 8, 2016**                **85767031**

**DESIGN MARK**

**Serial Number**
85767031

**Status**
REGISTERED

**Word Mark**
LOS CAMINANTES

**Standard Character Mark**
Yes

**Registration Number**
4410019

**Date Registered**
2013/10/01

**Type of Mark**
SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
Ramirez, Anthony INDIVIDUAL UNITED STATES 10020 Spruce Ave Bloomington
CALIFORNIA 92316

**Owner**
Ramirez, Jr., Agustin INDIVIDUAL UNITED STATES 10020 Spruce Ave
Bloomington CALIFORNIA 92316

**Owner**
Ramirez, Agustin INDIVIDUAL UNITED STATES 10020 Spruce Ave Bloomington
CALIFORNIA 92316

**Goods/Services**
Class Status -- ACTIVE. IC 041. US 100 101 107. G & S:
Entertainment in the nature of live performances by a musical group.
First Use: 1975/02/14. First Use In Commerce: 1975/02/14.

**Translation Statement**
The English translation of "LOS CAMINANTES" in the mark is  "The
Walkers"

**Filing Date**

-1-

**Print: Dec 8, 2016**                    **85767031**

2012/10/30

**Examining Attorney**
BLOHM, LINDA E.

**Attorney of Record**
Steven J. Eyre

# Exhibit E

| | |
|---|---|
| **To:** | Navarro, Martin (sun7676@yahoo.com) |
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 87156115 - LOS CAMINANTES HN - N/A |
| **Sent:** | 12/8/2016 5:31:57 PM |
| **Sent As:** | ECOM113@USPTO.GOV |
| **Attachments:** | Attachment - 1 |
| | Attachment - 2 |
| | Attachment - 3 |
| | Attachment - 4 |
| | Attachment - 5 |
| | Attachment - 6 |
| | Attachment - 7 |
| | Attachment - 8 |
| | Attachment - 9 |
| | Attachment - 10 |
| | Attachment - 11 |
| | Attachment - 12 |
| | Attachment - 13 |
| | Attachment - 14 |
| | Attachment - 15 |
| | Attachment - 16 |
| | Attachment - 17 |
| | Attachment - 18 |
| | Attachment - 19 |
| | Attachment - 20 |
| | Attachment - 21 |
| | Attachment - 22 |
| | Attachment - 23 |
| | Attachment - 24 |
| | Attachment - 25 |
| | Attachment - 26 |
| | Attachment - 27 |
| | Attachment - 28 |
| | Attachment - 29 |
| | Attachment - 30 |
| | Attachment - 31 |
| | Attachment - 32 |
| | Attachment - 33 |
| | Attachment - 34 |
| | Attachment - 35 |
| | Attachment - 36 |
| | Attachment - 37 |

**UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)**
**OFFICE ACTION (OFFICIAL LETTER) ABOUT APPLICANT'S TRADEMARK APPLICATION**

**U.S. APPLICATION SERIAL NO.**  87156115

**MARK:** LOS CAMINANTES HN

# *87156115*

CORRESPONDENT ADDRESS:
    NAVARRO, MARTIN
    16253 MAGNOLIA WAY
    FONTANA, CA 92336

CLICK HERE TO RESPOND TO THIS LETTER:
http://www.uspto.gov/trademarks/teas/response_forms.jsp

VIEW YOUR APPLICATION FILE

**APPLICANT:** Navarro, Martin

**CORRESPONDENT'S REFERENCE/DOCKET NO :**
    N/A
**CORRESPONDENT E-MAIL ADDRESS:**
    sun7676@yahoo.com

# OFFICE ACTION

# STRICT DEADLINE TO RESPOND TO THIS LETTER

TO AVOID ABANDONMENT OF APPLICANT'S TRADEMARK APPLICATION, THE USPTO MUST RECEIVE APPLICANT'S COMPLETE RESPONSE TO THIS LETTER **WITHIN 6 MONTHS** OF THE ISSUE/MAILING DATE BELOW.

**ISSUE/MAILING DATE:** 12/8/2016

The referenced application has been reviewed by the assigned trademark examining attorney.  Applicant must respond timely and completely to the issues below.  15 U.S.C. §1062(b); 37 C.F.R. §§2.62(a), 2.65(a); TMEP §§711, 718.03.

## SUMMARY OF ISSUES

In response to this Office action, applicant must address the following issues:

    (1)    Section 2(d) Refusal – Likelihood of Confusion;
    (2)    Specimen Refusal – Specimen Consists Of Mark Drawing Only;
    (3)    Amendment Required – Identification Of Services Is Indefinite;
    (4)    Amendment To Description Of Mark Required;
    (5)    English Translation Required;
    (6)    Explanation Of Mark's Significance Required.

## SECTION 2(d) REFUSAL – LIKELIHOOD OF CONFUSION

Registration of the applied-for mark is refused because of a likelihood of confusion with the mark in U.S. Registration No. 4410019.  Trademark Act Section 2(d), 15 U.S.C. §1052(d); *see* TMEP §§1207.01 *et seq.  See the attached registration*.

### Standard of Analysis for Section 2(d) Refusal

Trademark Act Section 2(d) bars registration of an applied-for mark that so resembles a registered mark that it is likely a potential consumer would be confused, mistaken, or deceived as to the source of the services of the applicant and registrant.  *See* 15 U.S.C. §1052(d).  A determination of likelihood of confusion under Section 2(d) is made on a case-by case basis and the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ 563, 567 (C.C.P.A. 1973) aid in this determination.  *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 1349, 98 USPQ2d 1253, 1256 (Fed. Cir. 2011) (citing *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085, 56 USPQ2d 1471, 1474 (Fed. Cir. 2000)).  Not all the *du Pont* factors, however, are necessarily relevant or of equal weight, and any one of the factors may control in a given case, depending upon the evidence of record.  *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d at 1355, 98 USPQ2d at 1260; *In re Majestic Distilling Co.*, 315 F.3d 1311, 1315, 65 USPQ2d 1201, 1204 (Fed. Cir. 2003); *see In re E. I. du Pont de Nemours & Co.*, 476 F.2d at 1361-62, 177 USPQ at 567.

In this case, the following factors are the most relevant:  similarity of the marks, similarity and nature of the services, and similarity of the trade channels of the services.  *See In re Viterra Inc.*, 671 F.3d 1358, 1361-62, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012); *In re Dakin's Miniatures Inc.*, 59 USPQ2d 1593, 1595-96 (TTAB 1999); TMEP §§1207.01 *et seq.*

### Facts

Applicant has applied to register the mark **LOS CAMINANTES H N** *in stylized form* for use on "Entertainment services in the nature of Entertainment in the nature of on-going television programs in the field of music and concert performances provided through cable television, satellite cable, webcast, and video on demand; Entertainment in the nature of visual and audio performances by LIVE PERFORMANCES, ROAD SHOWS, LIVE STAGE EVENTS, LIVE MUSIC CONCERTS; Entertainment services in the nature of live musical performances; Entertainment services in the nature of presenting live musical performances; Entertainment services in the nature of recording, production and post-production services in the field of music; Entertainment, namely, live music concerts; Entertainment, namely, live performances by musical bands; Music composition services; Music production services; Production of DVDs, videotapes and television programs featuring musical performances; Production of sound and music video recordings" in International Class 41.

U.S. Registration No. 4410019 for the mark **LOS CAMINANTES** is used in connection with "Entertainment in the nature of live performances by a musical group" in International Class 41.

### Similarity of the Marks

Marks are compared in their entireties for similarities in appearance, sound, connotation, and commercial impression. *Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 1321, 110 USPQ2d 1157, 1160 (Fed. Cir. 2014) (quoting *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F. 3d 1369, 1371, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005)); TMEP §1207.01(b)-(b)(v). "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014) (citing *In re 1st USA Realty Prof'ls, Inc.* , 84 USPQ2d 1581, 1586 (TTAB 2007)); *In re White Swan Ltd.*, 8 USPQ2d 1534, 1535 (TTAB 1988)); TMEP §1207.01(b).

In this case, applicant's mark, **LOS CAMINANTES H N** *in stylized form*, is confusingly similar to registrant's mark, **LOS CAMINANTES**, because the marks are highly similar in sound, appearance, connotation, and commercial impression. Specifically, the marks share the dominant wording **LOS CAMINANTES**, and this wording may be pronounced and displayed identically, thereby creating similarities in sound and appearance. Moreover, the wording **LOS CAMINANTES**, being Spanish for "the walkers", appears to be arbitrary in the context of the identified services; therefore, this wording conveys a similar meaning and creates a similar commercial impression of being arbitrary wording in both marks. *See* Google Translate, https://translate.google.com/#auto/en/los%20caminantes.

Although marks are compared in their entireties, one feature of a mark may be more significant or dominant in creating a commercial impression. *See In re Viterra Inc.*, 671 F.3d 1358, 1362, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012); *In re Nat'l Data Corp.* , 753 F.2d 1056, 1058, 224 USPQ 749, 751 (Fed. Cir. 1985); TMEP §1207.01(b)(viii), (c)(ii). Greater weight is often given to this dominant feature when determining whether marks are confusingly similar. *See In re Nat'l Data Corp.* , 753 F.2d at 1058, 224 USPQ at 751.

The wording **LOS CAMINANTES** is the dominant feature of the marks. Consumers are generally more inclined to focus on the first word, prefix, or syllable in any trademark or service mark. *See Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1372, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005) ("VEUVE . . . remains a 'prominent feature' as the first word in the mark and the first word to appear on the label"); *In re Integrated Embedded*, ___ USPQ2d ___, ___, Ser. No. 86140341, 2016 TTAB LEXIS 470, at *30-31 (Sept. 27, 2016) ("[T]he dominance of BARR in [a]pplicant's mark BARR GROUP is reinforced by its location as the first word in the mark."); *Presto Prods., Inc. v. Nice-Pak Prods., Inc.*, 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered" when making purchasing decisions). In this case, the wording **LOS CAMINANTES** is the first wording to appear in the applied-for mark and the only wording to appear in the registered mark; therefore, this wording is the dominant feature upon which consumers are likely to focus. The marks are identical with respect to this shared dominant element.

The applied-for mark contains the additional letters **H N**; however, the presence of these additional letters does not obviate the similarities between the marks. Specifically, applicant merely adds these letters to an already registered mark, and adding a term to a registered mark generally does not obviate the similarity between the compared marks, as in the present case, nor does it overcome a likelihood of confusion under Section 2(d). *See Coca-Cola Bottling Co. v. Jos. E. Seagram & Sons, Inc.*, 526 F.2d 556, 557, 188 USPQ 105, 106 (C.C.P.A. 1975) (finding BENGAL and BENGAL LANCER and design confusingly similar); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1269 (TTAB 2009) (finding TITAN and VANTAGE TITAN confusingly similar); *In re El Torito Rests., Inc.*, 9 USPQ2d 2002, 2004 (TTAB 1988) (finding MACHO and MACHO COMBOS confusingly similar); TMEP §1207.01(b)(iii). In the present case, the marks are identical in part. Accordingly, the presence of the additional letters does not obviate the similarities between the marks.

The applied-for mark also contains stylization elements; however, the presence of this stylization does not obviate the similarities between the marks. For a composite mark containing both words and a design, the word portion may be more likely to indicate the origin of the services because it is that portion of the mark that consumers use when referring to or requesting the services. *Bond v. Taylor*, 119 USPQ2d 1049, 1055 (TTAB 2016) (citing *In re Viterra Inc.*, 671 F.3d 1358, 1362, 101 USPQ2d 1905, 1908, 1911 (Fed. Cir. 2012)); TMEP §1207.01(c)(ii). Thus, although such marks must be compared in their entireties, the word portion is often considered the dominant feature and is accorded greater weight in determining whether marks are confusingly similar, even where the word portion has been disclaimed. *In re Viterra Inc.*, 671 F.3d at 1366-67, 101 USPQ2d at 1911 (citing *Giant Food, Inc. v. Nation's Foodservice, Inc.* , 710 F.2d 1565, 1570-71, 218 USPQ2d 390, 395 (Fed. Cir. 1983)).

In the present case, the dominant word portions of the marks are identical in appearance, sound, connotation, and commercial impression; therefore, the addition of stylization does not obviate the similarity of the marks in this case.  *See In re Shell Oil Co.*, 992 F.2d 1204, 1206, 26 USPQ2d 1687, 1688 (Fed. Cir. 1993); TMEP §1207.01(c)(ii).

Ultimately, applicant's mark is likely to cause confusion with registrant's mark because the similarities in sound, appearance, and connotation create the same overall commercial impression in the minds of consumers.  Thus the marks are confusingly similar.

**Relatedness of Services**

The services of the parties need not be identical or even competitive to find a likelihood of confusion.  *See On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 1086, 56 USPQ2d 1471, 1475 (Fed. Cir. 2000); *Recot, Inc. v. Becton*, 214 F.3d 1322, 1329, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000) ("[E]ven if the services in question are different from, and thus not related to, one another in kind, the same services can be related in the mind of the consuming public as to the origin of the services."); TMEP §1207.01(a)(i).

The respective services need only be "related in some manner and/or if the circumstances surrounding their marketing [be] such that they could give rise to the mistaken belief that [the services] emanate from the same source."  *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012) (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)); TMEP §1207.01(a)(i).

The application identifies "Entertainment services in the nature of Entertainment in the nature of on-going television programs in the field of music and concert performances provided through cable television, satellite cable, webcast, and video on demand; Entertainment in the nature of visual and audio performances by LIVE PERFORMANCES, ROAD SHOWS, LIVE STAGE EVENTS, LIVE MUSIC CONCERTS; Entertainment services in the nature of live musical performances; Entertainment services in the nature of presenting live musical performances; Entertainment services in the nature of recording, production and post-production services in the field of music; Entertainment, namely, live music concerts; Entertainment, namely, live performances by musical bands; Music composition services; Music production services; Production of DVDs, videotapes and television programs featuring musical performances; Production of sound and music video recordings" in International Class 41.

U.S. Registration No. 4410019 for the mark **LOS CAMINANTES** is used in connection with "Entertainment in the nature of live performances by a musical group" in International Class 41.

In the present case, applicant's services are related to registrant's services because the same entity that provides "Entertainment in the nature of live performances by a musical group" also commonly provides "Entertainment services in the nature of Entertainment in the nature of on-going television programs in the field of music and concert performances provided through cable television, satellite cable, webcast, and video on demand; Entertainment in the nature of visual and audio performances by LIVE PERFORMANCES, ROAD SHOWS, LIVE STAGE EVENTS, LIVE MUSIC CONCERTS; Entertainment services in the nature of live musical performances; Entertainment services in the nature of presenting live musical performances; Entertainment services in the nature of recording, production and post-production services in the field of music; Entertainment, namely, live music concerts; Entertainment, namely, live performances by musical bands; Music composition services; Music production services; Production of DVDs, videotapes and television programs featuring musical performances; Production of sound and music video recordings", and these services are all marketed together to consumers under a common mark.  Moreover, these services are sold through the same channels of trade and used by the same class of consumers in the same fields of use.

The attached Internet evidence consists of websites for third-party providers of music and entertainment services, such as those identified in the application and registration.  For example, The Wiggles is a musical group that offers entertainment services in the nature of live musical performances and an ongoing television program featuring music.  Similarly, PPS is a provider of music and entertainment services that offers consumers live musical performances, music recording and production services, concerts, music composition services, and production of DVDs, videotapes, and sound and music video recordings.  This evidence establishes that the same entity commonly provides the relevant services and markets the services under the same mark, that the relevant services are sold or provided through the same trade channels and used by the same classes of consumers in the same fields of use, and that the services are similar or complementary in terms of purpose or function.  Therefore, applicant's and registrant's services are considered related for likelihood of confusion purposes.  *See, e.g.*, *In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1202-04 (TTAB 2009); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1268-69, 1271-72 (TTAB 2009).

The Wiggles, http://www.thewiggles.com/watch; http://www.thewiggles.com/tours/notfound; http://baltimore.broadway.com/shows/wiggles-wiggle-town-north-american-tour/;
Austin City Limits, http://acltv.com/; http://austincitylimits.com/; https://www.aclfestival.com/;
Imagination Movers, http://www.imaginationmovers.com/events; http://www.imaginationmovers.com/season3/;
PPS, http://performanceproductionservices.com/production-rates/; http://performanceproductionservices.com/music-production/;
iMusicRain, http://www.imusicrain.com/events-and-performances.html;
Farley Music Services, http://www.farleymusicandart.com/farley-music-services;

UC San Diego, http://musicweb.ucsd.edu/about/about-pages.php?i=413; http://musicweb.ucsd.edu/about/musicians_referral.php; http://musicweb.ucsd.edu/media/discography.php; http://musicweb.ucsd.edu/concerts/; http://musicweb.ucsd.edu/media/audio_video.php; http://musicweb.ucsd.edu/about/about-pages.php?i=403;

Evidence obtained from the Internet may be used to support a determination under Section 2(d) that services are related. *See, e.g.*, *In re G.B.I. Tile & Stone, Inc.*, 92 USPQ2d 1366, 1371 (TTAB 2009); *In re Paper Doll Promotions, Inc.*, 84 USPQ2d 1660, 1668 (TTAB 2007). The Internet has become integral to daily life in the United States, with Census Bureau data showing approximately three-quarters of American households used the Internet in 2013 to engage in personal communications, to obtain news, information, and entertainment, and to do banking and shopping. *See In re Nieves & Nieves LLC*, 113 USPQ2d 1639, 1642 (TTAB 2015) (taking judicial notice of the following two official government publications: (1) Thom File & Camille Ryan, U.S. Census Bureau, Am. Cmty. Survey Reports ACS-28, *Computer & Internet Use in the United States: 2013* (2014), *available at* http://www.census.gov/content/dam/Census/library/publications/2014/acs/acs-28.pdf, and (2) The Nat'l Telecomms. & Info. Admin. & Econ. & Statistics Admin., *Exploring the Digital Nation: America's Emerging Online Experience* (2013), *available at* http://www.ntia.doc.gov/files/ntia/publications/exploring_the_digital_nation_-_americas_emerging_online_experience.pdf). Thus, the widespread use of the Internet in the United States suggests that Internet evidence may be probative of public perception in trademark examination.

Therefore, because the marks are confusingly similar and the services are closely related, purchasers encountering these services are likely to believe, mistakenly, that they emanate from a common source. Accordingly, there is a likelihood of confusion and registration is refused pursuant to Section 2(d) of the Trademark Act.

Applicant should note the following additional ground for refusal.

**SPECIMEN REFUSAL – SPECIMEN CONSISTS OF MARK DRAWING ONLY**

Registration is refused because the specimen in International Class 41 is merely a photocopy of the drawing or a picture or rendering of the applied-for mark, and thus fails to show the applied-for mark in use in commerce with the services for each international class. Trademark Act Sections 1 and 45, 15 U.S.C. §§1051, 1127; 37 C.F.R. §§2.34(a)(1)(iv), 2.56(a); *In re Chica*, 84 USPQ2d 1845, 1848 (TTAB 2007); TMEP §§904, 904.07(a), 1301.04(g)(i).

An application based on Trademark Act Section 1(a) must include a specimen showing the applied-for mark in use in commerce for each international class of services identified in the application or amendment to allege use. 15 U.S.C. §1051(a)(1); 37 C.F.R. §§2.34(a)(1)(iv), 2.56(a); TMEP §§904, 904.07(a).

Examples of specimens for services include advertising and marketing materials, brochures, photographs of business signage and billboards, and webpages that show the mark used in the actual sale, rendering, or advertising of the services. *See* TMEP §1301.04(a), (h)(iv)(C). Specimens comprising advertising and promotional materials must show a direct association between the mark and the services. TMEP §1301.04(f)(ii).

Applicant may respond to this refusal by satisfying one of the following for each applicable international class:

(1)     Submit a different specimen (a verified "substitute" specimen ) that (a) was in actual use in commerce at least as early as the filing date of the application or prior to the filing of an amendment to allege use and (b) shows the mark in actual use in commerce for the services identified in the application or amendment to allege use. A "verified substitute specimen" is a specimen that is accompanied by the following statement made in a signed affidavit or supported by a declaration under 37 C.F.R. §2.20: "The substitute (or new, or originally submitted, if appropriate) specimens were in use in commerce at least as early as the filing date of the application or prior to the filing of the amendment to allege use." The substitute specimen cannot be accepted without this statement.

(2)     Amend the filing basis to intent to use under Section 1(b), for which no specimen is required. This option will later necessitate additional fees and filing requirements such as providing a specimen.

For an overview of *both* response options referenced above and instructions on how to satisfy either option online using the Trademark Electronic Application System (TEAS) form, please go to http://www.uspto.gov/trademarks/law/specimen.jsp.

Although applicant's mark has been refused registration, applicant may respond to the refusals by submitting evidence and arguments in support of registration. However, if applicant responds to the refusals, applicant must also respond to the requirements set forth below.

**AMENDMENT REQUIRED – IDENTIFICATION OF SERVICES IS INDEFINITE**

The wording "Entertainment services in the nature of Entertainment in the nature of on-going television programs in the field of music and concert performances provided through cable television, satellite cable, webcast, and video on demand" in the identification of services is

indefinite and must be clarified because the duplicate wording "Entertainment services in the nature of" creates ambiguity regarding the exact nature of the services.  *See* 37 C.F.R. §2.32(a)(6); TMEP §1402.01.  Applicant must therefore clarify this wording by either further specifying the exact nature or purpose of the services or by deleting the duplicative wording.

The wording "Entertainment in the nature of visual and audio performances by LIVE PERFORMANCES, ROAD SHOWS, LIVE STAGE EVENTS, LIVE MUSIC CONCERTS" in the identification of services is indefinite and must be clarified because the wording following "by" does not identify the nature or type of performer, but rather, identifies an event type.  *See* 37 C.F.R. §2.32(a)(6); TMEP §1402.01.  Applicant must therefore clarify this wording by further specifying the exact nature or purpose of the services and also specifying by whom the services are performed.

Applicant may substitute the following wording, if accurate:

Class 41 – "Entertainment in the nature of on-going television programs in the field of music and concert performances provided through cable television, satellite cable, webcast, and video on demand; Entertainment in the nature of visual and audio performances**, namely,** live performances, road shows, live stage events, **and** live music concerts**, all performed by {***applicant to clarify nature of group or individual providing services, e.g. "a musical band"* **}**; Entertainment services in the nature of live musical performances; Entertainment services in the nature of presenting live musical performances; Entertainment services in the nature of recording, production and post-production services in the field of music; Entertainment, namely, live music concerts; Entertainment, namely, live performances by musical bands; Music composition services; Music production services; Production of DVDs, videotapes and television programs featuring musical performances; Production of sound and music video recordings"

*See* TMEP §§1402.01, 1402.03.

Applicant's services may be clarified or limited, but may not be expanded beyond those originally itemized in the application or as acceptably amended.  *See* 37 C.F.R. §2.71(a); TMEP §1402.06.  Applicant may clarify or limit the identification by inserting qualifying language or deleting items to result in a more specific identification; however, applicant may not substitute different services or add services not found or encompassed by those in the original application or as acceptably amended.  *See* TMEP §1402.06(a)-(b).  The scope of the services sets the outer limit for any changes to the identification and is generally determined by the ordinary meaning of the wording in the identification.  TMEP §§1402.06(b), 1402.07(a)-(b).  Any acceptable changes to the services will further limit scope, and once services are deleted, they are not permitted to be reinserted.  TMEP §1402.07(e).

For assistance with identifying and classifying goods and services in trademark applications, please see the USPTO's online searchable *U.S. Acceptable Identification of Goods and Services Manual*.  *See* TMEP §1402.04.

**AMENDMENT TO DESCRIPTION OF MARK REQUIRED**

Applicant must provide a complete mark description because the mark description in the application does not include all elements shown in the mark.  A complete mark description for a mark depicted in color must identify all the literal and design elements in the mark and specify where the colors appear in those elements.  *See* 37 C.F.R. §§2.37, 2.52(b)(1); TMEP §807.07(a)-(a)(ii).

If black, white, and/or gray are not being claimed as a color feature of the mark, applicant must exclude them from the color claim and include in the mark description a statement that the colors black, white, and/or gray represent background, outlining, shading, and/or transparent areas and are not part of the mark.  *See* TMEP §807.07(d).

The following mark description is suggested, if accurate:

**The mark consists of the wording "LOS CAMINANTES H N" in gold stylized lettering on a black background.**

**ENGLISH TRANSLATION REQUIRED**

Applicant must submit an English translation of all foreign wording in the mark.  37 C.F.R. §§2.32(a)(9), 2.61(b); *see* TMEP §809.  In the present case, the wording "**LOS CAMINANTES**" requires translation.

The following translation statement is suggested:

**The English translation of the word "LOS CAMINANTES" in the mark is "the walkers".**

TMEP §809.03.  *See attached translation evidence*.

**EXPLANATION OF MARK'S SIGNIFICANCE REQUIRED**

Applicant must specify whether the letters "**H N**" have any significance in the music and entertainment trade or industry or as applied to the services described in the application, or if such letters represent a "term of art" within applicant's industry.   *See* 37 C.F.R. §2.61(b); TMEP §814.

Failure to respond to a request for information is an additional ground for refusing registration. *See In re Cheezwhse.com, Inc.*, 85 USPQ2d 1917, 1919 (TTAB 2008); *In re DTI P'ship LLP* , 67 USPQ2d 1699, 1701 (TTAB 2003); TMEP §814.

 **RESPONSE GUIDELINES**

For this application to proceed further, applicant must explicitly address each refusal and/or requirement raised in this Office action.  If the action includes a refusal, applicant may provide arguments and/or evidence as to why the refusal should be withdrawn and the mark should register.  Applicant may also have other options specified in this Office action for responding to a refusal, and should consider those options carefully.  To respond to requirements and certain refusal response options, applicant should set forth in writing the required changes or statements.

In addition, because applicant filed a TEAS Plus application, applicant must respond online using the Trademark Electronic Application System (TEAS) to avoid incurring an additional fee. *See* 37 C.F.R. §2.22(b)(1), (c).  For more information and general tips on responding to USPTO Office actions, response options, and how to file a response online, see "Responding to Office Actions" on the USPTO's website.

If applicant does not respond to this Office action within six months of the issue/mailing date, or responds by expressly abandoning the application, the application process will end and the trademark will fail to register.  *See* 15 U.S.C. §1062(b); 37 C.F.R. §§2.65(a), 2.68(a); TMEP §§718.01, 718.02.  Additionally, the USPTO will not refund the application filing fee, which is a required processing fee. *See* 37 C.F.R. §§2.6(a)(1)(i)-(iv), 2.209(a); TMEP §405.04.

Where the application has been abandoned for failure to respond to an Office action, applicant's only option would be to file a timely petition to revive the application, which, if granted, would allow the application to return to active status.  *See* 37 C.F.R. §2.66; TMEP §1714.  There is a $100 fee for such petitions.  *See* 37 C.F.R. §§2.6(a)(15), 2.66(b)(1).

If applicant has questions regarding this Office action, please telephone or e-mail the assigned trademark examining attorney.  All relevant e-mail communications will be placed in the official application record; however, an e-mail communication will not be accepted as a response to this Office action and will not extend the deadline for filing a proper response. *See* 37 C.F.R. §§2.62(c), 2.191; TMEP §§304.01-.02, 709.04-.05.  Further, although the trademark examining attorney may provide additional explanation pertaining to the refusals or requirements in this Office action, the trademark examining attorney may not provide legal advice or statements about applicant's rights.  *See* TMEP §§705.02, 709.06.

 **TEAS PLUS OR TEAS REDUCED FEE (TEAS RF) APPLICANTS – TO MAINTAIN LOWER FEE, ADDITIONAL REQUIREMENTS MUST BE MET, INCLUDING SUBMITTING DOCUMENTS ONLINE:** Applicants who filed their application online using the lower-fee TEAS Plus or TEAS RF application form must (1) file certain documents online using TEAS, including responses to Office actions (see TMEP §§819.02(b), 820.02(b) for a complete list of these documents); (2) maintain a valid e-mail correspondence address; and (3) agree to receive correspondence from the USPTO by e-mail throughout the prosecution of the application. *See* 37 C.F.R. §§2.22(b), 2.23(b); TMEP §§819, 820.  TEAS Plus or TEAS RF applicants who do not meet these requirements must submit an additional processing fee of $50 per international class of services.  37 C.F.R. §§2.6(a)(1)(v), 2.22(c), 2.23(c); TMEP §§819.04, 820.04.  However, in certain situations, TEAS Plus or TEAS RF applicants may respond to an Office action by authorizing an examiner's amendment by telephone or e-mail without incurring this additional fee.

/Seth Dennis/
Examining Attorney
Law Office 113
(571) 272-9495
seth.dennis@uspto.gov

**TO RESPOND TO THIS LETTER:** Go to http://www.uspto.gov/trademarks/teas/response_forms.jsp.  Please wait 48-72 hours from the issue/mailing date before using the Trademark Electronic Application System (TEAS), to allow for necessary system updates of the application.  For *technical* assistance with online forms, e-mail TEAS@uspto.gov.  For questions about the Office action itself, please contact the assigned trademark examining attorney.  **E-mail communications will not be accepted as responses to Office actions; therefore, do not respond to this Office action by e-mail.**

**All informal e-mail communications relevant to this application will be placed in the official application record.**

**WHO MUST SIGN THE RESPONSE:**  It must be personally signed by an individual applicant or someone with legal authority to bind an applicant (i.e., a corporate officer, a general partner, all joint applicants).  If an applicant is represented by an attorney, the attorney must sign the response.

**PERIODICALLY CHECK THE STATUS OF THE APPLICATION:**  To ensure that applicant does not miss crucial deadlines or official notices, check the status of the application every three to four months using the Trademark Status and Document Retrieval (TSDR) system at http://tsdr.uspto.gov/.  Please keep a copy of the TSDR status screen.  If the status shows no change for more than six months, contact the Trademark Assistance Center by e-mail at TrademarkAssistanceCenter@uspto.gov or call 1-800-786-9199.  For more information on checking status, see http://www.uspto.gov/trademarks/process/status/.

**TO UPDATE CORRESPONDENCE/E-MAIL ADDRESS:**  Use the TEAS form at http://www.uspto.gov/trademarks/teas/correspondence.jsp.

**Print: Dec 8, 2016**                              **85767031**

**DESIGN MARK**

**Serial Number**
85767031

**Status**
REGISTERED

**Word Mark**
LOS CAMINANTES

**Standard Character Mark**
Yes

**Registration Number**
4410019

**Date Registered**
2013/10/01

**Type of Mark**
SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
Ramirez, Anthony INDIVIDUAL UNITED STATES 10020 Spruce Ave Bloomington
CALIFORNIA 92316

**Owner**
Ramirez, Jr., Agustin INDIVIDUAL UNITED STATES 10020 Spruce Ave
Bloomington CALIFORNIA 92316

**Owner**
Ramirez, Agustin INDIVIDUAL UNITED STATES 10020 Spruce Ave Bloomington
CALIFORNIA 92316

**Goods/Services**
Class Status -- ACTIVE.  IC 041.  US  100 101 107.  G & S:
Entertainment in the nature of live performances by a musical group.
First Use: 1975/02/14.  First Use In Commerce: 1975/02/14.

**Translation Statement**
The English translation of "LOS CAMINANTES" in the mark is   "The
Walkers"

**Filing Date**

-1-

**Print: Dec 8, 2016**                    **85767031**

2012/10/30

**Examining Attorney**
BLOHM, LINDA E.

**Attorney of Record**
Steven J. Eyre

# LOS CAMINANTES











HOME    TAPINGS    WATCH    ARTISTS    HALL OF FAME    NEWS    SHOP    Search

AIRS THE WEEK OF DECEMBER 10TH
**SHAKEY GRAVES**

**NEWS**



**ACL ARTISTS AT THE 2017 GRAMMYS**
Austin City Limits congratulates all the nominees for the 59th Annual Grammy Awards. We'd like to give special recognition to the nominees who have appeared … Continue reading →



**SHARON JONES R.I.P.**
We here at Austin City Limits were deeply saddened to learn about the premature passing of Sharon Jones after a heroic battle against pancreatic cancer, … Continue reading →



**ACL TO LIVESTREAM ALEJANDRO ESCOVEDO TAPING**
Austin City Limits closes out a banner Season 42 with something beautiful: a livestream of Austin legend and four-time ACL veteran Alejandro Escovedo on November … Continue reading →

**TAPING RECAP**



**ALEJANDRO ESCOVEDO ROCKS ACL SEASON 42 TO A CLOSE**
When we wrap production of a season of Austin City Limits, it's always nice to do it with an old friend – in this case, … Continue reading →



**CECE WINANS AND ST. PAUL & THE BROKEN BONES' SOULED-OUT PERFORMANCES**
CeCe Winans is a gospel legend, selling millions of albums and garnering ten Grammy Awards. St. Paul & the Broken Bones have taken the music … Continue reading →

Funding for Austin City Limits is provided in part by:



NINE INCH NAILS
"HURT"



BEHIND THE SCENES:
TWEEDY



FULL EPISODE:
ACL PRESENTS: AMERICANA MUSIC FESTIVAL 2016



FULL EPISODE:
TWEEDY







# THANKS AUSTIN!

## SEE YOU NEXT YEAR: OCT. 6-8 + OCT. 13-15, 2017

## RELIVE THE WEEKEND

WATCH SELECT PERFORMANCES FROM OUR LIVE BROADCAST ON RED BULL TV

## JOIN THE E-LIST

BE THE FIRST TO KNOW ABOUT EARLY BIRD TICKETS, 2017 LINEUP, AND MORE

jdoe@example.com | **Join**

# NEWS & ANNOUNCEMENTS



### 2016 Weekend Two Recap
As of: 12/6/2016
Weekend Two of ACL Festival's 15th Anniversary has come and gone, and we miss it already. We couldn't have asked for a better end to our 15th year. Take a look at our Weekend Two Recap, and get excited for 2017!



### 2016 Weekend One Recap
As of: 12/6/2016
We celebrated Weekend One of our 15th Anniversary with Radiohead, Kendrick Lamar, Mumford & Sons, LCD Soundsystem, and many more. Take a look at our Weekend One Recap below, and get your tickets for Weekend Two now!

**SEE MORE UPDATES**





### SEASON3

Purchase Season 3 on iTunes

The following four songs are featured in all Imagination Movers episodes:

Imagination Movers Theme Song / For Those About to Hop  iTunes  Buy CD
Brainstorming / For Those About to Hop  iTunes  Buy CD
Springtime Instrumental / Original Version  iTunes  Buy CD
Jump Up! / For Those About to Hop  iTunes  Buy CD

### 1. Goldilocks and the Four Movers

Episode songs:

1. My Favorite Snack / Good Ideas  iTunes  Buy CD
2. My Favorite Snack / Juice Box Heroes  iTunes  Buy CD
3. Please and Thank You / Calling All Movers  iTunes  Buy CD
4. Please and Thank You / Juice Box Heroes  iTunes  Buy CD

### 2. The Idea Cafe

Episode songs:

1. Breakfast Time Holler
2. Now We're Cooking / For Those About to Hop  iTunes  Buy CD

### 3. Imagination Movers in Concert

Episode songs:

1. Calling All Movers / Juice Box Heroes  iTunes  Buy CD
2. Calling All Movers / Calling All Movers  iTunes  Buy CD
3. Imagination Movers Theme Song / For Those About to Hop  iTunes  Buy CD
4. Shakable You / Eight Feet  iTunes  Buy CD
5. Shakable You / Juice Box Heroes  iTunes  Buy CD
6. Nina's Song / For Those About to Hop  iTunes  Buy CD
7. On My Way Home (Hawaiian Lullaby) / In a Big Warehouse  iTunes  Buy CD
8. Buckets and Cans / For Those About to Hop  iTunes  Buy CD
9. Brainstorming / For Those About to Hop  iTunes  Buy CD
10. Bounce / In a Big Warehouse  iTunes  Buy CD
11. My Favorite Snack / Good Ideas  iTunes  Buy CD
12. My Favorite Snack / Juice Box Heroes  iTunes  Buy CD
13. Friendly Guy / In a Big Warehouse  iTunes  Buy CD
14. Getting Stronger / In a Big Warehouse  iTunes  Buy CD
15. Seven Days a Week / Eight Feet  iTunes  Buy CD
16. Seven Days a Week / Juice Box Heroes  iTunes  Buy CD
17. Slip Sliding / In a Big Warehouse  iTunes  Buy CD
18. Jump Up! / For Those About to Hop  iTunes  Buy CD
19. Put Your Hands Up

 

# Rates

Home / Rates

## *PPS Commercial Production Rates*



Producing Professional Videos can be a very complicated task. Just view the credits on any of your favorite movies and you will see how many skills and people it takes to make a successful project. The Videos we produce may be smaller but the basic structure of production still exists, Pre-Production, Production and Post Production.

Since Google purchased YouTube on October 9th 2006, Video Marketing began a Journey that has changed the way Businesses market their products and services online. A marketing strategy that includes targeted keyword content working alongside professional optimized video content is a powerful strategy to build a strong long-term foundation for Organic SEO results.

### Check out these powerful Video Marketing statistics!

A recent Forrester Research study revealed that an Optimized Video has a 50 PERCENT BETTER CHANCE of appearing on 1st page Google results than an Optimized HTML or Website Page!

- According to Google Shopper, the Marketing Agency Council and M/A/R/C Research – 84% of smartphone shoppers use their phones while in a physical store.
- 90% is the percentage of online shoppers at major retailer's websites who said they find video helpful in making shopping and buying decisions.
- 47 % of shoppers say Professional Videos are more likely to lead to a purchase.
- 53 of Shoppers Prefer High-Quality Videos 49 percent of smartphone users have watched product videos.
- When marketers included a video in an email, the click-through rate increased by 200% – 300%

It is obvious that you must include Multiple Optimized Videos to your Internet Marketing Portfolio to stay competitive!

We have listed our 2 most popular business production packages below. But, it important to understand that every budget is flexible and the price point for any production can be adjusted to custom fit the requirements of your production.

## *Business Production Packages*

### Basic Production Package

### *Business Production Packages*

### Basic Production Package

 This introductory production package is a perfect fit for those clients who want to begin their video marketing campaign on a tighter budget.

### Pre-Production

- Consultation with Client to discuss Production Concepts and Goals
- Editing client script by our staff screenwriter for maximum impact
- Talent Coaching and Wardrobe preparation
- Location Consultation
- Scout 1 Location

### Production

- Film in High Definition
- One High Definition Camera
- Lighting, as required, for interior filming
- Recording with Lav and Studio Microphones
- Direction
- Cinematography
- Maximum 3.0 hours of location time

### Post Production

- 2 Videos – Trailer and Company Introduction
- Advanced Post Production editing including adding still photographs, custom titles, and custom digital transitions
- Editing clients scripts by our professional staff screenwriter for maximum impact
- Royalty Free Sound Design
- 1st Cut approval by Client with 1 additional edit at no charge> Upload Video to Client YouTube account and assist with linking to website as required
- Consultation with Client regarding best marketing practices with Video Media

*Budget: Only 1,295.00*

### Producers Choice Production Package

 Our most popular package! For Clients who want to maximize the quality of their overall production and their online marketing results using multiple marketing videos.

*The Producers Choice Production Package includes of the benefits of the Basic Production Package plus these important production benefits:*

- 4 Videos – Trailer, Company Introduction, Staff and Client Testimonials
- Maximum 5.0 hours of location time
- Writing the entire script(s) for the production after consultation with client

- Maximum 5.0 hours of location time
- Writing the entire script(s) for the production after consultation with client
- Set-up branded YouTube Site
- 2 High Definition Camera's
- Hair & Make-up
- Craft Services
- Scout 2 Locations as required
- Recording Voice Over
- Advanced Sound Design: Voice Over, Sound effects

*Budget: Only 1,995.00*

## Production Upgrades

To take your Video Production to the next level Performance Production Services highly recommends that our clients add any of these important Upgrades to their Production Projects.

- Production Filming and Post Production Edit employing "Green Screen" technology
  *Budget: 595.00 per production*
- Hair & Make-up
  *Budget: 225.00*
- Extended location time
  *Budget: 95.00/Hr*
- Additional Camera
  *Budget: 145.00*
- Writing the entire script(s) of the video after consultation with client.
  *Budget: 249.00*
- Craft Services (food and beverages)
  *Budget: 125.00*
- Additional Video Cut (Post Production)
  *Budget: 345.00*
- Set-up branded YouTube Site
  *Budget: 125.00*

## *PPS Family and Business Event Rates*

### Weddings



At PPS we use our experience, professionalism, creative talent and attentiveness to detail to Create, Produce, Film and Edit your next Cinematic Event Production.

As you will find out below, we are truly a 'One Stop Shop' for your next event production!

Whether it is a Wedding Event, Milestone Family Event, Non-Profit Event, Corporate/Political Event, Entertainment Event or Documentary, the one thread the connects them all is that they are important stories that need to be told. We at PPS are experts at telling stories using visual media.

Your wedding day needs to be documented and preserved forever. In order to accomplish this, we feel that a basic wedding production package must contain the following essential production

Your wedding day needs to be documented and preserved forever. In order to accomplish this, we feel that a basic wedding production package must contain the following essential production elements. Then, if our clients want to add any other production elements, they can choose from our 'A La Carte' Production Services listed below.

- Wedding 'Essentials' Film Production Package
- Complete coverage of your ceremony and reception
- Three camera operators at your ceremony and reception
- Filmed in 1920×1080 HD Video
- Digital Audio recorded in 16-bit PCM format at 48kHz for amazing quality
- Interviews with the bride, groom, family and guests filmed generally at reception
- Unlimited Coverage Day of Wedding
- An edited highlight reel of your wedding day (generally 10-20 minutes)
- Uncompressed Digital version of your Wedding Video (very high quality)
- Compressed Digital version of your Wedding Video (for streaming on YouTube/Social Media)
- Ten DVDs

*Budget: Only 2,495.00*

### 'A LA CARTE' Wedding Film Production Services

*(quoted costs apply only to clients who have already purchased the 'Essentials' package but each production can also be quoted individually for those clients who have not)*

### Pre-Wedding 'A La Carte' Film Productions

- Proposal Film
  *Budget: 295.00*
- Engagement Party Film
  *Budget: 495.00*
- 'Wedding Invitation' Film (stream to guest list)
  *Budget: 245.00*
- Rehearsal Dinner Film
  *Budget: 495.00*
- 'Couple Love Story' Film
  *Budget: 495.00*
- Master Film of all or any from the above list to screen at the reception
  *Budget: 195.00 – 395.00*
- Film Bridal Preparations and Groom Preparations prior to ceremony.
  *Budget: 295.00*
- Extra Day(s) of Coverage (multiple days are common in some cultures).
  *Budget: 1,795.00 per day for up to 8 hours of coverage*
- Fourth Cameraman
  *Budget: 495.00 for Day*

### 'Special' Wedding Day Additional Productions to take your Wedding Day to the 'Next Level!'

- Custom Song. We can create a Custom Song for the Bride, Groom or Both, performed live at your service.
  *Budget: 695.00*
- Custom Song Recording. Your Custom Song can also be professionally produced and recorded in a studio with full instrumentation and orchestral arrangements.
  *Budget: 795.00*

- Custom Song Recording. Your Custom Song can also be professionally produced and recorded in a studio with full instrumentation and orchestral arrangements.
  *Budget: 795.00*
- Ceremony Music. We can provide an Instrumentalist, Vocal Soloist, or Small Group to perform Devotional Music during those special moments in your Wedding service.
  *Budget: Generally 245.00–395.00 (depending on number of musicians)*
- Even Aerial Footage! HeliCam HD Aerial footage of your wedding. (Fair weather conditions apply)
  *Budget: $495.00*
- Even Live Streaming! We will stream your wedding and reception anywhere in the world so family can tune in a watch your wedding live! You can have 1 person or hundreds tune in.
  *Budget: $495.00 (both Locations must have internet steaming services)*
- Long Cut of Wedding & Reception (entire wedding service & lengthened reception footage)
  *Budget: 295.00*
- 30 EDITED STILL PHOTOS captured from video footage, not captured by your photographer.
  *Budget: 195.00*

## Turn Your Honeymoon into a Documentary Film!

We can even produce your 'Honeymoon Highlights' Documentary Film!
An amazing upgrade for amazing clients!

- Here is what our Honeymoon Highlights Documentary Film includes:
- 1 Multi-Talented Film Maker to Document the daily adventures of your choice
- Daily Updates will be edited on-location and streamed to family and friends
- An edited highlight reel of your Honeymoon completed soon after your return
- Uncompressed Digital version of your Wedding Video (very high quality)
- Compressed Digital version of your Wedding Video (for streaming on YouTube/Social Media)
- Ten DVDs

*Budget*: Due to the many budget variables in the travel and location costs for this production, all production budgets are quoted individually. But, with only one crew member to consider, you may be surprised at how reasonable this production can be.

## Trusted Wedding Production Partners

We can also refer you any of our Trusted Wedding Production Partners from the list below to help you plan and execute your special event without worry.

- Event Planner
- Create a 'Your Wedding' website
- Photographer
- Make-Up
- Clothier
- Caterer
- Florist
- Disk Jockey
- Limousine
- Classic Vehicles
- Live Reception Band
- Licensed Wedding Officiant
- Wedding and Reception Locations

- Classic Vehicles
- Live Reception Band
- Licensed Wedding Officiant
- Wedding and Reception Locations
- Honeymoon Travel Planning
- Wedding Post Production Options

## Milestone Family Events



Your Milestone Family Event needs to be documented and preserved forever. In order to accomplish this, we feel that a same 'Essentials' Film Production Package that applies to Weddings already listed above must also apply to Milestone Family Events.

Then, if our clients want to add any other production elements, they can choose from our 'A La Carte' Production Services that apply that are already listed above. But, since the coverage time is less, generally 5 hours instead of 10 hours, the cost is reduced from that of a Wedding.

*Budget: 1,595.00*

## Non-Profit Events



"Telling your story for your Non-Profit organization" is the strength for how PPS operates. People know when they are being given a sales pitch. However, that same pitch told as a human story, a drama if you will, equals success. A narrative drama makes it easy to understand the message of your Non-profit further, it is memorable and enjoying to watch. We feel that it is very important to help bring awareness to causes that might otherwise go unnoticed.

PPS will work with your organization and find the best people, the best representatives to convey your mission to your audience. We work with all types of budgets so do not hesitate to contact us if you have a project in mind.

*Budget: Generally Ranges from 1,495.00-2,595. (some hardship discounts may apply)*

## Corporate/Political Events



Video Marketing for business is exploding as maybe the most powerful Organic Search Engine Optimization Tool. More and more companies and politicians are realizing the importance including Video Marketing in their advertising strategy. Pictures and text only tell half the story.

That's why it is so important to invest in capturing important business and political events with professional video production so that content can be used to create powerful online marketing campaigns.

*Budget: Generally Ranges from 995.00-1,595.00*

## Entertainment Events

campaigns.

*Budget: Generally Ranges from 995.00-1,595.00*

### Entertainment Events



We have professional musicians on staff that have performed in rock bands and directed large singing groups. With this experience, we fully understand how important it is have live entertainment events filmed to market talent to an audience and to industry professionals.

Especially now, with video sharing sites like YouTube offering free worldwide distribution, it is all the more important for any artist or group to produce Professional Video Content to possess the most powerful tools to market themselves.

Our professional entertainment background gives us a unique edge when working with musicians and other entertainers to help them build an audience.

*Budget: Generally Ranges from 795.00-1,595.00*

### Documentary Films



A documentary is any video or film that informs viewers about a topic or issue, generally in a factual way. Many documentary films provide us with educational information. Others just describe certain people. Many people think making a documentary is easy. However, making a documentary is not as easy as it seems.

We are specialists at producing documentaries that educate the public about different subjects. This can include important people, events and even, in the case of a non-profit, the video can become a powerful tool to help raise donations.

*Budget: Generally Ranges from 1,495.00-2,595.00*

---

Call **PPS** today and let us help you tell your story! *949.842.9351*



Join Our Crew!

Watch PPS Production Reel

 

# Music Production

Home / Music Production

### *Jonathan Morgan Jenkins*
**Composer, Vocal Coach, Director, Arranger, Lyricist, Cinematographer, Editor, Film Producer, Screenwriter**



Jonathan began the music portion of his artistic career in 5th grade when he helped form the San Clemente surf band "The Exceptions" with 3 of his classmates. Since his parents owned a music store and rock club and his mother taught guitar, this was a natural interest.

After completing his BA in Music Education with a minor in Composition and Theory, he began a musical journey that encompassed over 30 years as re-nowned Vocal Coach, Founder and Musical Director of a 70+ member chorus, The Capistrano Chorale, and a composer/arranger of over 100 songs, Lyrics and arrangements.

At Performance Production Services we also produce Digital Audio projects from Voice Over to Music Demos on a flexible budget.

*Check out excerpts from his Recording Portfolio below!*

## Recording Artist: *Jonathan Morgan Jenkins*

**"When I recorded 'Windows' in 1993,** the first major advancements in Consumer Digital Recording Technology were in their infancy. These songs are a collection of **String Orchestra Arrangements** that I arranged for various Film and other Commercial Projects in development.



The **Yamaha Corporation**, at the forefront of Digital Technology during this time with the famous **DX7 Synthesizer**, manufactured an advanced sound module called the **Yamaha TX816**. This module had the "guts" of 8 Polyphonic DX7 Synthesizers stacked side by side. When you hear the sound, it is very "large" for the time, with all the notes playing from all the DX7's, 128 (8×16=128), that was 128 different instruments playing at the same time. The DX7 sounds were not "Digital Samples" but they were the best sounding "Synthesized" programs of that time. One must understand that this was way before Digital Sample Audio Files were on the market.



I was very fortunate to have a good friend, **Kevin Laubach**, who consulted for Yamaha and reviewed many of their prototype products before going on the market. The TX816

DEPARTMENT OF MUSIC


UC San Diego
Division of Arts & Humanities

ABOUT    PEOPLE    UNDERGRAD PROGRAM    GRADUATE PROGRAM    CONCERTS    GIVING    DIRECTIONS    CONTACT

Visiting Artists

News

Resources & Research

Facilities

Conrad Prebys Music Center Press Kit

Audio and Video Samples

Discographies

Publications

Partners and Links

Music Center

red fish blue fish

Musicians Referral List

Performance/Production

Ensembles in Residence

Departmental History

Box Office

# Performance/Production

The study of performance cannot be completed before performing in front of an audience. Students studying composition must also hear their works performed. Although performance students take lessons and give recitals within the framework of their degree programs, non-performance students are also encouraged to participate in the performance life of the department through engagement with ensembles, festivals, and other collaborative ventures.

During the academic year, a diverse slate of more than 150 public concerts is presented in well-equipped venues: Conrad Prebys Music Center (which features the 400-seat Concert Hall, the 150-seat Recital Hall and the 150-seat Experimental Theater) and Mandeville Center Auditorium (which houses 792 seats). These concerts provide students with performance experience and a forum for examining the music of diverse eras and cultures. Substantial resources and staffing are dedicated to producing the music of our time, including works by faculty, students, new music ensembles, experimental and improvisation ensembles, and student performance collectives.

The department's supportive atmosphere creates major outreach opportunities throughout San Diego County and beyond. Groups associated with UC San Diego's Department of Music have toured nationally and internationally, performing in cities as varied as Los Angeles, New York City and Darmstadt, Germany and at conferences like the International Computer Music Conference in Thessaloniki, Greece and June in Buffalo in New York.

The department's Musician Referral List provides the local community with access to students and alumni available for hire for performance opportunities and individual lesson services.

Practice facilities at UC San Diego are equipped with grand pianos, disclaviers and uprights, an electronic keyboard lab, several harpsichords, a wide array of percussion, a percussion studio, and a limited collection of musical instruments for student checkout.

UC San Diego, 9500 Gilman Dr., La Jolla, CA 92093 (858) 534-2230
Copyright ©2014 Regents of the University of California. All rights reserved.

UCSanDiego



DEPARTMENT OF MUSIC

UC San Diego
Division of Arts & Humanities

ABOUT    PEOPLE    UNDERGRAD PROGRAM    GRADUATE PROGRAM    CONCERTS    GIVING    DIRECTIONS    CONTACT

Visiting Artists
News
Resources & Research
Facilities
Conrad Prebys Music Center Press Kit
Audio and Video Samples
Discographies
Publications
Partners and Links
Music Center
red fish blue fish
Musicians Referral List
Performance/Production
Ensembles in Residence
Departmental History
Box Office

# Musicians Referral List

The UC San Diego Department of Music is pleased to refer to you the following list of music students, alumni, and part-time instructors employed by our department. This list, updated annually, represents musicians who would like to be considered for employment. The department is not able to make specific recommendations. Prices and special emphasis are to be negotiated with the individual instructor. This department is not responsible for the direct or indirect conduct of or qualifications with regards to individuals on this list. **This is only a public service listing which may be of service to the community.**

If you are affiliated with the Department of Music and would like to be added to this list, contact publicity@music.ucsd.edu

## MUSIC TEACHERS AND PERFORMANCE GROUPS

| Name / Status | Emphasis | Phone/E-mail | Web |
|---|---|---|---|

### Accompanist

| Name / Status | Emphasis | Phone/E-mail | Web |
|---|---|---|---|
| Isabelle Engler<br>Alumni | Music | piano@isabelleengler.com | isabelleengler.com |
| Ms. Loie Flood<br>Musician | | 619- 338-9787<br>loieflood@yahoo.com | |
| William Fried<br>Alumni | Performance | 858-531-6080<br>willnfried@gmail.com | www.williamfried.com |
| Gail Gipson<br>Alumni | Performance | 858-361-9751<br>ggipson@ucsd.edu | |
| Daniel Green<br>Alumni | Music-<br>Performance | 858-945-5157<br>danny@danny.green.net | www.dannygreen.net |
| John Mark Harris<br>Alumni | Performance | 858-531-1173<br>johnmarkpiano1@gmail.com | johnmarkpiano.com |
| Mr. Chris Hertzog<br>Alumni | Performance | 619-772-0094<br>christian.hertzog@gmail.com | |
| Dr. Kathleen Kranz<br>Alumni | | 619-300-7569<br>drkathleenkranz1@gmail.com | www.ljcm.org |
| Sean LaPerruque<br>Alumni | Music | 858-722-5249<br>seanthewig@gmail.com | seanthewig.wix.com/<br>goforbaroquestrings |
| Stephen Lewis<br>Graduate | Composition | 413-695-8871<br>s3lewis@ucsd.edu | www.stephenlewis-music.com |
| Stefani Walens<br>Alumni | Performance | 858-450-0258<br>sswalens@gmail.com | |
| Patricia Wang<br>Alumni | Music-<br>Performance | 858-432-3121<br>hello@patriciapiano.com | www.patriciapiano.com |

### Bass

| Name / Status | Emphasis | Phone/E-mail | Web |
|---|---|---|---|
| Scott Worthington<br>Alumni | Performance | sworthin@ucsd.edu | scottworthington.com |

### Cello

| Name / Status | Emphasis | Phone/E-mail | Web |
|---|---|---|---|
| Jennifer Bewerse<br>Graduate ABD | Performance | 321-298-4966<br>jbewerse@ucsd.edu | www.jenniferbewerse.com |
| Dr. Michael Staehle-Laburda<br>Alumni | Music-<br>Composition | 858-344-7996<br>michael.staehle@att.net | www.nmsu.edu/<br>~music/<br>people/<br>faculty/<br>MStaehle.html |

### Clarinet

## Clarinet

| | | | |
|---|---|---|---|
| **Mr. Christopher Klich**<br>Alumni | Performance | 619-462-8048 | www.chrisklich.com |
| **Curt Miller**<br>Alumni | Performance | 630-335-4908<br>cdmiller@ucsd.edu | |
| **Stefanie Schmitz**<br>Alumni | Music-<br>Performance | 858-707-5729<br>contact@stefanieshmitz.net | stefanieschmitz.net |
| **Dr. Ellen Weller**<br>Alumni | CS/EP | 619-263-8002<br>eweller@palomar.edu | www.wellermusic.com |
| **Robert Zelickman**<br>Alumni | Performance | 858-715-0204<br>rzelickman@ucsd.edu | secondavenueklezmer.com |

## Composer

| | | | |
|---|---|---|---|
| **Dr. William Cratty**<br>Alumni | | 858-689-1116<br>wcratty@san.rr.com | www.miracosta.cc.ca.us/<br>home/<br>wcratty/ |
| **Daniel Green**<br>Alumni | Music-<br>Performance | 858-945-5157<br>danny@dannygreen.net | www.dannygreen.net |
| **John Mark Harris**<br>Alumni | | 858-531-1173<br>johnmarkpiano1@gmail.com | johnmarkpiano.com |
| **Mr. Chris Hertzog**<br>Alumni | Performance | 619-772-0094<br>christian.hertzog@gmail.com | |
| **Dr. Jan Jarvlepp**<br>Alumni | Music | jarvlepp@magma.ca | www.janjarvlepp.com/ |
| **Stephen Lewis**<br>Graduate | Composition | 413-695-8871<br>s3lewis@ucsd.edu | www.stephenlewis-music.com |
| **Caroline Miller**<br>Graduate ABD | Composition | clm013@ucsd.edu | |
| **Momilani Ramstrum**<br>Alumni | CS/EP | 619 410 3842<br>momilani@ramstrum.com | www.ramstrum.com/momilani/ |
| **Jason Rosenberg**<br>Volunteer | Composition | 858-405-2258<br>jcrosenb@ucsd.edu | www.jasonrosenberg.org/ |
| **Jude Weirmeir**<br>Alumni | Composition | 858-558-0236 | |
| **Dr. Ellen Weller**<br>Alumni | CS/EP | 619-263-8002<br>eweller@palomar.edu | www.wellermusic.com |

## Conductor

| | | | |
|---|---|---|---|
| **Warren Gref**<br>Alumni | Performance | 760-809-7410<br>warrengref@gmail.com | www.GoldenValleyMusicSociety.org |
| **Dr. Ellen Weller**<br>Alumni | CS/EP | 619-263-8002<br>eweller@palomar.edu | www.wellermusic.com |

## Flute

| | | | |
|---|---|---|---|
| **Mr. Kristoffer Bohling**<br>Alumni | Composition | 858-453-5304<br>hanab23@yahoo.com | |
| **Ms. Marion Garver - Fredrickson**<br>Alumni | Performance | 858-361-8822<br>contraflutist@gmail.com | |
| **Mr. Christopher Klich**<br>Alumni | Performance | 619-462-8048 | www.chrisklich.com |
| **Eun Kyung Lee**<br>Alumni | Music-<br>Performance | 858/414-8062<br>eklee@ucsd.edu | |
| **Rosalind Richards**<br>Alumni | | 760-634-8104<br>rozrichards8@gmail.com | |
| **Kimberly Turney**<br>Alumni | Performance | 661-373-8812<br>kimberlyturney@yahoo.com | |
| **Dr. Ellen Weller**<br>Alumni | CS/EP | 619-263-8002<br>eweller@palomar.edu | www.wellermusic.com |

## Performance

| | | | |
|---|---|---|---|
| Gail Gipson<br>Alumni | Performance | 858-361-9751<br>ggipson@ucsd.edu | |

## Piano

| | | | |
|---|---|---|---|
| Dr. William Cratty<br>Alumni | | 858-689-1116<br>wcratty@san.rr.com | www.miracosta.cc.ca.us/<br>home/<br>wcratty/ |
| Isabelle Engler<br>Alumni | Music | piano@isabelleengler.com | isabelleengler.com |
| William Fried<br>Alumni | Performance | 858-531-6080<br>willnfried@gmail.com | www.williamfried.com |
| Gail Gipson<br>Alumni | Performance | 858-361-9751<br>ggipson@ucsd.edu | |
| Daniel Green<br>Alumni | Music-<br>Performance | 858-945-5157<br>danny@danny.green.net | www.dannygreen.net |
| John Mark Harris<br>Alumni | Performance | 858-531-1173<br>johnmarkpiano1@gmail.com | johnmarkpiano.com |
| Mr. Chris Hertzog<br>Alumni | Performance | 619-772-0094<br>christian.hertzog@gmail.com | |
| Dr. Kathleen Kranz<br>Alumni | | 619-300-7569<br>drkathleenkranz1@gmail.com | www.ljcm.org |
| Sean LaPerruque<br>Alumni | Music | 858-722-5249<br>seanthewig@gmail.com | seanthewig.wix.com/<br>goforbaroquestrings |
| Stephen Lewis<br>Graduate | Composition | 413-695-8871<br>s3lewis@ucsd.edu | www.stephenlewis-music.com |
| Dana Reason<br>Alumni | CS/EP | 760-744-2844<br>dana@danareason.com | www.danareason.com |
| Jason Rosenberg<br>Volunteer | Composition | 858-405-2258<br>jcrosenb@ucsd.edu | www.jasonrosenberg.org/ |
| Stefani Walens<br>Alumni | Performance | 858-450-0258<br>sswalens@gmail.com | |
| Patricia Wang<br>Alumni | Music-<br>Performance | 858-432-3121<br>hello@patriciapiano.com | www.patriciapiano.com |
| Bess Wang | Performance | yuwang@ucsd.edu | |
| Dr. Ellen Weller<br>Alumni | CS/EP | 619-263-8002<br>eweller@palomar.edu | www.wellermusic.com |
| James Williams<br>Alumni | Integrative<br>Studies | 315-443-9184<br>crossingbarlines@gmail.com | www.jamesgordonwilliams.com |

## Saxophone

| | | | |
|---|---|---|---|
| Mr. Christopher Klich<br>Alumni | Performance | 619-462-8048 | www.chrisklich.com |
| Dr. Ellen Weller<br>Alumni | CS/EP | 619-263-8002<br>eweller@palomar.edu | www.wellermusic.com |

## Trombone

| | | | |
|---|---|---|---|
| Sean Reusch | Performance | 760-438-4884<br>harmonywoods@earthlink.net | |

## Trumpet

| | | | |
|---|---|---|---|
| Trevor Henthorn<br>Staff | | 619-992-8973<br>trevor@cloud.ucsd.edu | trevor.ucsd.edu |

## Tuba

| | | | |
|---|---|---|---|
| Jonathan Piper | CS/EP | 858-254-9258 | www.jonathanpiper.com |

Volunteer                                      jcrosenb@ucsd.edu

| Dr. Ellen Weller | CS/EP | 619-263-8002 | www.wellermusic.com |
| Alumni | | eweller@palomar.edu | |

## GROUPS FOR PARTIES, WEDDINGS RECEPTIONS & OTHER OCCASIONS

**Ken Anderson**
(858) 729-3127
ptkenanderson@yahoo.com
Vocalist, Pianist, Conductor.
Classical, Popular and Gospel.
Music by note and ear.

**Anne-Marie Dicce,** DMA
(858) 504-0111
annemarie.dicce@gmail.com
www.annemariedicce.com
Soprano, available for all
occasions
(can provide own accompanist if
desired)

**Fiona Chatwin** DMA
(858) 558-0236
Soprano, all occasions

**Del Mar Trio** Alumni
Rosalind Richards (760) 634-8104
Loie Flood (619) 338-9787
Flute, Violin, Cello; all occasions

**Violinist: Duo/Trio/Quartet**
Kimberly Empeno MA
(858) 357-5162
kempeno@gmail.com
Weddings and Various occasions
Classical to Contemporary

**John Flood** MA Alumni
(619) 594-7452,
jcflood@mail.sdsu.edu
Percussion, Jazz, Classical, all
occasions,
Drumming and Dance of Ghana
www.hoasogli.com

**Loie Flood** Adj. Instr
(619) 338-9787
Piano, viola, violin, Del Mar Trio,
Lyric string quartet; Piano; all
occasions

**William Fried,** Graduate
(858) 531-6080
Pianist, classical/ contemporary,
all occasions
www.williamfried.com

**A Gaila Affair** Alumni
(858) 546-1919
Gail Gipson
Piano Music for All Occasions
ggipson@ucsd.edu

**Danny Green**
(858) 945-6157
danny@dannygreen.net
www.dannygreen.net
Latin Jazz, Brazilian Jazz, Salsa,
Straight Ahead Jazz, Classical,
Soul, R&B and Top 40. Available
for public and private events as a
solo act, up to a seven piece band.

**Warren Gref,** Lecturer
(760) 809-7410
warrengref@verison.net
Woodwind Quartet for all
occasions

**John Mark Harris**
(858) 531-1173
johnmark@sbcglobal.com
Pianist for all occasions

**Chris Hertzog** Alumni
(619) 772-0094
Piano, for all occasions

**Bricolage Music**
**Jennifer Bewerse**
321-298-4966
jbewerse@gmail.com
A small group of experienced musicians available for all
occasions. String Quartets or Trios, Violin, Viola, Cello, Piano.

**Go for Baroque Strings**
**Sean LaPerruque** (Director)
(858) 722-5249
http://seanthewig.wix.com/goforbaroquestrings
seanthewig@gmail.com
San Diego wedding music coordinator with Solo, Duos, Trios,
Quartets and other Chamber Ensembles for any occasion,
including traditional and LGBT weddings. Classical, jazz, rock,
contemporary, pop and Broadway arrangements for strings and
piano available. Private and group lessons in piano, violin and
viola.

**Vera Lukomsky** Ph.D.
(760) 634-8013
(619) 665-1676
Piano; all occasions

**Albus/Ater Productions**
**Colin McAllister - Classical and Jazz Guitar**
(858) 232-3388
colinmcallister.com
cm@colinmcallister
Guitarist with over 20 years professional experience available for
weddings and corporate events solo guitar, flute/guitar duo, jazz
trio & quartet

**Jason Robinson**
(858) 204-8859
Jazz Combo for all occasions

**David Savage** Ph.D.
(619) 460-9265
Flute/Viola Duo: Basson for all occasions

**Stefanie Schmitz** Alumni
(858) 344-6544
sschmitz@ucsd.edu
Clarinet. Classical & all occasions

**Geary Thompson** Ph.D. Alumni
(619) 286-1249
Solo Classical & Jazz Guitar, Jazz Trombone Trio.

**Weller Music**
Ellen Weller Ph.D. Alumni
(619) 263-8002
eweller@palomar.edu
Jazz, Standers, Klezmer, Classical, society Music, solo piano,
duos, trios, quarts. All occasions.

**JGW MUSIC**
James Gordon Williams - President
(646) 234-5952
jwgpiano@mac.com
www.sonicbirds.com/jamesgordonwilliams
Award winning pianist extraordinanaire, James Gordon Williams
is available for private concerts (solo piano or with ensemble),
international touring and corprate events.

DEPARTMENT OF MUSIC



ABOUT    PEOPLE    UNDERGRAD PROGRAM    GRADUATE PROGRAM    CONCERTS    GIVING    DIRECTIONS    CONTACT

Visiting Artists

News

Resources &
Research

Facilities

Conrad Prebys Music
Center Press Kit

Audio and Video
Samples

Discographies

Aleck Karis
Anthony Burr
Anthony Davis
Bertram Turetzky
Cecil Lytle
Charles Curtis
Chinary Ung
Edwin Harkins
Harvey Sollberger
János Négyesy
John Fonville
Josef Kucera
Mark Dresser
Philip Larson
Rand Steiger
Red Fish Blue Fish
Robert Zelickman
Roger Reynolds
SONOR Ensemble
of UCSD
Steven Schick
Susan Narucki
Tom Erbe

Publications

Partners and Links

Music Center

red fish blue fish

Musicians Referral
List

Performance/Production

Ensembles in
Residence

Departmental History

Box Office

# Discographies

The Department of Music at UCSD is dedicated to the development of musical intelligence and capacity and centers its quest on the music of our own time. This area is reserved for relevant discographies.

**Click on the left to view discographies for specific Faculty and Staff**

UC San Diego, 9500 Gilman Dr., La Jolla, CA 92093 (858) 534-2230
Copyright ©2014 Regents of the University of California. All rights reserved.

DEPARTMENT OF MUSIC



UC San Diego
Division of Arts & Humanities

ABOUT    PEOPLE    UNDERGRAD PROGRAM    GRADUATE PROGRAM    CONCERTS    GIVING    DIRECTIONS    CONTACT

Concerts
Mailing List
Wednesdays @7
Camera Lucida
Box Office Information
Directions
Seating Charts

# Department of Music Concert Calendar

Most Department of Music concerts are general admission, FREE and open to the public. Ticketed performances are listed below and available for sale online or via the Music Box Office: (858) 534-3448.

Purchase Tickets online for Department of Music Events.

Maps: to the Conrad Prebys Music Center pdf / weblink    Sign up for music events e-mail newsletter.

PLEASE NOTE: NO LATE SEATING. Guests arriving late may be turned away or will be asked to enter between pieces.



SEARCH EVENTS [                    ]    Search



**Neue Vocalsolisten**

Thursday, December 8th, 2016
7:00 pm
Conrad Prebys Music Center
Experimental Theater
Free

Established in 1984 as an ensemble specializing in the interpretation of contemporary vocal music, Neue Vocalsolisten has been artistically independent since 2000. Featuring high soprano Johanna Zimmer, lyric soprano Susanne Leitz-Lorey, mezzo soprano Truike van der Poel, tenor Martin Nagy, baritone Guillermo Anzorena and bass Andreas Fischer, Neue Vocalsolisten will present a special evening of chamber vocal music.

Neue Vocalsolisten will perform *tempi agitati*, a 55-minute vocal performance arranged by Associate Professor Katharina Rosenberger with choreography by theater and opera director Ludger Engels. The piece uses the music's rhythms, textures and tempi to drive the singers' movements while paying tribute to Renaissance poet Francesco Petrarch and Renaissance composers Adrian Willaert and Cipriano de Rore.



**Erik Carlson with Greg Stuart, percussion**

Friday, December 9th, 2016
7:00 pm
Conrad Prebys Music Center Recital Hall
Free

Assistant Professor of Music Erik Carlson will present new works by Jürg Frey, Marianne Schuppe and Tim Feeney with guest performers Greg Stuart (percussion) and graduate student Michiko Ogawa (clarinet). The trio will also perform pieces by Ryoko Akama.



**Aleck Karis, Erik Carlson and Michael Nicolas**

Saturday, January 7th, 2017
7:00 pm
Conrad Prebys Concert Hall
Free

Pianist Aleck Karis, violinist Erik Carlson and cellist Michael Nicolas will perform the following pieces:

- Charles Wuorinen's *Trio* (1983)
- Harrison Birtwistle's *Trio* (2011)
- Ludwig van Beethoven's *"Archduke" Trio, Opus 97* (1811)



**Camera Lucida**

Monday, January 9th, 2017
7:30 pm
Conrad Prebys Concert Hall

Reserved seating: $37
Faculty/Staff: $28
Students: FREE
UCSD Box Office
Ticket information: 858-534-TIXS (8497)

Camera Lucida is a chamber music collaboration between four musicians with diverse backgrounds. Created by a generous gift from the Sam B. Ersan Chamber Music Fund, Camera Lucida is a unique project matching masterpieces of the chamber music repertoire with a group of world-class instrumentalists who happen to call San Diego home.

Under the artistic directorship of UC San Diego professor and cellist Charles Curtis and anchored by regular featured performances by San Diego Symphony Concertmaster Jeff Thayer, Formosa Quartet violist and USC professor Che-Yen Chen, concert pianist Reiko Uchida, UC San Diego performance faculty and occasional guests, Camera Lucida has established a tradition of challenging, musically ambitious programs performed with the assurance of an established ensemble, with the added flexibility of changing instrumentation and guests from the international chamber music world.

Camera Lucida's program will include:
Schumann: *Fairy Tale Pictures for Viola and Piano, Opus 113*
Saint-Saëns: *Violin Sonata in d minor, Opus 75*
Fauré: *Trio for Clarinet, Cello and Piano, Opus 120*

For additional program information, please visit Camera Lucida's website: sdcamlu.org

*Subscription and single tickets available at the UC San Diego Box Office. Ticket information: (858) 534-TIXS (8497).*



**Ryan Nestor, percussion - Graduate Recital**

Wednesday, January 11th, 2017
3:00 pm
Conrad Prebys Concert Hall
Free

Percussionist Ryan Nestor will present his graduate recital in the Conrad Prebys Concert Hall.



**ArtPower presents Lea DeLaria**

Saturday, January 14th, 2017
8:00 pm
Mandeville Auditorium
*An ArtPower presentation.*
Tickets handed by

ArtPower presents a performance by Lea DeLaria.

DeLaria seems to have achieved overnight stardom with her SAG Award–winning stand-out role as Carrie "Big Boo" Black in the Netflix hit series Orange is the New Black. However, her multifaceted career as a comedian, actress and jazz musician has spanned decades. She was the featured vocalist at the 50th anniversary of the Newport Jazz Festival and has performed at some of the most prestigious venues in the world, including Carnegie Hall, Lincoln Center, the Chicago Symphony, Hollywood

DEPARTMENT OF MUSIC



| ABOUT | PEOPLE | UNDERGRAD PROGRAM | GRADUATE PROGRAM | CONCERTS | GIVING | DIRECTIONS | CONTACT |

Visiting Artists

News

Resources & Research

Facilities

Conrad Prebys Music Center Press Kit

Audio and Video Samples

General Media
Aleck Karis
Anthony Davis
Bertram Turetzky
Cecil Lytle
Chinary Ung
Edwin Harkins
Harvey Sollberger
János Négyesy
John Fonville
Mark Dresser
Nancy Guy
Philip Larson
Rand Steiger
Roger Reynolds
Steven Schick
Will Ogdon
Sound Check One
Sound Check Two
Sound Check Three
Sound Check Five
Discographies
Publications
Partners and Links
Music Center
red fish blue fish
Musicians Referral List
Performance/Production
Ensembles in Residence
Departmental History
Box Office

# Audio and Video Samples

Please visit this page often for samples of music by faculty and students, including the *Sound Check* CD collection featuring graduate composers and performers.

*Sound Check* is available either by digital download or on CD. To obtain your copy of *Sound Check One, Two, Three* or *Five*, e-mail your request (including your name and address) to publicity@music.ucsd.edu.

Video is presented here in QuickTime or Real Video format. Audio is presented in MP3 format. Click to download QuickTime or RealPlayer.

For questions or assistance with this content, contact Trevor Henthorn at thenthorn@ucsd.edu.



### New Music Center Promotional Video - 2007

- (09/01/2007 6:32)
Video preview of the Conrad Prebys Music Center, including images of the building, an interview with department chair Rand Steiger, and a performance by percussionist Steven Schick.

 Quicktime



### Compilation CD 1996-2000

- (06/01/2000)
The CD set is a compilation of musics from the UCSD graduate school community. Some contributions are drawn from archive recordings, others are more carefully recorded special projects and dissertation works.

Website

UC San Diego, 9500 Gilman Dr., La Jolla, CA 92093 (858) 534-2230
Copyright ©2014 Regents of the University of California. All rights reserved.

UCSanDiego

DEPARTMENT OF MUSIC


UC San Diego
Division of Arts & Humanities

ABOUT    PEOPLE    UNDERGRAD PROGRAM    GRADUATE PROGRAM    CONCERTS    GIVING    DIRECTIONS    CONTACT

Visiting Artists

News

Resources & Research

Facilities

Conrad Prebys Music Center Press Kit

Audio and Video Samples

Discographies

Publications

Partners and Links

Music Center

red fish blue fish

Musicians Referral List

Performance/Production

Ensembles in Residence

Departmental History

Box Office

# Facilities

The Department of Music maintains highly sophisticated and continuously upgraded facilities for the support of graduate and undergraduate instruction.

Computer Music Instructional Laboratory (CMIL)
Digital Music Recording Studio (DMRS)
ICAM Project Studios
Instructional Computing Laboratory (ICL)
Advanced Networking and Connectivity
Music Technology Checkout
Concert and Recording Technology
Warren Music Center Studios
Music Library

## Computer Music Instructional Laboratory (CMIL)

Established in 1987 to support undergraduate and graduate studies in computer music, CMIL now resides in a new 500-square-foot studio with machine isolation, acoustical treatment, mixer console, ergonomic workstation components, a high-resolution plasma screen, CD and DVD authoring, and integrated digital audio equipment for student access to audio processing, duplicating, high definition digital mixing and high-quality, multi-channel audio monitoring. The studio is built around a Yamaha DM2000 mixing console which is the central connection point for all digital and analog audio signals. The facility provides adequate space for instrumental rehearsal and interfacing experimentation and provides several firewire and USB audio interfaces for laptop computing.

Our server has high-speed network and wireless connections, mass storage, and archiving systems. Intel and Macintosh computer workstations run unique music software packages developed at UC San Diego. Pd is a new real-time, interactive musical and graphics programming environment written and under continuing development by Professor of Music Miller Puckette. Other audio and graphics editing and processing software packages are also supported, including ProTools HD, development compilers and several standard music production packages.

The facility is configured and optimized to support direct connection of musical instruments to computers for prototyping of real-time interactive performance and compositional projects using MAX/MSP/Jitter and Pd computer music software. It is also used for advanced seminars and classes in such topics as sound spatialization, music software programming, computer music techniques, repertoire analysis, and research.



## Digital Music Recording Studio (DMRS)

This 1500-square-foot facility includes an acoustically designed live room with high ceilings, a wooden floor, and a control room with Genelec 5.1 surround monitoring. The studio houses a Macintosh system and many dedicated software packages for music production and recording, including a ProTools HD digital audio production package with 24 channels of digital I/O for precise digital recording and editing with Apogee convertors and Grace Design microphone preamps. The studio supports MIDI for synthesis, processing, and control in music composition and performance, and includes hardware and software for CD and DVD mastering.



http://musicweb.ucsd.edu/about/about-pages.php?i=403

12/8/2016 12:50 PM



### ICAM Project Studios

The department now has four 200-square-foot studios designed for individual work on computer music projects. Each studio is equipped with an eight-channel DAW (iMac with MOTU audio interface) and is acoustically treated. In addition, the four studios are designed with different orientations: one with equipment, monitoring and software to support video editing; one for recording, editing and mastering; one for work with MIDI synthesizers; and one with analog mixing and recording.



### Instructional Computing Laboratory (ICL)

The 600-square-foot Instructional Computing Lab features 10 Intel iMac workstations and laptop work area. The composition work surfaces are based around Akai keyboard controllers. Software includes Ableton Live Suite 9, Max/MSP/Jitter 7, Soundhack, Pure Data, Sibelius 8, LogicX, and Adobe CS

Use of the lab is available to students in the enrolled in relevant Department of Music or ICAM courses.

### Advanced Networking and Connectivity

The Music Center features 10 Gb fiber connectivity to campus networking facilities, which are among the best in the world. This networking capability makes possible many types of experimental and next-generation application of media networking concepts, such as interactive collaborative performances and productions with distant locations that maintain the highest audio quality and low latency throughout. All instructional labs and all of the Department of Music's performance spaces and classroom spaces feature wireless and cabling for general purpose computing or media networking. All UC San Diego music production and research facilities are designed for ease of data portability and as complementary components of a powerful, well-designed, thoroughly integrated continuum of resources serving the needs of entering students through postdoc and faculty researchers. Additionally, there is wireless connectivity at most campus locations.



### Music Technology Equipment Checkout

The Department of Music maintains an inventory of technology equipment available to music majors and graduate students for overnight and weekend checkout. Available equipment includes laptop computers with music software installed, firewire audio interfaces, MIDI keyboards and interfaces, microphones, cables and other recording and production sound equipment. This equipment is provided primarily to support class-related, dissertation, thesis and ICAM senior projects.

### Concert Recordings and CD Releases

All faculty and most student concerts are recorded by professional staff or their assistants. Qualified students can utilize the department's extensive high-tech resources for experimental projects resulting in public performance and recordings of new works. Regularly released CDs, under advisement by faculty mentors, feature advanced graduate students who perform, compose, edit, and collaborate to produce a snapshot of musical achievement that predicts distinguished careers and new avenues of musical thought and practice.

many types of experimental and next-generation application of media networking concepts, such as interactive collaborative performances and productions with distant locations that maintain the highest audio quality and low latency throughout. All instructional labs and all of the Department of Music's performance spaces and classroom spaces feature wireless and cabling for general purpose computing or media networking. All UC San Diego music production and research facilities are designed for ease of data portability and as complementary components of a powerful, well-designed, thoroughly integrated continuum of resources serving the needs of entering students through postdoc and faculty researchers. Additionally, there is wireless connectivity at most campus locations.



### Music Technology Equipment Checkout

The Department of Music maintains an inventory of technology equipment available to music majors and graduate students for overnight and weekend checkout. Available equipment includes laptop computers with music software installed, firewire audio interfaces, MIDI keyboards and interfaces, microphones, cables and other recording and production sound equipment. This equipment is provided primarily to support class-related, dissertation, thesis and ICAM senior projects.

### Concert Recordings and CD Releases

All faculty and most student concerts are recorded by professional staff or their assistants. Qualified students can utilize the department's extensive high-tech resources for experimental projects resulting in public performance and recordings of new works. Regularly released CDs, under advisement by faculty mentors, feature advanced graduate students who perform, compose, edit, and collaborate to produce a snapshot of musical achievement that predicts distinguished careers and new avenues of musical thought and practice.

### Warren Music Center Studios

The Department of Music has a state-of-the-art recording and faculty research complex, completely refurbished in 2004-2005, with studios designed to meet the following objectives:



- Serve as an unsurpassed facility for recording and mastering classical and contemporary music
- Serve as a reference-critical listening space for the evaluation of audio production
- Support faculty research in psychoacoustics, computer music and digital signal processing (DSP) for audio

The facility incorporates two large recording studios (50' x 60') with variable wall and floor surfaces for diverse acoustical configurations, a control room (20' x 30'), an isolated machine room, and other support spaces. Warren Music Center Studios host live performances and are well suited for high-tech presentations and concert recording.

The Control Room features highly refined acoustic qualities and new all-digital mixing and editing systems including Pyramix and ProTools HD. ATC monitoring systems have been upgraded for surround sound. An excellent range of microphones supports an unusual array of recording possibilities; a fine selection of pianos, percussion, and electronic instruments is also part of the Control Room holdings. Graduate students may apply for staff positions and recording project support at Warren Music Center Studios, and ICAM majors may apply for engineering and production internship credits. The department's instructional labs are designed to serve as networked, media-compatible satellites to the Warren Music Center Studios.

### Arts Library

The Arts Library (located in Geisel Library), recognized internationally for its contemporary music holdings, maintains extensive collections of materials in all areas of music. In addition to its expansive ethnic music collections, the Arts Library also houses 32 media stations for playback of its recordings collection. Meanwhile, the library's Seminar Room is equipped with audio and video equipment for group presentations and its Digital Audio Reserves provides students with 24/7 access via the UC San Diego network to course listening assignments, which provides off campus access. http://libraries.ucsd.edu/locations/arts/.

UC San Diego, 9500 Gilman Dr., La Jolla, CA 92093 (858) 534-2230
Copyright ©2014 Regents of the University of California. All rights reserved.

UCSanDiego



Home / Music Services

**MUSIC PRODUCTION**   MUSIC COMPOSITION   MUSIC CONSULTING   EVENTS/PERFORMANCES   WELLNESS PROGRAMS

# Music Production Services

You might be an artist who just wants to concentrate on creating music and getting your music ready for an audience, or you might be a production house that needs more hands to complete a large project.

No matter where you are on that spectrum, we're here to help.

iMusicRain is a full service music production company, offering a comprehensive suite of services, ranging from initial ideation and conceptualization to the delivery of the final piece of music – and we cover all of the intermediate steps along the way.

Here's an outline of what our music production services include.

**Ideation** – *creativity begets creativity.*
We work with you to develop and gather the best ideas to ensure the success of your project.

**Research** – *the foundations of knowledge are research.*
Depending on your goals, we'll present you with a research brief designed to help you get the most out of your work. Whether that's understanding the market for your work, knowing who to contact or how to get your music to as many hands as possible, we'll do the legwork for you.

**Team assembly** – *the sum is greater than the individual parts.*
Quality music production requires a diverse team of talented people. We'll personally assemble the type of team best suited for your project by drawing on our deep network of music professionals, including musicians, voice talent, composers, writers, techies and engineers.

**Project management** – *the art and science of making things happen.*
Whether you call us project managers or music producers, our job remains the same – to oversee and manage all aspects of the recording project. And that includes adhering to schedules, managing budgets, maintaining perspective, communicating, influencing, timing, providing status updates and driving final execution.

**Creative guidance** – *one cannot hold a torch to light another's path without brightening their own.*
Our experienced team leaders will provide creative direction and guidance to ensure the finished product exceeds your expectations. Whether that includes coaching the artists and musicians in the studio, supervising mixing and mastering sessions or giving feedback to the mixing engineering, we'll be there each step of the way to help keep the team's creative energies flowing.

**Technical execution** – *any sufficiently advanced technology looks like magic.*
We have access to the hardware, software, facilities and people needed to create a finished piece of music ready for distribution. From recording to editing, mixing and mastering, we cover all the bases and can deliver your finished piece in any standard format you choose.

© Copyright iMusicRain 2013. All Rights Reserved. All sound and media found on this website are the property of iMusicRain or their respective copyright owners and are used by permission.

Home | Services | Samples | About | Quote | Contact



# Events and Performances

You have an event coming up that would benefit from having a live band or musical performance.

We have a deep network of performance artists who can help make your event a smashing success.

If you already know what you want for your event, just drop us a line and we'll make it happen. If you're not sure, we'll work with you to select the type of musical performance best suited to your venue.

Some events benefit from a 4 string quartet while others wouldn't be complete without a rousing performance of 80s rock tunes. Let us help you find the perfect fit for your event!

Our specialties include:

• Corporate events (holiday parties, team building sessions, employee recognition, vendor/client galas, expos, etc.)
• Non profit (fundraisers, cocktail parties, meetings, etc.)
• Outdoor events
• Cultural festivals
• Social parties & gatherings
• Friends/family festivities





# Music Consulting Services

As a music consulting company, iMusicRain aims to bring value to our clients by leveraging our experience as musicians and harnessing the power of our extended network of talent.

As music consultants, we wear many hats, including:

**Music supervisor**

**Sonic brand analysts**
We analyze your brand to develop a sonic identity that speaks and sounds the way you want it to be heard.

**Music advisors**
We help you find the right music and the right talent based on need, venue and goals.

**Talent liaison**
We connect you with musical talent across the country and around the world.

As part of the above services, we offer a unique suite of market research services designed to help our clients better understand how different types of music are perceived in commercials, marketing campaigns, retail outlets and other venues and how such perceptions impact brand identities and the user experience.

Our research services include:

• Music testing
• Campaign/commercial testing
• Jingle evaluation
• Emotive and motive correlations

**Music Market Research**

Each month, we publish the State of the Music Industry Index (SOMII), a unique look at the health of the music industry.

The State of the Music Industry Index is the first metric of its kind that provides a comprehensive and easily digestible view of the health of the music industry and evolving trends within the greater music landscape. The index is based on a monthly survey of adult American consumers. The index is typically published within the first 2 weeks of each month.

To receive monthly updates about the index, sign up to our **Newsletter**.

We also conduct other market research studies - on an ongoing and ad hoc (custom, by request) basis. Please contact us for more information.

© Copyright iMusicRain 2013. All Rights Reserved. All sound and media found on this website are the property of iMusicRain or their respective copyright owners and are used by permission.

Home   Bio   Farley Music Services   FMS Music Store   Lyrics and Chords   Gallery   Streaming/Videos   News and Media   Contact

# Farley Music Services

We provide a variety of audio, performance, studio engineering, live sound engineering,
music instruction, publishing, and production services
based on personal attention and years of proven experience.

Contact us (using the Contact Form below) if you would like services provided or have any questions.



## Music Production Services

With over 40 years of recording and performing experience, Farley
Music Services is your best choice for producing your first music demo,
audio book, or personal recording.

We specialize in acoustic instruments and vocals....especially
singer/songwriters and poets.

Services start at $50.00/hour.



## Home Concert Performances

Book Tom today for your private "home concert."

Solo, duo, and trio performances are available.

Prices vary according to the venue and number of players desired.



## Personalized Instruction
## (Audio Engineering – Guitar – Lap Steel)

Extensive experience as a public school teacher, college professor,
recording engineer, studio musician, and live performer make Tom and
Farley Music Services a great choice for your instructional needs.

Lessons based on basic chords, rhythms, fingerpicking, and the art of
musical collaboration.  Instructional services start at $35.00/hour.  The
number of student spots is limited.  All ages welcome!



## Musician for Hire (Guitar~Lap Steel-Dobro-Vocals)

Over 40 years of live performance and studio collaborations makes
Tom an exceptional musician to accent the sound of your music.

Specializing in Guitar, Lap Steel, Squareneck Dobro, and Vocals - his
favorite genres are Original Music, Acoustic, Rock & Roll, Country, and
Blues.

Cost per performance based upon gear, rehearsal, and venue
requirements.  To review a partial list of performance song titles (by
instrument), click here.

Tom Farley



*Cost per performance based upon gear, rehearsal, and venue requirements.* **To review a partial list of performance song titles (by instrument),** **click here***.*



### CD Cover and Performance Flyer Graphic Design

*Tom has designed the CD covers, liner notes, and flyers for all of his studio productions and live performances.*

*Graphic Design Services start at $35.00/hour plus printing costs.*



### Sound Engineer for Studio and Live Performances

*Tom has extensive experience as a live sound PA engineer....being the soundman for every group he created.*

*Services are for engineering only; we do not supply PA systems.*

*Cost are negotiated on a per session/gig basis.*



### Create your own Audio Book

*Record, produce, and publish your audio book of poetry, prose, or fiction.*

*Read your own work...or have a professional voice talent do the work.*

*Costs for studio time is $35.00 per hour.  Production, copyright, and publishing costs are extra and determined by the size of the project*

## Contact Form

| Name |
|---|

| Email |
|---|

| Subject |
|---|

| Message |
|---|

Send to Farley Music Services

Copyright 2016 - Tom Farley

| | |
|---|---|
| **To:** | Navarro, Martin (sun7676@yahoo.com) |
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 87156115 - LOS CAMINANTES HN - N/A |
| **Sent:** | 12/8/2016 5:31:58 PM |
| **Sent As:** | ECOM113@USPTO.GOV |
| **Attachments:** | |

## UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)

## <u>IMPORTANT NOTICE REGARDING YOUR<br>U.S. TRADEMARK APPLICATION</u>

### USPTO OFFICE ACTION (OFFICIAL LETTER) HAS ISSUED<br>ON 12/8/2016 FOR U.S. APPLICATION SERIAL NO. 87156115

Your trademark application has been reviewed.  The trademark examining attorney assigned by the USPTO to your application has written an official letter to which you must respond.  Please follow these steps:

**(1)  READ THE LETTER** by clicking on this link or going to http://tsdr.uspto.gov/, entering your U.S. application serial number, and clicking on "Documents."

The Office action may not be immediately viewable, to allow for necessary system updates of the application, but will be available within 24 hours of this e-mail notification.

**(2)  RESPOND WITHIN 6 MONTHS** (*or sooner if specified in the Office action*), calculated from 12/8/2016, using the Trademark Electronic Application System (TEAS) response form located at http://www.uspto.gov/trademarks/teas/response_forms.jsp.

**Do NOT hit "Reply" to this e-mail notification, or otherwise e-mail your response** because the USPTO does NOT accept e-mails as responses to Office actions.

**(3)  QUESTIONS** about the contents of the Office action itself should be directed to the trademark examining attorney who reviewed your application, identified below.

/Seth Dennis/
Examining Attorney
Law Office 113
(571) 272-9495
seth.dennis@uspto.gov

## <u>WARNING</u>

**Failure to file the required response by the applicable response deadline will result in the ABANDONMENT of your application.**  For more information regarding abandonment, see http://www.uspto.gov/trademarks/basics/abandon.jsp.

**PRIVATE COMPANY SOLICITATIONS REGARDING YOUR APPLICATION:**  Private companies **not** associated with the USPTO are using information provided in trademark applications to mail or e-mail trademark-related solicitations.  These companies often use names that closely resemble the USPTO and their solicitations may look like an official government document.  Many solicitations require that you pay "fees."

Please carefully review all correspondence you receive regarding this application to make sure that you are responding to an official document from the USPTO rather than a private company solicitation.  All <u>official</u> USPTO correspondence will be mailed only from the "United States Patent and Trademark Office" in Alexandria, VA; or sent by e-mail from the domain "@uspto.gov."  For more information on how to handle

private company solicitations, see http://www.uspto.gov/trademarks/solicitation_warnings.jsp.

# Exhibit F

| To: | Martin Navarro (sun7676@yahoo.com) |
|---|---|
| Subject: | U.S. TRADEMARK APPLICATION NO. 88028681 - LOS CAMINANTES H.N - N/A |
| Sent: | 11/2/2018 6:41:05 AM |
| Sent As: | ECOM113@USPTO.GOV |
| Attachments: | Attachment - 1 |
| | Attachment - 2 |
| | Attachment - 3 |
| | Attachment - 4 |
| | Attachment - 5 |
| | Attachment - 6 |
| | Attachment - 7 |
| | Attachment - 8 |
| | Attachment - 9 |
| | Attachment - 10 |
| | Attachment - 11 |
| | Attachment - 12 |
| | Attachment - 13 |
| | Attachment - 14 |
| | Attachment - 15 |
| | Attachment - 16 |
| | Attachment - 17 |
| | Attachment - 18 |
| | Attachment - 19 |
| | Attachment - 20 |
| | Attachment - 21 |
| | Attachment - 22 |
| | Attachment - 23 |
| | Attachment - 24 |
| | Attachment - 25 |
| | Attachment - 26 |
| | Attachment - 27 |
| | Attachment - 28 |
| | Attachment - 29 |
| | Attachment - 30 |
| | Attachment - 31 |
| | Attachment - 32 |

**UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)**
**OFFICE ACTION (OFFICIAL LETTER) ABOUT APPLICANT'S TRADEMARK APPLICATION**

**U.S. APPLICATION**
**SERIAL NO.** 88028681

**MARK: LOS**
**CAMINANTES H.N**

**\*88028681\***

CORRESPONDENT
ADDRESS:
    MARTIN
NAVARRO
    MAGNOLIA WAY
16253
    FONTANA, CA
92336

**CLICK HERE TO RESPOND TO THIS
LETTER:**
http://www.uspto.gov/trademarks/teas/response_forms.jsp

VIEW YOUR APPLICATION FILE

**APPLICANT:** Martin
Navarro

**CORRESPONDENT'S
REFERENCE/DOCKET
NO:**

**CORRESPONDENT E-
MAIL ADDRESS:**
    sun7676@yahoo.com

## OFFICE ACTION

## STRICT DEADLINE TO RESPOND TO THIS LETTER

TO AVOID ABANDONMENT OF APPLICANT'S TRADEMARK APPLICATION, THE USPTO MUST RECEIVE APPLICANT'S
COMPLETE RESPONSE TO THIS LETTER **WITHIN 6 MONTHS** OF THE ISSUE/MAILING DATE BELOW. A RESPONSE
TRANSMITTED THROUGH THE TRADEMARK ELECTRONIC APPLICATION SYSTEM (TEAS) MUST BE RECEIVED BEFORE
MIDNIGHT **EASTERN TIME** OF THE LAST DAY OF THE RESPONSE PERIOD.

**ISSUE/MAILING DATE: 11/2/2018**

The referenced application has been reviewed by the assigned trademark examining attorney. Applicant must respond timely and completely to
the issues below. 15 U.S.C. §1062(b); 37 C.F.R. §§2.62(a), 2.65(a); TMEP §§711, 718.03.

SUMMARY OF ISSUES:

- Section 2(D) Refusal – Likelihood Of Confusion
- Translation Statement Required
- Information About Significance Of Wording In The Mark Required
- Teas Plus Filing Status Lost – Not All Teas Plus Requirements Met – Additional Fee Required
- Substitute Specimen Required

SECTION 2(d) REFUSAL – LIKELIHOOD OF CONFUSION

Registration of the applied-for mark is refused because of a likelihood of confusion with the mark in U.S. Registration No. 4410019. Trademark
Act Section 2(d), 15 U.S.C. §1052(d); *see* TMEP §§1207.01 *et seq.* See the attached registration.

Trademark Act Section 2(d) bars registration of an applied-for mark that is so similar to a registered mark that it is likely consumers would be
confused, mistaken, or deceived as to the commercial source of the services of the parties. *See* 15 U.S.C. §1052(d). Likelihood of confusion is
determined on a case-by-case basis by applying the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ
563, 567 (C.C.P.A. 1973) (called the "*du Pont* factors"). *In re i.am.symbolic, llc*, 866 F.3d 1315, 1322, 123 USPQ2d 1744, 1747 (Fed. Cir.
2017). Only those factors that are "relevant and of record" need be considered. *M2 Software, Inc. v. M2 Commc'ns, Inc.* , 450 F.3d 1378, 1382,
78 USPQ2d 1944, 1947 (Fed. Cir. 2006) (citing *Shen Mfg. Co. v. Ritz Hotel Ltd.*, 393 F.3d 1238, 1241, 73 USPQ2d 1350, 1353 (Fed. Cir. 2004));
*see In re Inn at St. John's, LLC* , 126 USPQ2d 1742, 1744 (TTAB 2018).

Although not all *du Pont* factors may be relevant, there are generally two key considerations in any likelihood of confusion analysis: (1) the
similarities between the compared marks and (2) the relatedness of the compared goods and/or services. *See In re i.am.symbolic, llc*, 866 F.3d at
1322, 123 USPQ2d at 1747 (quoting *Herbko Int'l, Inc. v. Kappa Books, Inc.* , 308 F.3d 1156, 1164-65, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002));
*Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 1103, 192 USPQ 24, 29 (C.C.P.A. 1976) ("The fundamental inquiry mandated

by [Section] 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods [or services] and differences in the marks."); TMEP §1207.01.

Applicant's mark is LOS CAMINANTES H.N for "Entertainment services in the nature of live visual and audio performances, namely, musical band, rock group, gymnastic, dance, and ballet performances" in Class 41.

Registrant's mark is LOS CAMINANTES for "Entertainment in the nature of live performances by a musical group" in Class 41.

<u>Similarity of the Marks</u>

Marks are compared in their entireties for similarities in appearance, sound, connotation, and commercial impression. *Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 1321, 110 USPQ2d 1157, 1160 (Fed. Cir. 2014) (quoting *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1371, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005)); TMEP §1207.01(b)-(b)(v). "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Inn at St. John's, LLC* , 126 USPQ2d 1742, 1746 (TTAB 2018) (citing *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)); TMEP §1207.01(b).

In this case, the applicant's mark is similar in sound, appearance, and commercial impression to the registered mark. Both marks being with the wording "LOS CAMINANTES," which is spelled and pronounced the same way in each mark. Moreover, the wording creates the same commercial impression when used in connection with live performances by musical groups, namely, that the the musical group is entitled "LOS CAMINANTES" or "THE WALKERS."

Adding a term to a registered mark generally does not obviate the similarity between the compared marks, as in the present case, nor does it overcome a likelihood of confusion under Section 2(d). *See Coca-Cola Bottling Co. v. Jos. E. Seagram & Sons, Inc.*, 526 F.2d 556, 557, 188 USPQ 105, 106 (C.C.P.A. 1975) (finding BENGAL and BENGAL LANCER and design confusingly similar); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1269 (TTAB 2009) (finding TITAN and VANTAGE TITAN confusingly similar); *In re El Torito Rests., Inc.*, 9 USPQ2d 2002, 2004 (TTAB 1988) (finding MACHO and MACHO COMBOS confusingly similar); TMEP §1207.01(b)(iii). In the present case, the marks are identical in part and the addition of the wording "H.N" in the applied-for mark does not obviate the similarities between the marks.

Because the marks are similar in sound, appearance, and commercial impression, the marks are confusingly similar.

<u>Relatedness of the Similar</u>

The compared services need not be identical or even competitive to find a likelihood of confusion. *See On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 1086, 56 USPQ2d 1471, 1475 (Fed. Cir. 2000); *Recot, Inc. v. Becton*, 214 F.3d 1322, 1329, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000); TMEP §1207.01(a)(i). They need only be "related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that [the services] emanate from the same source." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012) (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)); TMEP §1207.01(a)(i).

In this case, the applicant's services are commonly provided by the same companies and under the same mark as the services of the registrant. *See* third party evidence at https://www.cirquedusoleil.com/corteo (offering live performances featuring musical groups, gymnastics, dance and ballet under the CIRQUE DU SOLEIL mark), https://www.blueman.com/ (offering live performances featuring musical groups, gymnastics, and dance under the BLUE MAN GROUP mark), and http://dragone.com/en/shows/le-reve (offering live performances the feature ballet, dance, gymnastics, and musical acts under the DRAGONE mark).

The trademark examining attorney has also attached evidence from the USPTO's X-Search database consisting of a number of third-party marks registered for use in connection with the same or similar services as those of both applicant and registrant in this case. This evidence shows that the services listed therein, namely musical bands or groups, gymnastic performance, dance performances, and ballet performances, are of a kind that may emanate from a single source under a single mark. *See In re I-Coat Co.*, 126 USPQ2d 1730, 1737 (TTAB 2018) (citing *In re Infinity Broad. Corp.*, 60 USPQ2d 1214, 1217-18 (TTAB 2001); *In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783, 1785-86 (TTAB 1993); *In re Mucky Duck Mustard Co.*, 6 USPQ2d 1467, 1470 n.6 (TTAB 1988)); TMEP §1207.01(d)(iii).

*See* U.S. Registration Nos.: 4955579, 4953997, 4952771, 4708437, and 4775983.

Because the services identified by the applicant are commonly provided by the same companies under the same marks, the services are considered related.

Because the applicant's mark is confusingly similar to the registrant's mark, and because the applicant's goods are related to the goods of the registrant, a likelihood of confusion exists and registration is refused pursuant to Section 2(d) of the Trademark Act.

<u>Response to 2(d) Refusal</u>

Although applicant's mark has been refused registration, applicant may respond to the refusal by submitting evidence and arguments in support of registration.

If applicant responds to the refusal, applicant must also respond to the requirements set forth below.

TRANSLATION STATEMENT REQUIRED

To permit proper examination of the application, applicant must submit an English translation of the foreign wording in the mark LOS CAMINANTES H.N. 37 C.F.R. §§2.32(a)(9), 2.61(b); *see* TMEP §809.

The following English translation is suggested:

**The English translation of "LOS CAMINANTES" in the mark is "THE WALKERS".** TMEP §809.03. See attached translation evidence.


INFORMATION ABOUT SIGNIFICANCE OF WORDING IN THE MARK REQUIRED

To permit proper examination of the application, applicant must explain whether the letters in the mark "H.N" have any significance in the music or entertainment trade or industry or as applied to applicant's goods and/or services, or if such letters represent a "term of art" within applicant's industry. *See* 37 C.F.R. §2.61(b); TMEP §814. Failure to comply with a request for information is grounds for refusing registration. *In re Harley*, 119 USPQ2d 1755, 1757-58 (TTAB 2016); TMEP §814.

TEAS PLUS FILING STATUS LOST – NOT ALL TEAS PLUS REQUIREMENTS MET – ADDITIONAL FEE REQUIRED

Applicant must submit an additional processing fee of $125 per class because the application as filed did not meet the TEAS Plus application filing requirements. *See* 37 C.F.R. §§2.6(a)(1)(v), 2.22(a), (c); TMEP §§819.01 *et seq.*, 819.04. Specifically, applicant failed to meet the following application filing requirement(s): a translation of all non-English wording in the mark was not provided.

The additional fee is required even if applicant later corrects these application requirements.

SUBSTITUTE SPECIMEN REQUIRED

Registration is refused because the specimen in International Class 41 is merely a photocopy of the drawing or a picture or rendering of the applied-for mark, and thus fails to show the applied-for mark in use in commerce with the services for each international class. Trademark Act Sections 1 and 45, 15 U.S.C. §§1051, 1127; 37 C.F.R. §§2.34(a)(1)(iv), 2.56(a); *In re Chica*, 84 USPQ2d 1845, 1848 (TTAB 2007); TMEP §§904, 904.07(a), 1301.04(g)(i). An application based on Trademark Act Section 1(a) must include a specimen showing the applied-for mark in use in commerce for each international class of services identified in the application. 15 U.S.C. §1051(a)(1); 37 C.F.R. §§2.34(a)(1)(iv), 2.56(a); TMEP §§904, 904.07(a).

Examples of specimens for services include advertising and marketing materials, brochures, photographs of business signage and billboards, and webpages that show the mark used in the actual sale, rendering, or advertising of the services. *See* TMEP §1301.04(a), (h)(iv)(C). Specimens comprising advertising and promotional materials must show a direct association between the mark and the services. TMEP §1301.04(f)(ii).

Applicant may respond to this refusal by satisfying one of the following for each applicable international class:

    (1)    Submit a different specimen (a verified <u>"substitute" specimen</u>) that (a) was in actual use in commerce at least as early as the filing date of the application and (b) shows the mark in actual use in commerce for the services identified in the application. A "verified substitute specimen" is a specimen that is accompanied by the following statement made in a signed affidavit or supported by a declaration under 37 C.F.R. §2.20: "The substitute (or new, or originally submitted, if appropriate) specimen(s) was/were in use in commerce at least as early as the filing date of the application or prior to the filing of the amendment to allege use." The substitute specimen cannot be accepted without this statement.

    (2)    Amend the filing basis to <u>intent to use under Section 1(b)</u>, for which no specimen is required. This option will later necessitate additional fee(s) and filing requirements such as providing a specimen.

For an overview of *both* response options referenced above and instructions on how to satisfy either option online using the Trademark Electronic Application System (TEAS) form, please go to <u>http://www.uspto.gov/trademarks/law/specimen.jsp</u>.

<u>Advisory Regarding Matching Inconsistency Between the Applied-for Mark and Registered Mark</u>

The drawing shows the mark sought to be registered, and must be a substantially exact representation of the mark as used on or in connection with the services, as shown by the specimen. 37 C.F.R. §2.51(a); TMEP §807.12(a). Because the mark in the drawing is not a substantially exact representation of the mark on the specimen, applicant has failed to provide the required evidence of use of the applied-for mark in commerce on or in connection with applicant's services. *See* TMEP §807.12(a). Specifically, the specimen displays the mark as "LOS CAMINANTES HN"; however, the drawing displays the mark as "LOS CAMINANTES H.N".

The applicant is advised that if the specimen for the applied-for mark does not match the drawing of the applied-for mark, registration will be refused.

RESPONSE GUIDELINES

**Response guidelines**. For this application to proceed, applicant must explicitly address each refusal and/or requirement in this Office action. For a refusal, applicant may provide written arguments and evidence against the refusal, and may have other response options if specified above. For a requirement, applicant should set forth the changes or statements. Please see "Responding to Office Actions" and the informational video "Response to Office Action" for more information and tips on responding.

Please call or email the assigned trademark examining attorney with questions about this Office action. Although the trademark examining attorney cannot provide legal advice or statements about applicant's rights, the trademark examining attorney can provide applicant with additional explanation about the refusal(s) and/or requirement(s) in this Office action. *See* TMEP §§705.02, 709.06. Although the USPTO does not accept emails as responses to Office actions, emails can be used for informal communications and will be included in the application record. *See* 37 C.F.R. §§2.62(c), 2.191; TMEP §§304.01-.02, 709.04-.05.

<u>Advisory Regarding Amendment of the Identification of Services</u>

Applicant's services may be clarified or limited, but may not be expanded beyond those originally itemized in the application or as acceptably amended. *See* 37 C.F.R. §2.71(a); TMEP §1402.06. Applicant may clarify or limit the identification by inserting qualifying language or deleting items to result in a more specific identification; however, applicant may not substitute different services or add services not found or encompassed by those in the original application or as acceptably amended. *See* TMEP §1402.06(a)-(b). The scope of the services sets the outer limit for any changes to the identification and is generally determined by the ordinary meaning of the wording in the identification. TMEP §§1402.06(b), 1402.07(a)-(b). Any acceptable changes to the services will further limit scope, and once services are deleted, they are not permitted to be reinserted. TMEP §1402.07(e).

<u>Advisory Regarding the Hiring of a Private Trademark Attorney</u>

Because of the legal technicalities and strict deadlines involved in the USPTO application process, applicant may wish to hire a private attorney specializing in trademark matters to represent applicant in this process and provide legal advice. Although the undersigned trademark examining attorney is permitted to help an applicant understand the contents of an Office action as well as the application process in general, no USPTO attorney or staff is permitted to give an applicant legal advice or statements about an applicant's legal rights. TMEP §§705.02, 709.06.

For attorney referral information, applicant may consult the American Bar Association's Consumers' Guide to Legal Help ; an online directory of legal professionals, such as FindLaw®; or a local telephone directory. The USPTO, however, may not assist an applicant in the selection of a private attorney. 37 C.F.R. §2.11.

**TEAS PLUS OR TEAS REDUCED FEE (TEAS RF) APPLICANTS – TO MAINTAIN LOWER FEE, ADDITIONAL REQUIREMENTS MUST BE MET, INCLUDING SUBMITTING DOCUMENTS ONLINE:** Applicants who filed their application online using the lower-fee TEAS Plus or TEAS RF application form must (1) file certain documents online using TEAS, including responses to Office actions (see TMEP §§819.02(b), 820.02(b) for a complete list of these documents); (2) maintain a valid e-mail correspondence address; and (3) agree to receive correspondence from the USPTO by e-mail throughout the prosecution of the application. *See* 37 C.F.R. §§2.22(b), 2.23(b); TMEP §§819, 820. TEAS Plus or TEAS RF applicants who do not meet these requirements must submit an additional processing fee of $125 per class of goods and/or services. 37 C.F.R. §§2.6(a)(1)(v), 2.22(c), 2.23(c); TMEP §§819.04, 820.04. However, in certain situations, TEAS Plus or TEAS RF applicants may respond to an Office action by authorizing an examiner's amendment by telephone or e-mail without incurring this additional fee.

/Mark S. Tratos/

Mark S. Tratos
Trademark Examining Attorney
Law Office 113
(571) 270-3575
Mark.Tratos@uspto.gov

**TO RESPOND TO THIS LETTER:** Go to http://www.uspto.gov/trademarks/teas/response_forms.jsp. Please wait 48-72 hours from the issue/mailing date before using the Trademark Electronic Application System (TEAS), to allow for necessary system updates of the application. For *technical* assistance with online forms, e-mail TEAS@uspto.gov. For questions about the Office action itself, please contact the assigned trademark examining attorney. **E-mail communications will not be accepted as responses to Office actions; therefore, do not respond to this Office action by e-mail.**

All informal e-mail communications relevant to this application will be placed in the official application record.

**WHO MUST SIGN THE RESPONSE:** It must be personally signed by an individual applicant or someone with legal authority to bind an applicant (i.e., a corporate officer, a general partner, all joint applicants). If an applicant is represented by an attorney, the attorney must sign the response.

**PERIODICALLY CHECK THE STATUS OF THE APPLICATION:** To ensure that applicant does not miss crucial deadlines or official notices, check the status of the application every three to four months using the Trademark Status and Document Retrieval (TSDR) system at http://tsdr.uspto.gov/. Please keep a copy of the TSDR status screen. If the status shows no change for more than six months, contact the Trademark Assistance Center by e-mail at TrademarkAssistanceCenter@uspto.gov or call 1-800-786-9199. For more information on checking status, see http://www.uspto.gov/trademarks/process/status/.

**TO UPDATE CORRESPONDENCE/E-MAIL ADDRESS:** Use the TEAS form at http://www.uspto.gov/trademarks/teas/correspondence.jsp.

**Print: Oct 25, 2018**                    **85767031**

**DESIGN MARK**

**Serial Number**
85767031

**Status**
CANCELLATION PENDING

**Word Mark**
LOS CAMINANTES

**Standard Character Mark**
Yes

**Registration Number**
4410019

**Date Registered**
2013/10/01

**Type of Mark**
SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
Ramirez, Anthony INDIVIDUAL UNITED STATES 10020 Spruce Ave Bloomington
CALIFORNIA 92316

**Owner**
Ramirez, Jr., Agustin INDIVIDUAL UNITED STATES 10020 Spruce Ave
Bloomington CALIFORNIA 92316

**Owner**
Ramirez, Agustin INDIVIDUAL UNITED STATES 10020 Spruce Ave Bloomington
CALIFORNIA 92316

**Goods/Services**
Class Status -- ACTIVE. IC 041. US 100 101 107. G & S:
Entertainment in the nature of live performances by a musical group.
First Use: 1975/02/14. First Use In Commerce: 1975/02/14.

**Translation Statement**
The English translation of "LOS CAMINANTES" in the mark is    "The
Walkers"

**Filing Date**

-1-

**Print: Oct 25, 2018**                    **85767031**

2012/10/30

**Examining Attorney**
BLOHM, LINDA E.

**Attorney of Record**
Steven J. Eyre

# LOS CAMINANTES



# Exhibit G





 **puertoescondidomariscos** ・・・



6:22

 

🔒    m.facebook.com    

Facebook Watch



Este viernes 13 de mayo los TIRANOS del NORTE guardianes del amor LOS CAMINANTES y la Sonora Dinamita 🎤 en club Silverado boletos 🎫 $40 comparte el post recibe $5 descuerdo.  6027483477

 1

                



# Exhibit H

Alejandro Menchaca (State Bar No. 220471)
THE MENCHACA LAW FIRM
714 West Olympic Blvd., Suite 450
Los Angeles, CA 90015
Telephone: (213) 792-0877
Facsimile: (213) 745-6060
Email: amenchaca@ymail.com

Attorneys for Counterclaimant
ESTATE OF HUMBERTO A. NAVARRO

FILED

2011 MAY 29 PM 2:38

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AGUSTIN RAMIREZ <br><br> Plaintiff, <br><br> v. <br><br> MARTIN NAVARRO, ANGEL JUAREZ, ESTATE OF HUMBERTO NAVARRO, DOES 1- 10 <br><br> Defendant <br><br> ESTATE OF HUMBERTO A. NAVARRO <br><br> Counterclaimant, <br><br> v. <br><br> AGUSTIN RAMIREZ, an individual; LOS CAMINANTES PARTNERSHIP, a partnership, and ROES 1 through 5 inclusive <br><br> Counter-Defendants | CASE NO. CV 11-8012 R (DTBx) <br><br> COUNTERCLAIM FOR: <br><br> 1) FEDERAL TRADEMARK INFRINGEMENT; <br> 2) FEDERAL TRADEMARK COUNTERFEITING; <br> 3) FALSE DESIGNATION OF ORIGIN; <br> 4) TRADEMARK DILUTION; <br> 5) STATE LAW INFRINGEMENT; <br> 6) INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE; <br> 7) ACCOUNTING; <br> 8) INJUNCTIVE RELIEF; <br> 9) DISSOLUTION OF PARTNERSHIP <br><br> DEMAND FOR JURY TRIAL |

Counterclaimant Estate of Humberto Ambriz Navarro alleges:

## JURISDICTION AND VENUE

1.     This Court has exclusive subject matter jurisdiction as to the violations of the Lanham Act pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1332(a)-(c) and § 1338(a). This Court also has pendant jurisdiction over the state causes of action relating to unfair competition and to trademark, service mark, trade name and trade dress infringement, pursuant to 28 U.S.C. § 1338(b).

2.     The Court has specific personal jurisdiction over all the defendants as each has purposefully committed, within the state, the acts from which these claims arise and/or has committed tortuous  acts outside California, knowing and intending that such acts would case injury within the state.

3.     Venue in this action is proper in the United States District Court for the Central District of California by virtue of 28 U.S.C. §§ 1391(b) and 1391(c) in that some defendants reside in this District, transact affairs in this District and that a substantial part of the events or omissions giving rise to the claims herein occurred within this District.

## THE PARTIES

4.     Counterclaimant is the Estate of Humberto Ambriz Navarro ("Navarro"), the co-founder of the popular Spanish musical group, "Los Caminantes". Navarro died on June 5, 2011 in San Bernardino County, California.

5.     Counterclaimant is informed and believes, and based thereon alleges that Los Caminantes is, and at all times relevant hereto was a partnership,

conducting business within the Central District of California with its principal place

of business within the County of San Bernardino, State of California. The

partnership is comprised of the late Humberto Navarro and Defendant Agustin

Ramirez.

6.      Counterclaimant is informed and believes, and based thereon alleges,

that Cross-Defendant Agustin Ramirez resides within the Central District of

California. Specifically, Cross-Defendant resides in the County of San Bernardino,

State of California. Navarro is the sole person in complete control of the

partnership.

7.      The true names and capacities, whether individual, corporate,

associates, employee, or otherwise, of the defendants sued herein as Roes 1 through

5, inclusive, currently are unknown to Counterclaimant and Counterclaimant

therefore sues said defendants by such fictitious names.  Counterclaimant is

informed and believes and based upon such information and belief alleges that each

of the Counter-Defendants designated herein as a Doe is responsible legally in

some manner for the acts, conduct, omissions and events referred to herein, causing

injury and damages proximately thereby to Plaintiff, as alleged hereinafter.

Plaintiff will seek leave to amend this Complaint to allege the true names,

capacities and circumstances establishing the liability of the Counter-Defendants

designated herein as Does 1 through 25, inclusive, at such time as Plaintiff

ascertains the same.

8.     Plaintiff is informed and believes and based upon such information and belief alleges that, at all times herein relevant, each of the Counter-Defendants was the agent, servant, employee, supervisor, co-venturer, subsidiary and/or corporate-parent of each of the remaining Counter-Defendants and, at all times herein relevant, each Counter-Defendant was acting within the course, scope, purpose, consent, knowledge, ratification, and authorization of such agency, employment, joint venture, subsidiary and/or corporate-parent relationship.

9.     Whenever, in this Counterclaim reference is made to "Counter-Counter-Defendants," such allegations shall refer to all Counter-Counter-Defendants named herein, including all Counter-Defendants designated herein as Roes, and shall be deemed to mean the conduct of any and all such Counter-Defendants acting individually, jointly and/or severally.

## GENERAL ALLEGATIONS

10.     Los Caminantes is a popular, Spanish-language musical group that was formed in 1975 by Humberto Navarro, Agustin Ramirez, and three former band mates, two of which are now deceased.

11.     Since its inception, Navarro, at great expense and effort, developed the musical group known as "Los Caminantes" which began recording sound master recordings, along with promoting and marketing musical performances for the musical group. The musical group came to be one of the most successful Spanish-language acts of its time, and continues to be so.

4

12.     After three of original band members were no longer part of the group, the two remaining founders, Humberto Navarro and Agustin Ramirez, formed the Los Caminantes Partnership on or about 1998 to operate the musical group, account for the group's revenues, and distribute all profits and losses to the partners. By virtue of such partnership agreement, all partners agreed to share equally in the profits and losses of the Los Caminantes Partnership.

13.     Counterclaimant also alleges claims for federal trademark infringement and unfair competition in connection with Counter-Counter-Defendant Ramirez's unauthorized and unlawful use and misappropriation of a duly registered federal trademark and service mark "Los Caminantes" in association with the musical group.

14.     Navarro has used the name "Los Caminantes" substantially and continuously throughout the United States and Latin America since 1975.

15.     Navarro has used the "Los Caminantes" name in association with the musical group's sound recordings and compositions since 1975.

16.     Navarro has exhibited the musical group named "Los Caminantes" at live music performances in venues throughout the United States and Mexico since 1975.

17.     Navarro has used the "Los Caminantes" mark for live music performances as well as on promotional flyers, electronic and print media, and other forms of advertisement and marketing for "Los Caminantes" musical

performances.

18.     The "Los Caminantes" mark was initially registered in 1990 by Abel De Luna and thereafter in 1993 by Luna Music Company, the musical group's former manager and management group, respectively. That registration pertained to any sound recordings made by the group.

19.     Following litigation between Navarro and Ramirez, on the one hand, and De Luna (and various entities controlled by him), on the other, the parties entered into a settlement agreement whereby the De Luna parties agreed to assign to Navarro and Ramirez any and all interests they may have in the registered trademark, "Los Caminantes".

20.     On or about August 15, 2006, the Los Caminantes Partnership composed of Humberto Navarro and Agustin Ramirez registered the "Los Caminantes" trademark.

21.     On or about January 16, 2007, Agustin Ramirez assigned all his rights in the trademark and name "Los Caminantes" to Humberto Navarro by virtue of a written "Assignment of Rights".

22.     At all times since the assignment and up until the time of his death, Navarro maintained the "Los Caminantes" federal trademark and enhanced the mark's value.

23.     Navarro has continually and substantially advertised and marketed performances and other entertainment services, as well as goods, in connection with

the mark "Los Caminantes". Navarro has spent considerable sums of money promoting and enhancing the goodwill associated with the "Los Caminantes" performances, services, and products throughout the United States and Mexico.

24.     Since being assigned the trademark and up until the time of his death, Navarro has continually controlled the content and quality of the "Los Caminantes" musical performances and other services and goods.

25.     As a result of Navarro's aforementioned use, promotion and publicity, the "Los Caminantes" mark has continued to acquire enormous value and inestimable goodwill, and has become extremely well-known and famous to the consuming public and trade as identifying a source of high quality.

26.     Navarro's efforts have strengthened the public meaning of the inherently distinctive trademark and service mark "Los Caminantes". The mark is used to indicate the source of Navarro's "Los Caminantes" public performances and other goods and services, identifying and distinguishing them from those rendered or sold by others.

27.     Following the death of Navarro, the Estate of Navarro holds exclusive rights in the "Los Caminantes" mark. Despite being placed on notice that Counter-Counter-Defendant Ramirez's group holds no rights to the mark, Counter-Counter-Defendant Ramirez still continues to use the mark in association with live musical performances, in violation of the assignment and applicable law. Counterclaimant Estate now seeks to put a stop to Agustin Ramirez's unlawful and unauthorized

usage of the mark in association with the musical group "Los Caminantes".

28.     Counterclaimant alleges on information and belief that Counter-Defendant Agustin has knowingly misrepresented to the general public that his is the rightful owner of the trademark and service mark "Los Caminantes".

29.     Counterclaimant alleges on information and belief that Counter-Defendant Ramirez has knowingly misrepresented in promotional materials, advertisements, and flyers that they are the owners of the mark and trade name "Los Caminantes".

30.     Counterclaimant alleges on information and belief that Counter-Counter-Defendant Ramirez has knowingly and intentionally held his musical group out to concert promoters, venue operators, and the general public as "Los Caminantes". Furthermore, Counter-Counter-Defendant Ramirez has scheduled performances in the coming days and weeks in California and elsewhere, wherein he has used or plans to use the "Los Caminantes" mark in connection with these performances

31.     Meanwhile, Counterclaimant is irreparably harmed each time Counter-Counter-Defendant practices his deceptions upon an unsuspecting public.  Such customers are less likely to be as trusting when a performance by Counterclaimants musical group is advertised.  The damage to Counterclaimant's reputation, earning ability and bottom line is incalculable and the harm is irreparable. Counter-Defendant can be expected to continue his conduct in order to benefit from the

confusion they are causing unless enjoined from such unlawful and deceptive conduct.

32.     Respecting the Los Caminantes Partnership, Counter-Counter-Defendant Agustin Ramirez has also wrested control of the finances of the musical group following the death of Navarro. In essence, since Navarro's death, Ramirez has locked out Counterclaimant Estate and Navarro's son, Martin Navarro from ascertaining the proper sums being generated by the group's performances.

33.     Specifically, since the time of Navarro's death, Ramirez has failed to provide Navarro's representatives with an accounting of the group's performance revenues or royalties from the sale and distribution of its musical compositions and sound recordings. Following each performance, Ramirez merely provides Navarro's son, Martin Navarro, with an unsubstantiated statement reflecting amounts that are paid to the band members, its new manager, as well as a listing of costs. Ramirez has failed together to provide Navarro with any documents reflecting ticket sales, receipts, or costs associated with a performance.

34.     Additionally, while Ramirez had previously paid Navarro fifty (50) percent of net profits from performances revenues, following Navarro's death, Ramirez has breached the Partnership Agreement by paying Navarro's representative (Martin Navarro) well below that fifty percent fee. Indeed, Navarro makes less than the present manager.

35.     Since its commencement, Counter-Defendant Los Caminantes

Partnership and Agustin Ramirez have failed to issue financial statements, accountings and to make any proper disbursements to Counterclaimant, or Martin Navarro.

36.    Counter-Defendant Ramirez has failed to account for all amounts received for the appearances and performances of Plaintiff, along with the amounts deposited into Counter-Defendants' bank accounts for those appearances and performances.

37.    Counter-Defendants' Los Caminantes Partnership and Ramirez have received considerable monies from live performances and royalties without accounting to the Plaintiff or providing the agreed-upon percentage of net profits.

38.    Counter-Defendant Ramirez has engaged in pervasive fraud, mismanagement, abuse of authority, and persistent unfairness toward Plaintiff and Martin Navarro.    Furthermore, the assets of Los Caminantes are being misapplied or wasted by Counter-Defendant Ramirez in that he has taken money, profits, and financial assets of the Caminantes Partnership and has used them for personal gain. Counterclaimant is also informed and believes thereon that Counter-Defendant Ramirez has further commingled monies and profits of Counter-Defendant Caminantes Partnership with his personal bank accounts preventing a proper accounting of said monies and profits.

## FIRST CLAIM FOR RELIEF

### Trademark Infringement in Violation of Section 32

of the Lanham Act, 15 U.S.C. § 1114 against Counter- Counter-Defendant

Agustin Ramirez

39. Counterclaimant realleges and incorporates by reference paragraphs 1-through 38 of this complaint as though fully set forth herein.

40. This claim for relief arises under Section 32 of the Lanham Act, 15 U.S.C. § 114 and is alleged against all Counter-Counter-Defendants. Counterclaimant is the Estate of Humberto Navarro, which owns the exclusive rights in the mark "Los Caminantes". in commerce in connection with the services of the musical group as performing and recording artists. The mark "Los Caminantes" is inherently distinctive and has acquired a secondary meaning to referring to Counterclaimant's group.

41. Counter-Defendant Ramirez has no colorable right or claim to use the mark as Agustin Ramirez assigned all his rights to the mark pursuant to an Assignment of Rights dated January 16, 2007.

42. The foregoing acts of Counter-Defendant Ramirez constitute infringement of U.S.Trademark Registration No. 3,129,214 in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

43. Counter-Counter-Defendant's unauthorized use of "Los Caminantes" as a mark falsely indicates to consumers that Counter-Defendant's entertainment services originate from, are approved by, are licensed by, or are affiliated with Plaintiff or are otherwise associated with Counterclaimant's entertainment services

and live music performances.

44.     Counter-Defendant's unauthorized use of "Los Caminantes" in the manner described above is likely to cause confusion, to cause mistake, or to deceive the public into believing Counter-Defendant's goods and services originate from or are associated with Plaintiff or its licensee/assignee.

45.     Counter-Defendant's unauthorized use of the "Los Caminantes" mark removes Counterclaimant's ability to control the nature and quality of the goods and services provided under its "Los Caminantes" mark and places the Counter-claimant's valuable reputation and goodwill in the hands of the Counter-Defendant.

46.     Counterclaimant's mark is entitled to strong protection under Section 32 of the Lanham Act because such mark, when used to identify entertainment services and live music performances is "arbitrary" as to such services.

47.     Counterclaimant believes that it has or is likely to be damaged by Counter-Defendant's use of the mark at issue and will suffer irreparable harm.

48.     Counter-Defendant is therefore liable, without limitation, for the remedies provided for in 15 U.S.C. § 1114(2), 1116, 1117 and 1118.

## SECOND CLAIM FOR RELIEF

**Federal Trademark Counterfeiting, 15 U.S.C. § 1114 against Counter-Defendant Ramirez**

49.     Counterclaimant realleges and incorporates by reference paragraphs 1 through 48 of this complaint as if fully set forth herein.

50.     This claim for relief arises under 15 U.S.C. § 114 and is alleged against Counter-Defendant Ramirez.

51.     Counter-Defendant's foregoing acts constitute federal trademark counterfeiting of Plaintiff's federally registered trademark "Los Caminantes" as defined by 15 U.S.C. §§ 1114, 1116.

52.     Federal registration of a trademark is prima facie evidence of a registrant's exclusive right to use the registered trademark in commerce in connection with the goods or services specified in the certificate, pursuant to 15 U.S.C. § 1057(b).   Counterclaimant Estate is the exclusive owner of the "Los Caminantes" trademark, possesses the right to initiate proceedings to enforce, protect, and defend the "Los Caminantes" brand.

53.     Counterclaimant has continually and substantially advertised and marketed performances and other entertainment services, as well as goods, in connection with the mark "Los Caminantes".  Navarro spent considerable sums of money promoting and enhancing the goodwill associated with the "Los Caminantes" performances, services, and products throughout the United States and in foreign countries.

54.     Counter-Defendant is presently advertising the performances of musical groups presenting themselves as "Los Caminantes" at public performances that have taken place over several years.

55.     Counter-Defendant's willful and intentional counterfeiting, imitating,

and copying of Counterclaimant's registered trademark has confused, and will likely continue to confuse or deceive the public into believing Counter-Counter-Defendants' goods and services originate from or are associated with the late Humberto Navarro and his estate.

56.   Counter-Defendant's activities are in violation of 15 U.S.C. § 1116(1)(a) and constitute counterfeiting of a registered trademark in connection with the sale or offering for sale of a service which is likely to cause confusion, mistake or deception with the services offered by Counterclaimant.

## THIRD CLAIM FOR RELIEF

### False Designation of Origin and Unfair Competition in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) against Counter-Defendant Ramirez

57.   Counterclaimant realleges and incorporates by reference paragraphs 1 through 63 of this complaint as if fully set forth herein.

58.   This claim for relief arises under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and is alleged against Counter-Defendant Ramirez.

59.   Counter-Defendants' unauthorized use of the "Los Caminantes" mark, trade name, and trade dress falsely indicates to consumers that Counter-Defendant's entertainment services originate from, are approved by, are sponsored by, are licensed by, or are affiliated with Counterclaimant or are otherwise associated with Counterclaimant's entertainment services and live music performances.

60. Counter-Defendant's unauthorized use of the "Los Caminantes" mark in the manner described above is likely to cause confusion, to cause mistake, or to deceive the public into believing Counter-Defendant's goods and services originate from or are associated with Plaintiff.

61. Counter-Defendant's infringement has been intentional and willful, constituting and exceptional case pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117. Counterclaimant is therefore entitled to recover three times the amount of: (1) Counter-Defendants' profits; and (2) Counter-Defendants' actual damages, including pre-judgment interest. Counterclaimant is further entitled to recover their attorney fees and costs incurred in this action.

62. Counter-Defendant's unauthorized use of the "Los Caminantes" Trademark, trade name and trade dress removes from Counterclaimant the ability to control the nature and quality of the goods and services provided under its "Los Caminantes" mark and places the valuable reputation and goodwill of Counterclaimant in the hands of the Counter-Defendant.

63. Counterclaimant's mark is entitled to strong protection under Section 43(a) of the Lanham Act because such mark, when used to identify entertainment services and musical sound recordings, is "arbitrary" as to such services, and because Counterclaimant has extensively promoted the mark to the relevant public.

64. Counterclaimant has been or is likely to be irreparably damaged by Counter-Defendant's use of the mark, trade name, and trade dress at issue.

15

65. Counter-Defendant's actions, as set forth above, constitute trademark, trade name and trade dress infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

66. Counter-Defendant is therefore liable, without limitation, for the remedies provided for in 15 U.S.C. § 1114(2), 1116, 1117, and 1118.

## FOURTH CLAIM FOR RELIEF

### Trademark Dilution Under The Lanham Act against Counter-Defendant Ramirez

67. Counterclaimant realleges and incorporates by reference paragraphs 1 through 73 of this complaint as if fully set forth herein.

68. This claim for relief arises under Lanham Act and is alleged against the Counter-Defendant.

69. The trade name and mark of Counterclaimant's, "Los Caminantes" has become famous throughout the United States, through use in advertising of the musical group's services, through radio airplay, record sales, the appearance of the musical group on television broadcast in Latin America and the United States, over the Internet and social media sites, newspaper and magazine articles concerning the group and public appearances at concerts, dances and events.

70. Counter-Defendant's use of the "Los Caminantes" mark and distinctive design tarnishes the image of and dilutes the distinctive character of the "Los Caminantes" mark and will diminish and destroy the public association of the trade

16

name and mark of Counterclaimant.

71.     In engaging in the actions complained of above, Counter-Defendant willfully intended and intend to trade on the reputation of the musical group.

72. In engaging in the actions complained of above, Counter-Defendants and each of them have willfully intended to cause dilution of the famous trade name and mark belonging to Counterclaimant Estate.

73. For each act of unfair competition, Counterclaimant is entitled to recover actual damages as well as Counter-Defendants' profits from such infringement.

74. Counter-Defendants' continuous use of Counterclaimant's trademark and distinctive designs diminishes and dilutes the distinctive value of the mark, to the great detriment of Counterclaimant in contravention of 15 U.S.C. § 1125(c)(1).

75.     As a result of Counter-Defendants' activities, Counterclaimant and the public have been and are likely to be further irreparably damaged.

## FIFTH CLAIM FOR RELIEF

### State Law and Statutory Trade Name Infringement and Dilution against Counter-Defendant Ramirez

76.     Counterclaimant realleges and incorporates by reference paragraphs 1 through 75 of this Counterclaim as if fully set froth herein.

77.     This claim for relief arises under the laws of the State of California and is alleged against Counter-Defendant Ramirez.

78.     By their acts alleged herein, Counter-Defendant has engaged in trade

name infringement and dilution pursuant to California Business and Professional Code §§ 14330 et seq., and §§ 14402 et seq.

79. Counter-Defendant has intentionally deceived the public by misrepresenting that they are connected with the musical group pertaining to Navarro's Estate.

80. Counterclaimant is informed and believes that the acts of Counter-Defendant described herein were undertaken willfully and with the intention of causing confusion, mistake or deception.

81. Monetary relief alone is not adequate to address fully the irreparable injury that Counter-Defendant's illegal actions have caused and will continue to cause Counterclaimant if Counter-Defendant's conduct is not enjoined. Counterclaimant therefore is also entitled to preliminary and permanent injunctive relief to stop Counter-Defendant's ongoing acts of unfair competition.

### SIXTH CLAIM FOR RELIEF

**Inference With Prospective Business Advantage against Counter-Defendant Ramirez**

82. Counterclaimant realleges and incorporates by reference paragraphs 1 through 81 of this complaint as if fully set forth herein.

83. This claim for relief arises under the common law of the State of California and is alleged against Counter-Defendant Ramirez.

84. Counter-Defendant, through his actions, has interfered

with the prospective business advantage of Counterclaimant by interfering with the right of Counterclaimant to exploit and benefit commercially from the trade name and mark, "Los Caminates".

85. Counterclaimant and his licensee/assignee have been damaged by the tortious interference by Counter-Defendant with Counterclaimant's economic relations in an amount to be alleged by amendment by this complaint.

86.    The aforementioned acts of Counter-Defendant was willful, oppressive and malicious.  Counterclaimant therefore should be awarded punitive damages in an amount to be alleged by amendment to this complaint.

## SEVENTH CLAIM FOR RELIEF

### Accounting against Counter-Defendants

87. Counterclaimant realleges and incorporates by reference paragraphs 1 through 86 of this complaint  as if fully set forth herein.

88.    The claim for relief arises under the common law of the State of California and is alleged against all Counter-Defendants.

89.  Counter-Defendants are in possession of information relating to monies paid to Counter-Defendants from their misleading and deceptive practices described herein, which represents a misappropriation of monies from Counterclaimant and Counterclaimant's licensor.  The books, accounts, records, ledgers, etc. which provide this information are in the possession of Counter-Defendants and each of them.  The amount of damages, profits and interest owing to Counterclaimant from

Counter-Defendants cannot be ascertained without an accounting by Counter-Defendants and each of them. Counter-Defendants and each of them have also benefitted economically from the usurpation of the trade name and service mark of Counterclaimant without accounting to Counterclaimant or its representatives for the income and profits realized by Counter-Defendants and each of them as a result of such activities.

90.    Counterclaimant hereby demands, and is entitled to, an accounting of all monies received by Counter-Defendants from use of the mark and trade name of Counterclaimant's licensor and any other confusingly similar terms.

## EIGHT CLAIM FOR RELIEF

### Temporary, Preliminary and Permanent Injunctive Relief against Counter-Defendant

91. Counterclaimant realleges and incorporates the prior paragraphs.

92. The continuing wrongful acts of Counter-Defendants herein have harmed and continue to harm the interest of Counterclaimant in the use of the name and mark "Los Caminantes" and any confusingly similar names.  If this court does not issue a temporary, preliminary and permanent injunction against the Counter Defendants and each of them prohibiting the use of the name "Los Caminantes" and other confusing similar terms, in connection with the goods and services of Counter-Defendants' musical group, Counterclaimant and Counterclaimant's licensee/assignee will suffer irreparable harm for which there is no adequate

remedy at law.

## NINTH CLAIM FOR RELIEF

**(Involuntary Dissolution of Partnership and Appointment of Receiver Against Counter-Defendants Los Caminantes Partnership and Agustin Ramirez**

93.   Counterclaimant incorporates by reference the allegations contained in paragraphs 1 through 92, inclusive, of this Complaint as though fully set forth herein.

94.   Since the partnership business began, Counter-Defendants willfully committed a breach of the partnership agreement by wrongfully misappropriating profits of the partnership and failing to account to Humberto Navarro.  As a result of Counter-Defendants' behavior, it is not reasonably practicable to carry on the business with them and Counterclaimant is entitled to a judicial decree of dissolution of the partnership.

95.   That at the commencement of the partnership business, Counter-Defendants took exclusive control and possession of the partnership books and accounts and since that time have taken, for their own use, large sums of money from the receipts and profits of the partnership business exceeding their rightful share.  Counter-Defendants have refused and continue to refuse to account to Counterclaimant concerning the allocation of partnership profits despite Counterclaimant's repeated demands that they account and distribute partnership profits to Counterclaimant in compliance with the terms of the partnership

agreement.

96.    That since the inception of the partnership, Counterclaimant and Counter-Defendants have been unable to agree upon the proper and reasonable management of the partnership business.  As a result of the continuing disagreement concerning managerial control, it has become impossible to carry on the Partnership Business.

97.    That because of Counter-Defendants' behavior, it is not reasonably practicable to carry on the business in partnership and Counterclaimant is entitled to a judicial decree of dissolution of the partnership.

98.    That unless a receiver is appointed, the property and accounts of the partnership are in danger of being lost, removed, or materially injured since Counter-Defendants are in control of all partnership assets and are applying those assets to their own use in violation of the partnership agreement.  It is necessary that a receiver be appointed to take possession of all property and accounts of the partnership, to receive accounts receivable, pay current debts, and wind up the business of the partnership.

99.    That unless Counter-Defendants are immediately enjoined from collecting or receiving, or in any matter interfering or meddling with, or disposing of , the assets, property or other effects of the partnership, pending the final determination in the action, Counterclaimant will suffer great and irreparable harm in that partnership assets under the control of the Counter-Defendants will be sold

or hidden, making it impossible for Counterclaimant to determine and receive his share of the partnership assets.

100.    Counterclaimant has performed all of his obligations under the terms and conditions of the Partnership Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimant demands judgment as follows:

ON THE FIRST THOUGH EIGHTH CLAIM FOR RELIEF:

1.  For an order requiring Counter-Defendants to show cause, if they have any, why they should not be enjoined as set forth below, during the pendency of this action.

2.    For a temporary restraining order, a preliminary injunction and a permanent injunction, all enjoining Counter-Defendants and each of them and their agents, servants, employees and co-ventures, and all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, from engaging in or performing any of the following acts:

(a)    Using the name "Los Caminantes" or any confusing similar or colorable imitation of the name, in connection with advertising in any form, or in connection with the goods or services of Counter-Defendants or any of them.

(b)    Using the name "Los Caminantes"or any confusing similar colorable imitation of the name, in any manner for the

purpose of enhancing the commercial value of the goods or services of Counter-Defendants;

(c)     Otherwise infringing or diluting the distinctive quality of Counterclaimant's service mark and trade name "Los Caminantes";

(d)     Causing a likelihood of confusion, deception or mistake as to the makeup, source, nature or quality of Counterclaimant's or Counter-Defendants' services.

(e)     Contacting promoters, advertisers or other businesses for the purpose of offering the services of Counter-Defendants as "Los Caminantes" or any confusing similar or colorable imitation of the name.

3.     For an order requiring the Counter-Defendants to deliver up and destroy all promotional literature, advertising, goods and other materials bearing the infringing, diluting or injurious designations.

4.     For actual damages in an amount to be proven at trial.

5.     For three times the amount of Counterclaimant's actual damages suffered by reason of Counter-Defendants' infringement of Counterclaimant's mark and trade name.

6.     For three times the amount of Counter-Defendants' profits

derived from the infringement of Counterclaimant's mark and trade name.

7.    For punitive damages in an amount to be proved at trial.

8.    For prejudgement interest.

9.    For an accounting of all monies received by Counter-Defendants form their activities in connection with the use of the name "Los Caminantes".

10.    For costs of suit.

11.    For reasonable attorney fees.

12.    For such relief as the court may deem appropriate

## ON THE NINTH CAUSE OF ACTION

13.    That the partnership be dissolved.

14.    For an order that an accounting be taken of all the dealings and transactions of the partnership business from its commencement, and that all the money received by and paid to Counter-Defendants respectively, in relation to the partnership, and that Counterclaimant have judgment against Counter-Defendants for any and all sums that may be found owing Counterclaimant.

15.    That the partnership property be sold and the partnership debts and liabilities be paid off, and the surplus if any, be divided and distributed to Counterclaimant and Counter-Defendants in accordance with the terms of the partnership;

16. That a receiver be appointed, with usual powers and duties, to take possession of the property and the assets of the partnership, to wind up the affairs of the partnership, and to have custody of the accounts and property of the partnership pending their final distribution to the partnership.

17. That pending a final settlement of all partnership affairs, Counter-Defendants be immediately enjoined from collecting and receiving, or in any manner interfering or meddling with, or disposing of, the debts, money, property, and other effects of the partnership or from entering into any new transactions in the name or on behalf of the partnership.

## AS TO ALL CAUSES OF ACTION:

18. For costs; and expenses of suit.

19. For such other and further relief as the court deems just.

Dated: November 29, 2011        THE MENCHACA LAW FIRM

Alejandro Menchaca
Attorney for Counterclaimant
Estate of Humberto Navarro

1

2

<u>CERTIFICATE OF SERVICE</u>

3

4

 I HEREBY CERTIFY that on November 29, 2011, I hand-filed filed the

5

foregoing with the document with the Clerk of the Court and mailed the Answer and

6

Counterclaim VIA MAIL TO

7

 STEVE J. EYRE

8

 ATTORNEY AT LAW

9

 3550 Wilshire Boulevard, Suite 1440

10

 Los Angeles, CA 90010

11

12

13

14

 Alejandro Menchaca

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MARTIN NAVARRO'S ANSWER TO PLAINTIFF'S COMPLAINT

# Exhibit I

1  Larry Zerner (155473)
2  Law Office of Larry Zerner
   1801 Century Park East. Ste. 2400
3  Los Angeles, CA 90067
   Telephone:   (310) 773-3623
4  Email: Larry@Zernerlaw.com

5  Attorneys for Defendant Martin Navarro

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                        WESTERN DIVISION

11

12  AGUSTIN RAMIREZ, ANTHONY          | Case No. 5:20-cv-2408 JGB (SPx)
    RAMIREZ and AGUSTIN RAMIREZ, Jr.  |
13                                     | DEFENDANT'S RESPONSE TO
                          Plaintiffs,  | SPECIAL INTERROGATORIES (SET
14                                     | ONE)
15           vs.                       |
16  MARTIN NAVARRO and DOES 1-10,      |
    inclusive,                         |
17                                     |
18                         Defendants. |
19

20    PROPOUNDING PARTY:    Agustin Ramirez, Agustin Ramirez, Jr., Anthony Ramirez

21    RESPONDING PARTY:     Martin Navarro

22    SET NUMBER:           One

23

24  **SPECIAL INTERROGATORY NO.** 1

25       State all facts that support YOUR assertion that YOU have rights in the LOS

26  CAMINANTES Trademark.

27  **RESPONSE TO REQUEST NO. 1.**

28

1   Objection.  This interrogatory calls for a legal conclusion and invades the attorney-
2   client privilege and attorney work product privilege.  Notwithstanding the forgoing
3   objection, Defendant responds as follows: The Los Caminantes trademark was owned by a
4   partnership owned by my father and Agustin Ramirez.  That partnership was never
5   dissolved and I have inherited my father's rights in the trademark.  Additionally, I have been
6   touring using the Los Caminantes HN trademark since 2011 with the full knowledge of
7   Plaintiffs.  Plaintiff previously filed a lawsuit against me in 2012 for trademark infringement
8   and that lawsuit was dismissed.  I have spent the past 10 years building up the Los
9   Caminantes HN trademark.  People associated that mark with me and my band.  I have
10   spent thousands of dollars and thousands of hours building up my brand.  There is no
11   confusion between my band and Plaintiff's band.  Plaintiff cannot come forth after 10 years
12   of uninterrupted use and try to stop me from using this mark.

13   **SPECIAL INTERROGATORY NO.** 2

14   State all facts that support YOUR contention that YOU do not infringe the
15   LOS CAMINANTES Trademark.

16   **RESPONSE TO REQUEST NO. 2.**

17   Objection.  This interrogatory calls for a legal conclusion and invades the attorney-
18   client privilege and attorney work product privilege.  Further, the interrogatory is
19   objectionable in that it requires Defendant to prove a negative, that he is not infringing.  It is
20   Plaintiff's burden to prove trademark infringement.  It is not Defendant's burden to prove
21   that he is not infringing.  Notwithstanding the forgoing objection, Defendant responds as
22   follows: The Los Caminantes trademark was owned by a partnership owned by my father
23   and Agustin Ramirez.  That partnership was never dissolved and I have inherited my father's
24   rights in the trademark.  I have been touring using the Los Caminantes HN trademark since
25   2011 with the full knowledge of Plaintiffs.  Plaintiff previously filed a lawsuit against me in
26   2012 for trademark infringement and that lawsuit was dismissed.  I have spent the past 10
27   years building up the Los Caminantes HN trademark.  People associated that mark with me
28   and my band.  I have spent thousands of dollars and thousands of hours building up my

1  brand.  There is no confusion between my band and Plaintiff's band.  Plaintiff cannot come
2  forth after 10 years of uninterrupted use and try to stop me from using this mark.

3  **SPECIAL INTERROGATORY NO.** 3

4     State all facts that support YOUR assertion that "Los Caminantes H.N." does
5  not infringe the LOS CAMINANTES Trademark.

6  **RESPONSE TO REQUEST NO. 3.**

7          Objection.  This interrogatory calls for a legal conclusion and invades the
8  attorney-client privilege and attorney work product privilege.  Further, the interrogatory is
9  objectionable in that it requires Defendant to prove a negative, that he is not infringing.  It is
10 Plaintiff's burden to prove trademark infringement.  It is not Defendant's burden to prove
11 that he is not infringing.  Notwithstanding the forgoing objection, Defendant responds as
12 follows: I have been touring using the Los Caminantes HN trademark since 2011 with the
13 full knowledge of Plaintiffs.  Plaintiff previously filed a lawsuit against me in 2012 for
14 trademark infringement and that lawsuit was dismissed.  I have spent the past 10 years
15 building up the Los Caminantes HN trademark.  People associated that mark with me and
16 my band.  I have spent thousands of dollars and thousands of hours building up my brand.
17 There is no confusion between my band and Plaintiff's band.  Plaintiff cannot come forth
18 after 10 years of uninterrupted use and try to stop me from using this mark.

19 **SPECIAL INTERROGATORY NO.** 4

20    IDENTIFY all instances in which YOU have policed the trademark THE
21 TRADEMARKS.

22 **RESPONSE TO REQUEST NO. 4.**

23    Objection. Vague and ambiguous as to the meaning of the term "policed."

24 **SPECIAL INTERROGATORY NO.** 5

25

26    IDENTIFY by date and venue each concert played by LOS CAMINANTES
27 H.N. after January 1, 2017.

28 **RESPONSE TO REQUEST NO. 5.**

March - July 2017 I worked in the country of Guatemala.

February and March 2018 I worked in Texas, California, Nevada, and Arizona.

July and August 2018 I worked in Guatemala.

October 2018 I worked Texas and California.

November 2018 I worked in Mexico and Guatemala.

February 2019 I worked in California.

May through July 2019 I worked in Mexico.

September, October, November 2019 I worked in California, Arizona, Texas, Georgia, and North Carolina.

2020 no work.

2021 June

11- Las Vegas

12-Phoenix & Tucson

18- Gilroy

19- Fox& Leonardo's

20- La Sierra club

25- Frisco & Santa Rosa

26- La Movida & Potersville

27- Sacramento & Tracy

2021 July

2- Wichita

3- Denver

4- Colorado Springs

DEFENDANT'S RESPONSES TO SPECIAL INTERROGATORIES

9-Nashville

10-Atl/Birmingham

11-Charlotte

16-Indianapolis

17-De Moines

18-Kansas

23,24,25

New Jersey area

30,31,1

New Jersey area

2021 August

6 Fort Worth/Dallas

7  Houston

Mesquite/bravo

8 Austin/ San Antonio

13 Tulsa

14 Oklahoma

15 Grand Prairie

2021 September

03 Santa Fe, NM

04 Denver, CO

05 Garden City, CO

2021 September

DEFENDANT'S RESPONSES TO SPECIAL INTERROGATORIES

**10 Sacramento, CA**

**11 San Jose, CA**

**12 Salinas, CA**

**2021 October**

**21 Houston, TX**

**22 Dallas, TX**

**23 Lufkin, TX**

**24 Austin, TX**

**SPECIAL INTERROGATORY NO.** 6

IDENTIFY all recordings of the band Los Caminantes on which YOU have performed

**RESPONSE TO REQUEST NO. 6.**

1) Sueno Contigo. 2) Rumbo al Sur. 3) Cuando Quire un Mexicano 4) De Pueblo en Pueblo

**SPECIAL INTERROGATORY NO.** 7

IDENTIFY the promoters with whom Los Caminantes H.N. has worked in the last three years.

**RESPONSE TO REQUEST NO. 7.**

Able Quiroz (469)279-4496, Able de Luna (213) 999-6800, Emilio (615) 439-7050, Asuncion aka El Chon (484) 576-7742.

**SPECIAL INTERROGATORY NO.** 8

IDENTIFY any instances of actual confusion between the band Los Caminantes and the band Los Caminantes H.N.

**RESPONSE TO REQUEST NO. 8.**

I am unaware of any instance of actual confusion between the bands.

**SPECIAL INTERROGATORY NO.** 9

IDENTIFY the advertising used to promote LOS CAMINANTES H.N.

**RESPONSE TO REQUEST NO. 9.**

We use flyers to promote the band.  The promoters will promote the group through their social media.

**SPECIAL INTERROGATORY NO.** 10

State the average gross revenue earned by LOS CAMINANTES H.N. per live performance in 2021.

**RESPONSE TO REQUEST NO. 10.**

Between $1,500 - $2,500

**SPECIAL INTERROGATORY NO.** 11

STATE the contact information for each venue at which LOS CAMINANTES H.N. has performed in the last three years.

**RESPONSE TO REQUEST NO. 11.**

I do not know this information.  I only deal with the promoters.

**SPECIAL INTERROGATORY NO.** 12

IDENTIFY all recordings of Los Caminantes on which Humberto Navarro (his father) performed?

**RESPONSE TO REQUEST NO. 12**

- **1**983: Supe Perder
- 1983: Especialmente Para Usted
- 1983: Numero Tres
- 1984: Corridos Al Estilo De Los Caminantes
- 1984: Porque Tengo Tu Amor
- 1985: Cada Día Mejor
- 1986: De Guanajuato...Para America!
- 1987: Gracias Martín
- 1988: Los Idolos Del Pueblo

7

- 1988: Incontenibles Romanticos
- 1989: No Cantan Mal Las Rancheras
- 1990: Enamorados
- 1990: Tropicalísimos
- 1991: Dos Cartas y Una Flor
- 1992: Recuerdos
- 1993: Buenos Vaqueros
- 1994: En Vivo
- 1994: A Todisima...Banda
- 1994: Lagrimas Al Recordar
- 1995: Por Ese Amor
- 1996: Con Mariachi
- 1996: Corridos Bravos
- 1997: Con Tinta Del Corazon
- 1998: Baraja Adicta
- 1999: Con Canciones
- 1999: Rumbo Al Sur
- 2000: Cielo
- 2000: Sueño Contigo
- 2001: De Pueblo En Pueblo
- 2002: Cuando Quiere Un Mexicano
- 2003: Con Banda Sinaloense
- 2007: Aunque Mal Paguen Ellas
- 2008: Celebrando Nuestro 25 Aniversario
- 2009: En Vivo! Desde Tijuana, San Diego y Mexicali
- 2013: Los Chulos, Chulos, Chulos

Compilations[edit]
- 1983: 15 Exitos, Vol. 1
- 1985: 15 Exitos, Vol. 2
- 1986: Cumbias Al Estilo De Los Caminantes
- 1987: 15 Exitos, Vol. 3

- 1993: 10 Años
- 1993: 21 Exitos, Vol. 1
- 1997: 15 Aniversario
- 1999: 21 Exitos, Vol. 2
- 1999: 20th Anniversary
- 2001: Nuestras Canciones Romanticas Favoritas: 20 Exitazos
- 2002: Nuestras Canciones Rancheras Favoritas: 20 Exitazos
- 2002: Colección de Oro
- 2002: 20 Corridazos
- 2002: 20 Cumbias Sin Parar
- 2003: Mis 30 Mejores Canciones
- 2004: Tesoros de Colección: Puras Rancheras
- 2005: Tesoros de Colección: Lo Romantico de Los Caminantes
- 2007: La Historia: Lo Mas Chulo, Chulo, Chulo
- 2008: Caminantes Si Hay Caminos: Sus Rancheras Mas Chula
- 2009: En Vivo! Desde Tijuana, San Diego y Mexicali
- 2009: Moviditas y Cumbias Bien Chulas
- 2010: Mis Favoritas
- 2011: La Historia de Los Exitos
- 2013: Iconos: 25 Exitos

Music DVD

- 2007: La Historia: Lo Mas Chulo, Chulo, Chulo
- 2008: Caminantes Si Hay Caminos: Sus Rancheras Mas Chula
- 2009: En Vivo! Desde Tijuana, San Diego y Mexicali
- 2009: Moviditas y Cumbias Bien Chulas

**SPECIAL INTERROGATORY NO.** 13

State the gross revenue earned by Los Caminantes H.N. for live performances in each of the last four calendar years.

**RESPONSE TO REQUEST NO. 12.**

2018: $90,000

9

2019: $120,000

2020: $0

2021: $50,000

Dated: October 25, 2021                          Law Office of Larry Zerner

                                                 By: /Larry Zerner/
                                                 _____
                                                 Larry Zerner
                                                 Attorney for Defendant Martin Navarro

PROOF OF SERVICE

On  October 25, 2021, I served the foregoing documents described as:

DEFENDANT'S RESPONSE TO SPECIAL INTERROGATORIES

Said document was served on the interested party(ies) in this action as follows:

Eric Bjorgum
Email: Eric.bjorgum@kb-ip.com

_____BY MAIL:  I am readily familiar with the practices of this business for collection and processing of mail, and I declare that on the same day, and in the ordinary course of business, said mail is deposited in the United States Mail with postage thereon fully prepaid at Los Angeles, California.  I am aware that on motion of a party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in the affidavit regarding proof of service.

__X__BY ELECTRONIC MAIL:  The above-referenced document was transmitted in "pdf" format by electronic ("e-mail") to each of the email addresses on the attached service list, and no errors were reported.

_____PERSONAL SERVICE:  I caused said envelope to be delivered to the offices of the addressee(s) marked with a ***.

Executed on October 25, 2021 at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

_____
Larry Zerner

# Exhibit J

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    AGUSTIN RAMIREZ, ANTHONY          )
     RAMIREZ and AGUSTIN              )
5    RAMIREZ, JR.                     )
                                      )
6           Plaintiffs,               )
                                      )
7       vs.                           ) Case No.
                                      ) 20-cv-02408-FLA-SP
8    MARTIN NAVARRO, DOES 1-10,       )
     inclusive,                       )
9                                     )
            Defendants.               )
10   _____)

11

12

13              VIDEOCONFERENCE DEPOSITION OF

14                     MARTIN NAVARRO

15          Wednesday, March 2, 2022, 9:13 a.m.

16                   Fontana, California

17

18

19      Reported By Ivy Reid,
        CSR No. 13897
20

21

22

23

24

25

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4    AGUSTIN RAMIREZ, ANTHONY          )
     RAMIREZ and AGUSTIN              )
5    RAMIREZ, JR.                     )
                                      )
6          Plaintiffs,                )
                                      )
7       vs.                           ) Case No.
                                      ) 20-cv-02408-FLA-SP
8    MARTIN NAVARRO, DOES 1-10,       )
     inclusive,                       )
9                                     )
           Defendants.                )
10   _____)

11

12

13

14

15

16

17          THE VIDEOCONFERENCE DEPOSITION OF MARTIN

18   NAVARRO, on Wednesday, March 2, 2022, at 9:13 a.m.,

19   before Ivy Reid, Certified Shorthand Reporter, in and for

20   the State of California.

21

22

23

24

25

Martin Navarro,                                                                March 2, 2022

1    APPEARANCES:

2

3    For Plaintiffs:

4              KARISH & BJORGUM PC
               BY:  ERIC BJORGUM, ESQ.
5              (APPEARING VIA VIDEOCONFERENCE)
               119 E. Union Street, Suite B
6              Pasadena, California 91103
               213.785.8070
7              Eric.bjorgum@kb-ip.com

8

9    For Defendants:

10             LAW OFFICE OF LARRY ZERNER
               BY:  LARRY ZERNER, ESQ.
11             (APPEARING VIA VIDEOCONFERENCE)
               1801 Century Park East
12             Suite 2400
               Los Angeles, California 90067
13             larry@zernerlaw.com

14

15   Also present:

16             Augustine Ramirez

17

18

19

20

21

22

23

24

25

3

1    or --

2         A.    Yeah.

3         Q.    So why did you guys separate?

4         A.    Because he's a drunk and a drug addict.

5         Q.    Okay.

6         A.    I don't need that kind of stuff in my business.

7         Q.    Okay.  We've all worked around a lot of bands.

8    Okay.  That's all you have to say on that topic.  Okay.

9    Yeah, I don't -- don't want to get into that.

10              Now did he keep playing after you -- after you

11   parted?

12        A.    My understanding, yes, he had.  He did.

13        Q.    Have you ever tried to stop him from playing

14   live?

15        A.    No.

16        Q.    Do you know if your attorney ever discussed my

17   client trying to stop him from playing live?

18              MR. ZERNER:  Discussed with who?

19              MR. BJORGUM:  With me.

20              MR. ZERNER:  Objection that he would only know

21   that by having conversations with me which would require

22   attorney-client communications, so I'm instructing him

23   not to answer.

24              MR. BJORGUM:  Well, you had sent me an e-mail

25   about something about that at one point, so I don't know

Martin Navarro,                                      March 2, 2022

1   if that's a waiver or --

2           MR. ZERNER:  I did.  But if I discussed it with

3   my client, you don't get to hear about it.

4           MR. BJORGUM:  Well, of course the alternative is

5   you did that for fun on your own, which I doubt you did,

6   so I would say that may be waived, but we're not going to

7   get into it.

8   BY MR. BJORGUM:

9       Q.   Okay.  Were you aware that Mr. -- my client

10  Agustin Ramirez and also Agustin Ramirez, Jr., and

11  Anthony Ramirez had filed a lawsuit against Vicente

12  Martinez, Anja Juarez, and Juan Manuel Navarro?

13      A.   Yes.

14      Q.   And that was in 2017; right?

15      A.   I believe so.  I don't remember.  But yes.

16      Q.   And who is Juan Manuel Navarro?

17      A.   He's a promoter.

18      Q.   And what companies does he use?

19      A.   I don't know.

20      Q.   Have you ever worked with him?

21      A.   Yes.

22      Q.   When was that?

23      A.   I'm working with him to this present day right

24  now.

25      Q.   You're working with Juan Manuel Navarro right

1    now?

2         A.   Yes.  I'm in one of the tours that he's doing.

3         Q.   What company is he under?

4         A.   I don't know.  I have no idea.

5         Q.   Did he ever call himself J and J Promocines?

6         A.   I don't know.

7              MR. BJORGUM:  For the court reporter, that's

8    P-r-o-m-o-c-i-n-e-s.

9    BY MR. BJORGUM:

10        Q.   Is that the -- what is it, "El Regreso

11   Romantico," [phonetic] whatever that tour is?

12             Is that what you're talking about?

13        A.   Yes.

14        Q.   Okay.  What's the full name?

15        A.   Of what?

16        Q.   Of the tour.  It's El, E-l, Regreso --

17        A.   I don't know.

18        Q.   Okay.

19        A.   I have to see a flyer.  I don't pay attention to

20   that.

21        Q.   Okay.  Never mind.  Okay.

22             Do you currently have a manager?

23        A.   No.

24        Q.   Do you currently have a booking agent?

25        A.   No.

1    Q.   Do you handle all that yourself?

2    A.   Yes.

3    Q.   Was Anja Juarez currently working with Juan

4  Manuel Navarro?

5    A.   I have no idea.

6    Q.   But you saw Anja Juarez in Colorado; correct?

7    A.   Yeah, I saw him, but I have nothing to do with

8  whatever business he does.

9    Q.   Okay.  And Juan Manuel Navarro, is he booking

10  that tour that you're on?

11    A.   Booking, I have no idea.  I really don't know --

12  I don't know.  I don't know.

13    Q.   What do you think he's doing?

14    A.   I don't know.  Could be -- he's the one, maybe,

15  I'm assuming, doing that tour.

16    Q.   Okay.  Now did you -- on the case that we just

17  talked about, this would be the one with Vicente

18  Martinez, Anja Juarez, and Juan Manuel Navarro, were you

19  aware of the results of that case?

20         MR. ZERNER:  Objection.  Vague as to time.

21  BY MR. BJORGUM:

22    Q.   Do you know if that case resulted in any

23  injunctions?

24         MR. ZERNER:  Objection.  Vague as to time.

25         You can answer if you know.

1          THE WITNESS:  Yes, I did.  I found out.

2   BY MR. BJORGUM:

3      Q.   And what's your understanding of the

4   injunctions?

5      A.   I don't know.  I mean, I would assume stopping.

6   I don't know.  I really don't know.  I didn't follow-up

7   on that.

8      Q.   Did you ever read the injunctions?

9      A.   No, I never did.

10     Q.   Okay.  So I'm going to show you another

11  document.

12         Can you read this document?  Is it large enough?

13     A.   Yes.

14         MR. BJORGUM:  I'm going to mark this as

15  Exhibit 11.

16         MR. ZERNER:  What was 10?  I don't think you

17  marked 10.

18         THE REPORTER:  No, you did.

19         THE WITNESS:  Was it the -- it was the letter?

20         MR. ZERNER:  Yeah.

21         MR. BJORGUM:  So Exhibit 11 is going to be AR 7

22  through AR 11, just so we have that clear.

23         MR. ZERNER:  I think a -- I think it's already.

24  I think it's Exhibit -- this is which case, Martinez?  On

25  Martinez, it's Exhibit 6.

```
 1              MR. ZERNER:  You need me to e-mail it again?
 2              MR. BJORGUM:  Yeah.  I'm going to e-mail it to
 3    you, yeah.  I'm just trying to -- the e-mail is hiding
 4    behind my Zoom video.  Okay.  Here we go.  All right.
 5              Did you get that one, Larry?
 6              MR. ZERNER:  Yeah, got it.
 7              Well, this is Exhibit 6.
 8              MR. BJORGUM:  I thought Exhibit 6 was the Sotelo
 9    case.
10              MR. ZERNER:  No.  Exhibits 3 and 4 are the
11    Sotelo case.  5 and 6 -- 4 is the Sotelo injunction, 6 is
12    the Vicente injunction.
13              MR. BJORGUM:  Okay.  Well, I guess I'm just
14    going to enter it just to be sure because I want to make
15    sure I have this one in.
16              MR. ZERNER:  Okay.
17              (Whereupon Exhibit 12 was marked by the
18              court reporter and attached hereto.)
19    BY MR. BJORGUM:
20         Q.   Take a look at it, Mr. Navarro, if you could
21    please.
22         A.   Okay.  And what is it I'm looking at -- oh, you
23    want me to see on this one?
24         Q.   I want you to just take a look -- okay, well,
25    you see at the top of the first page, it's Agustin
```

1    Ramirez versus Vicente Martinez?

2         A.   Uh-huh.

3         Q.   Okay.  Now do you see subparagraph 2,

4    "Plaintiffs shall recover from Navarro $77,000"?

5         A.   Uh-huh.

6         Q.   Is your business currently making any payments

7    to Navarro?

8         A.   My business?

9         Q.   Yeah, yeah.

10        A.   Paying -- who Navarro?  Which Navarro are you

11   talking about?

12        Q.   Juan Manuel Navarro.

13        A.   Me paying him for what?

14        Q.   I don't know, anything.  For -- anything at all,

15   I don't know.  I'm trying to figure out how to collect

16   this money, so I'm just asking.

17             MR. ZERNER:  Eric?  Wait, wait, wait --

18             THE WITNESS:  You know, I don't know about this.

19             MR. ZERNER:  Martin, Martin, Martin.

20             THE WITNESS:  I don't know.  I don't know.  I

21   have no idea.

22             MR. ZERNER:  Martin, stop talking.

23             THE WITNESS:  Okay.

24             MR. ZERNER:  Eric, it's irrelevant.

25   ///

Martin Navarro,                                                    March 2, 2022

1    BY MR. BJORGUM:

2         Q.    Do you know where he lives?

3         A.    Who?

4         Q.    Juan Manuel Navarro.

5         A.    I know he lives in Texas.  I don't know what

6    city he lives in.

7         Q.    He lives in Texas?

8         A.    Apparently, yes, he does.

9         Q.    Okay.  Now, do you see paragraph --

10   subparagraph 3 here?  It says, "Juan Manuel Navarro, his

11   agents, servants, employees, co-ventures, and all persons

12   in active concert or participation with the foregoing who

13   received actual notice of this order by personal service

14   or otherwise, are enjoined from using the Los Caminantes

15   mark or trade name alone or in combination with other

16   words or symbols including without limitations," and then

17   it lists some things after that.

18              Do you see that?

19        A.    Okay.  Yes, I do.

20        Q.    Now, you just testified that you're still

21   doing -- you're still working with Juan Manuel Navarro;

22   isn't that right?

23        A.    Correct.

24        Q.    So according to this, you should not be using

25   Los Caminantes; isn't that right?

| | |
|---|---|
| 1 | MR. ZERNER:  Objection.  Objection.  Calls for a |
| 2 | legal conclusion. |
| 3 | Instruct him not to answer. |
| 4 | MR. BJORGUM:  Instruct him not to answer? |
| 5 | MR. ZERNER:  Yeah. |
| 6 | MR. BJORGUM:  You can't do that. |
| 7 | MR. ZERNER:  Yeah, I can. |
| 8 | MR. BJORGUM:  No, you can't. |
| 9 | MR. ZERNER:  Yes, I can. |
| 10 | MR. BJORGUM:  Well, I guess we can go to the |
| 11 | court on it. |
| 12 | MR. ZERNER:  You can go to the court and say |
| 13 | should he do this. |
| 14 | MR. BJORGUM:  Obviously, it says here, "All |
| 15 | persons who are in active concert or participation," and |
| 16 | he just testified that he's been working -- |
| 17 | MR. ZERNER:  Who received actual notice of the |
| 18 | order by personal service or otherwise. |
| 19 | MR. BJORGUM:  Right. |
| 20 | MR. ZERNER:  Have you established that fact? |
| 21 | No, you haven't. |
| 22 | MR. BJORGUM:  Well, you used it in the |
| 23 | deposition.  You just said that, so -- so from now on -- |
| 24 | MR. ZERNER:  Yeah, I used it in a deposition. |
| 25 | MR. BJORGUM:  Is he going to stop using -- stop |

```
 1    dealing with him now that I've told him about this?  Is
 2    that, you know --
 3            MR. ZERNER:  Maybe.  Maybe.  Maybe me and Martin
 4    will have a conversation when we're done.
 5            MR. BJORGUM:  Okay.  Well, two days ago you
 6    didn't know who he was, so --
 7            All right.  I think you can see where this is
 8    going, okay?  This is quite confusing.
 9    BY MR. BJORGUM:
10        Q.  Do you know, Mr. Navarro, who Vicente Martinez
11    is working with now?
12        A.  No, I have no idea.
13        Q.  Do you know who his band members are?
14        A.  No.
15        Q.  Have you ever seen this order before today, this
16    document we're looking at, document -- Exhibit 11?
17        A.  Exhibit 11?  This one right -- oh, no, I have
18    it -- either --
19            MR. ZERNER:  It's Exhibit 11 or 12?
20            THE REPORTER:  12.
21            MR. BJORGUM:  Oh, I'm sorry, is it 12?
22            MR. ZERNER:  The new one is 12.
23            MR. BJORGUM:  The most recent exhibit.
24            MR. ZERNER:  It's 12.
25            MR. BJORGUM:  AR --
```

Martin Navarro,                                                    March 2, 2022

 1              MR. ZERNER:  12.

 2              MR. BJORGUM:  12, right.  Okay.

 3    BY MR. BJORGUM:

 4       Q.   Have you ever -- you don't remember seeing this

 5    or you do?

 6       A.   I don't.  I have nothing to do with this, so why

 7    would I have this?

 8       Q.   Just asking.

 9            Do you know what other bands Juan Manuel Navarro

10    is working with?

11       A.   No, I don't.

12       Q.   What's your understanding of the role of what he

13    has in your current tour?

14       A.   He contracted me to be in that tour.  That's all

15    I know.  Other bands, I have no idea.

16       Q.   Okay.  I want to be clear.  Did you say he

17    contacted you or he contracted you?

18       A.   Contracted.

19       Q.   Okay.  And what -- do you have a copy of that

20    contract?

21       A.   No, this is all verbally.  No contract.

22       Q.   Okay.  No written contract?

23       A.   No written contract.

24       Q.   And so what's the agreement for you to be paid

25    or for you to provide services on that tour?

1        A.    Perform.

2        Q.    With Los Caminantes?

3        A.    (In Spanish) "HN."

4              (In English) Or Los Caminantes, Humberto

5    Navarro.

6              MR. BJORGUM:  For the court reporter, (in

7    Spanish) "HN" is HN.  He's saying Los Caminantes HN,

8    which is (in Spanish) "HN."

9    BY MR. BJORGUM:

10        Q.    And what are you paid for that?

11              THE WITNESS:  Larry, do I answer that?

12              MR. ZERNER:  Yeah.

13              THE WITNESS:  Oh, okay.  I get paid between

14    1,500 to $2,000 per performance.

15              MR. BJORGUM:  Larry, we'll do the same stip as

16    to the confidentiality, okay?

17              MR. ZERNER:  Yeah.

18    BY MR. BJORGUM:

19        Q.    Just so you know, you were on the depo

20    yesterday, Mr. Navarro, but we're keeping all the

21    financial stuff confidential.

22        A.    Okay.

23        Q.    Especially given this particular market.

24              Let's see.  And what is that dependent upon, the

25    15- to 2,000?  Is that dependent upon like the turnout or

Martin Navarro,                                                    March 2, 2022

```
 1        Q.   Do you know if they are re-records?
 2        A.   Some of them are, yes.  And some of them are
 3   not.
 4        Q.   Is there any reason you can't give me a copy of
 5   that?
 6        A.   Yeah.  I'm not giving this copy to nobody
 7   because I own it.  No, there's no way.  Agustin should
 8   have kept a copy from a long time ago.  He should have.
 9        Q.   I'm not talking about that.  I'm talking about
10   the thing that you send to the --
11        A.   Oh, oh, oh.  Yeah, I can -- I can -- I have it
12   in a flash drive.
13             THE WITNESS:  Larry, is that okay to do that or
14   not?
15             MR. ZERNER:  We'll discuss it during -- in a
16   break.
17             THE WITNESS:  Okay.  All right.
18   BY MR. BJORGUM:
19        Q.   When is the last time you sent this out?
20        A.   I don't know.  Last year in the summer.  All the
21   promoters have it already.
22        Q.   Does it have any voiceover on it or is it just
23   songs?
24        A.   Songs, voiceover, yes.  Presenting the band.
25        Q.   Oh, okay.  Is this something you do when they
```

1    come on stage?

2        A.   Yes.  And they also use it for the promotional

3    marketing --

4        Q.   Okay.

5        A.   -- when they are announcing the venue that it's

6    going to be.

7        Q.   Okay.  But aside from that, do you have any

8    guidelines that you provide like you should use (in

9    Spanish) "HN" (in English) in a font equal to Los

10   Caminantes or anything like that?

11       A.   Yeah.  I always specifically say that they need

12   to use that logo that I have Los Caminantes (in Spanish)

13   "HN."

14       Q.   Okay.  Is there any other guidance as to how to

15   present it on the marquee?

16       A.   No.

17       Q.   Do you have any writings that talk about how the

18   promoters can use the mark?

19       A.   No.

20       Q.   Do you have any e-mails between you and Juan

21   Manuel Navarro?

22       A.   No.

23       Q.   Do you have files about the lawsuits, any

24   lawsuits that have been going on about the trademarks?

25       A.   Files on lawsuits?

Martin Navarro,                                                    March 2, 2022

1       Q.    Well, any copy of documents.  Any documents

2   about the lawsuits?

3       A.    About the lawsuit.  Yeah, the one that you

4   just --

5             MR. ZERNER:  Sorry --

6             THE WITNESS:  Ours.  Ours.  That's the only one

7   I have.

8   BY MR. BJORGUM:

9       Q.    Okay.  Have you given me any bank statements

10  regarding profits made from the trademark?

11      A.    No, I haven't.

12      Q.    Who are the members, the current members of Los

13  Caminantes HN?

14      A.    Members?

15      Q.    Uh-huh.

16      A.    Just me.

17      Q.    Well, who plays with you in the band right now?

18      A.    Those are musicians for hire.

19      Q.    Well, they have names, but who are they right

20  now?

21      A.    Right now, one of them is --

22            THE WITNESS:  This I can answer, Larry?

23            MR. ZERNER:  Yeah.

24            THE WITNESS:  Oh, okay.

25            So the base player's name is Walter, and the

1    guys?  This is a whole other set of people.  Talk about

2    not going for the young crowd.  Who are these guys?

3         A.   I have no idea.  I mean, Vicente Martinez --

4         Q.   Now it's going to redact it.  Hang on.

5              Is that Vicente Martinez in there?

6         A.   Yeah, the top one.  We see --

7         Q.   Oh, it is.  Okay.

8         A.   Yeah.  And the rest of the guys right here, I

9    have no idea who they are.  But you see the difference

10   right there?  He's using only "Los Caminantes."

11        Q.   Yeah.  Do you think that possibly Vicente

12   Martinez is working with Chico Malo?

13             MR. ZERNER:  Objection.  Calls for speculation.

14             THE WITNESS:  Do I answer that?

15             MR. ZERNER:  Sure.

16   BY MR. BJORGUM:

17        Q.   If you know, yes.

18        A.   Yes, yes.

19        Q.   He's working with him?

20        A.   I heard rumors that apparently he is, but don't

21   quote me on that, you know.  It's just a rumor that I

22   heard.

23        Q.   Do you see Chico Malo at these promoter events?

24        A.   Yes, I have.

25        Q.   And do you see Vicente Martinez?

1        A.    No, no.

2        Q.    Do you see -- who promotes Mario Sotelo?

3        A.    I have no idea.

4        Q.    Do you know why Mario Sotelo plays mainly in

5    Florida?

6        A.    No.

7        Q.    Does Juan Manuel Navarro go to those meetings?

8        A.    Sometimes.

9        Q.    Have you ever discussed this case with Chico

10   Malo?

11       A.    No.

12       Q.    At these meetings do people talk about which

13   band will play in which part of the country?

14       A.    Sometimes.  But most of the stuff is stuff

15   that's been done in the past.

16       Q.    What do you mean "been done"?

17       A.    Yeah, like concerts that happen, they'll talk

18   about like that.  Did you see -- some promoters will go,

19   "did you hear about that concert that happened last

20   month" -- let's just say in Chicago.

21       Q.    Uh-huh.

22       A.    "Did you see that it sold out?"  You know --

23       Q.    Oh, I see.

24       A.    "It was amazing."  And they'll talk about that

25   kind of stuff.  More of that than what's coming in the

```
 1    future.
 2         Q.   Did they talk about all the different versions
 3    of Los Caminantes that have played?
 4         A.   They only mentioned Agustin Ramirez and Los
 5    Caminantes Humberto Navarro, which is me.  But Agustin
 6    never goes.  I do go.
 7         Q.   Have they tried to get -- come to an agreement
 8    about who will play where?
 9         A.   No.
10         Q.   Showing you another document.
11              Do you remember if you played this show on
12    September 15, 2022?
13         A.   Let me see.  Can you go down more so I can
14    see -- oh, yeah.  That was at Leonardo's; right?
15         Q.   Yeah.
16         A.   In Huntington Park.  Yeah, yeah.  We performed
17    there.  That's the flyer that was there.  There's
18    actually another flyer.  They did two versions of flyers
19    for that venue.
20         Q.   Okay.
21         A.   They did this one, and they did another one
22    where it has all the images of all the bands.
23         Q.   And this says, "Juan Navarro is feeling
24    excited."
25              Did you see him at that show?
```

1    A.   Yes, I did.

2    Q.   In September?

3    A.   This is not -- this was in January.

4    Q.   January.  Okay.  Never mind.  January.  Okay.

5         But you think he lives in Texas now?

6    A.   What I've known of, he's always lived in Texas.

7    I think he lives in Midland, Odessa, somewhere around

8    there.  I'm not too sure.  I know he lives in Texas

9    though.

10   Q.   But he travels a lot for -- for these shows; is

11   that right?

12   A.   Right.  I see him every weekend.  No.  I'm

13   talking about since we started tour this year.

14   Q.   Right.  Say hi for us.  I'm going to show you

15   another document.

16        Have you ever seen Juan Manuel Navarro's social

17   media pages?

18   A.   No, I haven't because I don't have social media.

19   And the social media and the Facebook page that we have,

20   I don't control that.  The record label does.

21   Q.   Oh, okay.  You don't control it?

22   A.   No, I don't.  So therefore -- I used to have a

23   Facebook.  I no longer use it because when I used to work

24   at AT&T, that's a dangerous thing to have.  I can get

25   fired for just dumb stuff they post and they tag me on.

Martin Navarro,                                                March 2, 2022

1    Q.   I see.  So is this the tour that you're on right

2    now?  It's the third year, El Regreso --

3    A.   Let's see.  Can you scroll down a little bit

4    more?  Maybe even zoom too because that one's a little

5    bit -- those small, little letters are where I have

6    trouble seeing.

7    Q.   Yeah.  Yeah.  It looks like your logo.  I can't

8    tell --

9    A.   That's me right there, yes.

10   Q.   But you've never seen this before?

11   A.   No.  Not that page.

12   Q.   This page?

13   A.   Not on that page.

14   Q.   Okay.

15   A.   I've seen the flyers because they were sent to

16   me to my e-mail or they text them to me.

17   Q.   Okay.  Now I'm going to go over -- do you

18   remember signing your interrogatory responses answering

19   questions for Mr. Zerner?

20   A.   Is that those --

21        THE WITNESS:  Larry, are those -- those

22   questions that you sent me?

23   BY MR. BJORGUM:

24   Q.   They're like written questions.  This is a

25   different thing.  It's around the same time, but these

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3

4    AGUSTIN RAMIREZ, ANTHONY              )
     RAMIREZ and AGUSTIN                   )
5    RAMIREZ, JR.                          )
                                           )
6            Plaintiffs,                   )
                                           )
7        vs.                               ) Case No.
                                           ) 20-cv-02408-FLA-SP
8    MARTIN NAVARRO, DOES 1-10,            )
     inclusive,                            )
9                                          )
             Defendants.                   )
10   _____)

11

12

13              VIDEOCONFERENCE DEPOSITION OF

14                     MARTIN NAVARRO

15           Wednesday, March 2, 2022, 9:13 a.m.

16                   Fontana, California

17

18

19      Reported By Ivy Reid,
        CSR No. 13897
20

21

22

23

24

25

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4    AGUSTIN RAMIREZ, ANTHONY              )
     RAMIREZ and AGUSTIN                   )
5    RAMIREZ, JR.                          )
                                           )
6          Plaintiffs,                     )
                                           )
7       vs.                                ) Case No.
                                           ) 20-cv-02408-FLA-SP
8    MARTIN NAVARRO, DOES 1-10,            )
     inclusive,                            )
9                                          )
           Defendants.                     )
10   _____)

11

12

13

14

15

16

17           THE VIDEOCONFERENCE DEPOSITION OF MARTIN

18   NAVARRO, on Wednesday, March 2, 2022, at 9:13 a.m.,

19   before Ivy Reid, Certified Shorthand Reporter, in and for

20   the State of California.

21

22

23

24

25

2

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4              KARISH & BJORGUM PC
                BY:  ERIC BJORGUM, ESQ.
 5              (APPEARING VIA VIDEOCONFERENCE)
                119 E. Union Street, Suite B
 6              Pasadena, California 91103
                213.785.8070
 7              Eric.bjorgum@kb-ip.com

 8

 9    For Defendants:

10              LAW OFFICE OF LARRY ZERNER
                BY:  LARRY ZERNER, ESQ.
11              (APPEARING VIA VIDEOCONFERENCE)
                1801 Century Park East
12              Suite 2400
                Los Angeles, California 90067
13              larry@zernerlaw.com

14

15    Also present:

16              Augustine Ramirez

17

18

19

20

21

22

23

24

25
```

```
 1              Take a break, Mr. Navarro.

 2              Off the record.

 3              (Recess was taken.)

 4              MR. BJORGUM:  Okay.  Back on the record?

 5   Everyone agree?

 6              MR. ZERNER:  Yes.

 7              THE WITNESS:  Yes.

 8   BY MR. BJORGUM:

 9       Q.   Okay.  Mr. Navarro, we're back on the record,

10   and you recognize that you're still under oath; correct?

11       A.   Yes.

12       Q.   Now, your father passed away in 2011; is that

13   correct?

14       A.   Yes.

15       Q.   What month was that?

16       A.   June.

17       Q.   June.  Okay.  And after that, was it -- I'm

18   sorry, I don't want to ask you about -- too much about

19   your father, but what's your -- was it a sudden death or

20   was the family expecting it or --

21       A.   Sudden.

22       Q.   So had -- had he worked out any details about

23   the ownership of -- well, about the band in general, the

24   business of the band?

25       A.   Meaning?  Like in what way?
```

Martin Navarro,                                                    March 2, 2022

1          Q.    Discussed, for instance, would the band continue

2     to record without him?

3          A.    After his death?

4          Q.    Yeah.   Had he ever discussed that with you?

5          A.    No.

6          Q.    Okay.   And had he discussed whether the band

7     would play without him?

8          A.    No.

9          Q.    And did he have a will?

10         A.    Yes, he did.

11         Q.    Okay.   And did that will resolve any issues

12    about ownership of recordings?

13         A.    Yes.

14         Q.    Okay.   And then what about the trademark?

15         A.    Just -- I mean, yes and no.

16         Q.    Okay.   So in your -- you know, I know you're not

17    an attorney.   But in your impression, who owned the

18    trademark after his trademark rights -- whatever his

19    trademark rights were, okay, we're having a lawsuit about

20    that, but whatever they were, let's -- what's your

21    impression of who owned them?

22         A.    After his death?

23         Q.    Yes.

24         A.    My mom at this point because my dad is no

25    longer, so she's -- she's the one alive.   So -- yeah.

Martin Navarro,                                                    March 2, 2022

1       Q.   And have you been conducting any business

2    affairs for your mom on that point or you helped her

3    or --

4       A.   Yes, I help her in everything right now.

5       Q.   Do the recording royalties go to her?

6       A.   Yes.

7       Q.   And on your father's trademark rights, has your

8    mom told you that you can play as -- in the band called

9    Los Caminantes HN?

10      A.   Yes.

11      Q.   So she owns -- whatever rights there are, she

12   owns them; is that correct?

13      A.   Yes.

14      Q.   Has she transferred them to you?

15      A.   Not yet.

16      Q.   Do you know if she intends to?

17      A.   Yes.

18      Q.   She intends to transfer you the rights?

19      A.   Yes.

20      Q.   And what other -- are there other siblings who

21   made claim rights in the mark?

22      A.   That made -- no.

23      Q.   Has anyone claimed rights besides your mom?

24      A.   No.

25      Q.   Okay.

1          Now, I'm going to show you another exhibit which

2     will be Exhibit 9 or 10, I'm not sure.  Which is it?

3          MR. ZERNER:  10.

4          THE REPORTER:  10.

5          MR. BJORGUM:  Okay.  This will be Exhibit 10.

6          Okay.

7          By the way, Larry, I don't want you taking any

8     screenshots of my screen.  If you're going to -- I had

9     someone once demand everything on my screen after a depo,

10    so --

11         MR. ZERNER:  If they're an exhibit to the

12    deposition, I'm getting a copy.

13         MR. BJORGUM:  No, I know.  But people have --

14    it's ridiculous.  You seem to be fairly friendly, okay.

15         (Whereupon Exhibit 10 was identified

16         for the record.)

17    BY MR. BJORGUM:

18      Q.   So this is a letter -- do you see this letter,

19    September 14, 2011?

20      A.   Yes.

21      Q.   Okay.

22         MR. BJORGUM:  Larry, I'm sorry.  To ease your

23    mind, yeah, you are going to get copies.  I'm saying

24    people have taken screenshots of like the file names and

25    said, oh, you disclosed all that in the depo.  You know,

```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   AGUSTIN RAMIREZ, ANTHONY            )
     RAMIREZ and AGUSTIN                 )
 5   RAMIREZ, JR.                        )
                                         )
 6          Plaintiffs,                  )
                                         )
 7      vs.                              ) Case No.
                                         ) 20-cv-02408-FLA-SP
 8   MARTIN NAVARRO, DOES 1-10,          )
     inclusive,                          )
 9                                       )
            Defendants.                  )
10   _____)

11

12

13           VIDEOCONFERENCE DEPOSITION OF

14                   MARTIN NAVARRO

15          Wednesday, March 2, 2022, 9:13 a.m.

16                 Fontana, California

17

18

19      Reported By Ivy Reid,
        CSR No. 13897
20

21

22

23

24

25
```

1             UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3

4  AGUSTIN RAMIREZ, ANTHONY        )
   RAMIREZ and AGUSTIN           )
5  RAMIREZ, JR.               )
                          )
6       Plaintiffs,         )
                          )
7    vs.                 ) Case No.
                          ) 20-cv-02408-FLA-SP
8  MARTIN NAVARRO, DOES 1-10,    )
   inclusive,                )
9                         )
        Defendants.        )
10 _____)

11

12

13

14

15

16

17       THE VIDEOCONFERENCE DEPOSITION OF MARTIN

18  NAVARRO, on Wednesday, March 2, 2022, at 9:13 a.m.,

19  before Ivy Reid, Certified Shorthand Reporter, in and for

20  the State of California.

21

22

23

24

25

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4              KARISH & BJORGUM PC
                BY:  ERIC BJORGUM, ESQ.
 5              (APPEARING VIA VIDEOCONFERENCE)
                119 E. Union Street, Suite B
 6              Pasadena, California 91103
                213.785.8070
 7              Eric.bjorgum@kb-ip.com

 8

 9    For Defendants:

10              LAW OFFICE OF LARRY ZERNER
                BY:  LARRY ZERNER, ESQ.
11              (APPEARING VIA VIDEOCONFERENCE)
                1801 Century Park East
12              Suite 2400
                Los Angeles, California 90067
13              larry@zernerlaw.com

14

15    Also present:

16              Augustine Ramirez

17

18

19

20

21

22

23

24

25
```

1    are actually written questions.

2             MR. ZERNER:  Between you or I it was screwed up.

3             THE WITNESS:  I don't remember if I did or not.

4    I'm sorry, I have no recall on that.  If it was there

5    during that time that I was having issue with my eyes

6    again, then maybe I didn't because I couldn't -- I

7    couldn't see.

8    BY MR. BJORGUM:

9        Q.   Okay.  In this response I have up right now, in

10   your interrogatories, you say, "There's no confusion

11   between my band and plaintiffs' band."

12            Have you ever had an instance where -- where

13   there was confusion?  Have you ever heard of anyone being

14   confused?

15       A.   No.

16       Q.   You've never had anyone come to you after a show

17   and say, "where's Agustin?"

18       A.   No.

19       Q.   Do you feel that -- do you believe that the

20   people who buy tickets to your shows are careful

21   purchasers?

22       A.   Yeah.  They know what they are buying.  They

23   know who they're going to see.

24            MR. ZERNER: Wait.  Wait.  Objection.  Calls for

25   a legal conclusion.  That's a legal term.

```
 1                You can answer, but I just wanted to --
 2                THE WITNESS:  Yeah.  People know what's going
 3    on.  They know -- they know the difference between my
 4    band and Agustin's band.
 5    BY MR. BJORGUM:
 6        Q.   And if your band plays on its own, what's the
 7    average price of a ticket?
 8        A.   Oh, I have no idea.
 9        Q.   Over $30?
10        A.   Maybe.  I don't take care of that so I have no
11    idea.  I get paid by -- by venue, whatever it is that --
12    wherever I'm going to work at.
13        Q.   Now you say, "The partnership was never
14    dissolved and I inherited my father's rights to the
15    trademark."
16             Do you know if the partnership still has a bank
17    account?
18        A.   Yeah.  They don't have a bank account no more.
19    It was actually taken out before my dad passed away.
20        Q.   Have you ever told anyone to cease and desist
21    from using the Los Caminantes mark?
22        A.   I'm sorry.  What was that again?
23        Q.   Have you ever told anyone to stop using the Los
24    Caminantes mark?
25        A.   No, I haven't.
```

Martin Navarro,                                                March 2, 2022

1       Q.   Now in response to number 5, you said in March

2   and July 2017 you worked in Guatemala.

3            Was that with the band?

4       A.   Yeah.  Los Caminantes -- with my band, yes.

5       Q.   So you toured Guatemala for -- for five months?

6       A.   No.  I only worked there for just the month of

7   July.  That's it.

8       Q.   Oh, okay.  Because this answer says March

9   through July.

10      A.   Let me see.  March through -- yeah.  Okay.  Now

11  I see.  Yeah, that sounds about right, yeah.  March

12  through July, there's a lot of work over there.

13      Q.   So that's five months you played there?

14      A.   Yeah.

15      Q.   Now after July 2017, did you stop playing until

16  February 2018?

17      A.   Yes.

18      Q.   Why was that?

19      A.   I was still working for AT&T so I had a lot of

20  work.  During that time it's just -- there's a chaos

21  going on at work, so --

22      Q.   Now, how about, "July and August 2018 I worked

23  in Guatemala."

24           You went back to Guatemala for two more months?

25      A.   Yep.

Martin Navarro,                                                                    March 2, 2022

1       Q.    In November 2018 you went to Mexico and

2   Guatemala?

3       A.    Yeah.   Just for the -- I believe that was just

4   the month of November.   We did two weeks and then split

5   the other two weeks in Mexico.

6       Q.    And then you say, "No work in 2020."

7       A.    Right.

8       Q.    Number 6, I asked you to identify all recordings

9   in which you have performed, and you list four songs.

10   "Sueno Contigo," et cetera.

11            Do you see those?

12      A.    I didn't actually -- I didn't -- I never put

13   down the songs I performed.   Those are the names of the

14   albums I performed.

15      Q.    Oh, okay.   But you didn't perform on every song?

16      A.    No, not on every song, no.   I did -- what it's

17   called -- I did work though on every single song on each

18   of those albums.

19      Q.    You did what?

20      A.    I was the -- work by -- I was the recording

21   engineer for all those albums.

22      Q.    Oh, okay.   So you recorded at your house?

23      A.    "Sueno Contigo" was recorded at Sandoval Studios

24   in Van Nuys.   Also "Rumbo Al Sur."   And let's see.

25   What's the other one?   Can you --

1        Q.    "Cuando Quiere Un Mexicano"?

2        A.    "Cuando Quiere Un Mexicano"?

3        Q.    Yeah.

4        A.    "Cuando Quiere Un Mexicano" was recorded in my

5    recording studio in the city of Ontario, not in my house.

6    And "De Pueblo En Pueblo" was also recorded in my

7    recording studio.

8        Q.    So you have a recording studio?

9        A.    I did.

10       Q.    You do or you did?

11       A.    I did.  I don't have it no more.

12       Q.    Oh, okay.  Did you sell the equipment?

13       A.    Yes.

14       Q.    But you have all the -- you have all the

15   masters, all the hard drives and stuff.  Was it Pro

16   Tools?

17       A.    "Sueno Contigo" and "Rumbo Al Sur," I have.  I

18   mean, yeah, I do have the masters between

19   (unintelligible) and Pro Tools.

20       Q.    Okay.  Now, after your father died, didn't you

21   try to take some equipment off one of the buses?

22       A.    No.

23       Q.    You don't remember that?

24       A.    No, I don't remember that, taking any

25   equipment off -- off my bus too.